**EXHIBIT 9**
CARL JOINER - 7/21/2022

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON COUNTY

T&W HOLDING COMPANY, LLC;      :
PALAPAS, INC.; AND IT'S FIVE   :
O'CLOCK HERE, LLC;             :
                               :
    Plaintiffs;            :
                               :
v.                             :Civil Action No. 3:22-cv-7
                               :
CITY OF KEMAH, TEXAS;          :
                               :
    Defendant.             :

*********************************
ORAL AND VIDEO DEPOSITION OF
CARL JOINER
JULY 21, 2022
(VOLUME 1 OF 1)
*********************************

ORAL AND VIDEO DEPOSITION OF CARL JOINER, produced as a
witness at the instance of the Plaintiffs, and duly sworn,
was taken in the above-styled and numbered cause on the 21st
of July, 2022, from 1:10 p.m. to 5:06 p.m., before Sheila J.
Nieto, CSR, in and for the State of Texas, reported
stenographically, at Kemah City Hall, 1401 State Highway 146,
Kemah, Texas  77565; pursuant to Notice, the Federal Rules of
Civil Procedure, and the provisions stated on the record or
attached hereto.

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**
CARL JOINER – 7/21/2022

2

1                          I N D E X

2                                           PAGE NO.
   Appearances ....................................   3
3  CARL JOINER
          Examination by Mr. Kilpatrick .................   4
4         Examination by Mr. Helfand ....................  134
          Further Examination by Mr. Kilpatrick ..........  135
5  Changes and Signature ............................  145
   Reporter's Certificate ...........................  147
6
                         E X H I B I T S
7
   NO./DESCRIPTION                           PAGE NO.
8  NOTE:  Exhibits 1 through 11 were marked in Volume 1
          and Volume 2 of Mr. Walter Gant's deposition.)
9  12 ..............................................   48
   9-1-2021 Kemah City Council Meeting agenda
10 13 ..............................................   69
   Resolution Number 2017-11
11 14 ..............................................   80
   Email string re:  6th Street
12 15 ..............................................   82
   City of Kemah application for short-term rental
13 permit
   16 ..............................................   86
14 Certificate of Occupancy application
   17 ..............................................   90
15 (NOTE:  THIS EXHIBIT IS IN SEALED ENVELOPE PER
          MR. HELFAND'S INSTRUCTION)
16 Email string re:  Palapa's meeting
   18 ..............................................  126
17 The City of Kemah, Texas, city building official
   scope of responsibilities
18

19

20

21

22

23

24

25

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

3

```
 1                   A P P E A R A N C E S

 2     FOR THE PLAINTIFFS:

 3          Mr. Brian Kilpatrick
            WILSON, CRIBBS & GOREN, P.C.
 4          2500 Fannin Street
            Houston, Texas  77002
 5          Telephone:  713.222.9000
            Fax:  713.229.8824
 6          Email:  bkilpatrick@wcglaw.com

 7     FOR THE DEFENDANT:

 8          Mr. William S. Helfand
            LEWIS BRISBOIS BISGAARD & SMITH LLP
 9          24 Greenway Plaza, Suite 1400
            Houston, Texas  77046
10          Telephone:  713.659.6767
            Fax:  713.759.6830
11          Email:  bill.helfand@lewisbrisbois.com

12     THE VIDEOGRAPHER:

13          Mr. Keith Bowman
            Carol Davis Reporting, Records & Video, Inc.
14          7838 Hillmont
            Houston, Texas  77040
15          Telephone:  713.647.5100
            Fax:  713.647.5157
16
       ALSO PRESENT:
17
            Mr. Matthew Placek
18

19

20

21

22

23

24

25
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

4

```
 1                    (Whereupon, the reading of the introduction

 2      into the record, pursuant to Rule 30(b)(5), by the reporter,

 3      was waived by all counsel present.)

 4                         THE REPORTER:  Stipulations on the record?

 5                         MR. HELFAND:  Federal Rules of Civil

 6      Procedure.

 7                         MR. KILPATRICK:  Yeah.

 8                         THE VIDEOGRAPHER:  On the record on July 21,

 9      2022, at 1:10 p.m., beginning Card 1.

10                              CARL JOINER,

11      Having been first duly sworn, testified as follows:

12                         E X A M I N A T I O N

13      BY MR. KILPATRICK:

14          Q    Good afternoon, Mr. Joiner.  I'm Brian Kilpatrick,

15      and you -- you understand I represent the plaintiffs in this

16      lawsuit?

17          A    Yes.

18          Q    Okay.  I just want to go over some ground rules.

19      Have you given your deposition before?

20          A    Have I given one?

21          Q    Yes.

22          A    Yes.

23          Q    Okay.  Approximately, how many times?

24          A    Less than five.

25          Q    Less than five?
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1    A    Yeah.

2    Q    Okay.  And what was -- Were you a party in the

3  lawsuit, in which you gave a dep-- deposition, an attorney --

4  any of those depositions?

5    A    We were suing.

6    Q    Okay.

7    A    My wife and I.

8    Q    Okay.  So you understand the -- basically, how it

9  works.  I'm going to ask questions, you -- and you wait 'til

10  I finish my question before you give an answer, so we have a

11  clear record.

12    A    Yes.

13    Q    Okay.  And so I'm going to be referring to the

14  property or Palapas and you understand I'm referring to 606

15  and 608 6th Street, in Kemah, Texas?

16    A    Yes.

17    Q    Okay.  And when I refer to "defendant," I'm,

18  obviously, re-- referring to the City of Kemah.  And the

19  plaintiffs are the -- the three plaintiffs in this lawsuit,

20  T&W Holding Company, LLC, Palapas, Inc., and It's Five

21  O'Clock --

22              MR. HELFAND:  Here.

23    Q    -- Here --

24              MR. KILPATRICK:  Yeah.

25    Q    -- It's 5:00 O'Clock Here, LLC.  So I'll re-- I'll

**EXHIBIT 9**

CARL JOINER - 7/21/2022

6

1  refer to those three as "the plaintiffs."  Okay?

2          Now -- Okay.  Tell me a little bit about your

3  background.  Where did you -- Where'd you go to college and

4  any post-graduate studies you have?

5      A    Grew up in Kansas.  I went to University of Kansas.

6  Moved to Houston in 1973.  Moved to Lake Charles, Louisiana,

7  in 1977.  Came back to the Houston area, in Kingwood, in

8  1983.  Raised our family in Kingwood.  In the late '90s, when

9  our kids were out of high school, we started coming down

10  here, on the weekends, and, eventually, built a weekend home.

11  And since then, have sold our Kingwood house and live here

12  full time.

13      Q    Okay.  And do you -- do you have any professional

14  licenses or certifications, designations, things of that

15  nature?

16      A    Yes, I'm a registered architect in Texas.

17      Q    Okay.  And any other professional certifications or

18  designations in connection with that?

19      A    National Council of Architectural Registration

20  Board, American Institute of Architects.

21      Q    Okay.  And so do you -- let -- let's -- how -- how

22  did you get -- Where did you start in the architecture

23  practice?

24      A    In Houston.

25      Q    Okay.  Did you work for another company?

**EXHIBIT 9**

CARL JOINER - 7/21/2022

7

1       A     Yes.

2       Q     What company was that?

3       A     The Klein Partnership.

4       Q     Okay.  And what -- what type of properties did --

5    did you des-- or -- or what type of buildings did you design

6    or develop?

7       A     Well, when you're first starting out, you're not

8    designing anything.  You're --

9       Q     Okay.

10      A     -- maybe, doing -- working drawings or whatever.

11   But The Klein Partnership is where I started my

12   apprenticeship.  To be a registered architect, you have to

13   have a five-year degree and then work for three years for a

14   firm before you can take your exam.  So I started at

15   The Klein Partnership; and they did, mostly, hospitals.

16      Q     Okay.  And, currently, now, what type of

17   architecture work do you do?

18      A     Well, we've had our firm for forty-five years, but

19   I'm in the process of selling our firm, and so I'm not active

20   in the day-to-day business.  I'm more of a PR person.  But we

21   had been doing schools and municipal work for over forty

22   years.

23      Q     Okay.  What school districts and municipalities

24   have you worked for?

25      A     All the way up to Huntsville, Willis, Humble,

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1    Houston, Cy-Fair, Hitchcock, Clear Creek.  There's probably

2    some more but that's what I know right now.

3         Q    Okay.  And City of Kemah?

4         A    I've done no work for City of Kemah.

5         Q    Okay.  Who -- What architect-- architecture firm

6    designed the City Hall building that we're in right now?

7         A    Okay.  So there's two buildings here.  I'm not sure

8    about over there.  This one was done by a local architect

9    here in Kemah.  For some reason, I can't remember his name.

10        Q    That's okay.  So the other building?

11        A    Yeah, I have no idea who did -- That was done back

12   before my time in Kemah.

13        Q    Okay.  Is there a company called -- named Duron

14   Tech?

15        A    Yeah, that's a contractor, uh-huh.

16        Q    Okay.  You -- You don't work for Duron Tech?

17        A    No.  They're a construction company.

18        Q    Okay.  Does your architecture firm do work for

19   them?

20        A    They have been the contractor on a number of our

21   projects that we were the architect on.

22        Q    Okay.  Okay.  So to prepare for your deposition

23   today, did you review any documents?

24        A    No.

25        Q    No?

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
1        A    No.

2        Q    Did you talk to anyone?  I mean, other than

3   Mr. Helfand.

4        A    No.

5        Q    So do you feel like you have a good recollection of

6   what transpired since you became Mayor through today?

7        A    Just let me say this, that I had very little input

8   on this project --

9        Q    On the --

10       A    -- when I came.

11       Q    On the Palapas?

12       A    Yeah, right.

13       Q    Okay.  So who with the City was kind of, I guess,

14   you can say, taking the lead on the Palapas project?

15       A    Walter Gant.

16       Q    Okay.

17       A    The City Administrator.

18       Q    And so what was -- what was he doing in connection

19   with the Palapas project and the permits?

20            MR. HELFAND:  Objection, calls for

21   speculation.

22       A    Again, that's a day-to-day operation.  I'm the

23   Mayor.  I don't get into that.

24       Q    Okay.  But you -- It -- It was your understanding,

25   he was taking the lead on the Palapas project.
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1          MR. HELFAND:  Objection, calls for

2    speculation; assumes facts not in evidence.

3          THE WITNESS:  Do I need to answer?

4          MR. HELFAND:  And, also, vague as to "the

5    Palapas project."

6          MR. KILPATRICK:  Oh.  Well, I'm sorry.  He --

7    He referred to it as "the -- the -- the project," so --

8          MR. HELFAND:  I know, but he didn't --

9          MR. KILPATRICK:  We'll --

10          MR. HELFAND:  -- refer to it as "the Palapas

11   project."  And it doesn't matter what he said.  Your question

12   is vague.

13          Again, don't talk to me, just ask another

14   question or let him ask one that's -- that's bad, either way.

15   Q    Don't worry.  You -- You can answer the question.

16          So it was your under-- understanding Mr. Gant was

17   taking the lead with respect to the Palapas property?

18   A    Walter Gant is our City Administrator and is over

19   permitting, public works, and that's why I assume he was in

20   charge.

21   Q    Okay.  What about -- Let's see.  So did you look

22   through your emails to prepare for today?

23   A    No.

24   Q    No.  So... Hold on.  Okay.  So when you became --

25   You were elected Mayor in May of 2021.  Is that correct?

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1    A    Correct.

2    Q    So after you took office, what were the primary

3    objectives that you wanted to accomplish as Mayor?

4    A    To make sure Maritage project moved forward; get

5    our Evergreen Memorial Parkway paved; carry out our drainage

6    study; and meet with Council and work together to develop a

7    strategic -- strategic plan for Kemah.

8    Q    Okay.  What about short-term rentals?

9    A    That wasn't in my plan for the City.

10   Q    Okay.  How about with respect to food trucks?

11   A    Wasn't in my plan.

12   Q    Okay.  At some point did the City create a

13   short-term rental subcommittee?

14   A    Yes; I was not on it.

15   Q    Okay.  Who was on the -- the subcommittee?

16   A    You know, I'm -- I'm not totally sure.  I just know

17   that Teresa Vazquez Evans, our -- a Council member, was, I

18   think, was head of it.

19   Q    Okay.  And was Walter Gant on the short-term rental

20   subcommittee?

21   A    I'm not sure.

22   Q    And what about Brandon Shoaf?

23   A    I'm not sure.

24   Q    Okay.  How many times have you been elected Mayor

25   of Kemah?

**EXHIBIT 9**

CARL JOINER - 7/21/2022

12

```
 1        A     Three times.

 2        Q     Okay.  And when -- what -- when was the first time

 3   you were elected Mayor?

 4        A     2015.

 5        Q     Okay.  And the second?

 6        A     2017.

 7        Q     And the third was 2021?

 8        A     Uh-huh.

 9        Q     Okay.  Okay.  And who -- who were your opponents in

10   each of those elections?

11        A     In 2015, Bob Cummings; 2017, I didn't have an

12   opponent; and in 2021, it was Terri Gail and Matt Wiggins.

13        Q     Okay.  Okay.  So the -- How would you characterize

14   the campaign season leading up to the election in 2021,

15   between you, Terri Gail, and Matt Wiggins?

16        A     Contentious.

17        Q     Okay.  What -- What types of things were happening

18   that made it contentious?

19        A     Negative emails, negative billboards, those types

20   of things.

21        Q     Okay.  And out-- out-- outside of the campaign

22   season, were there any disputes between you and Terri Gail

23   before y'all were running against each other?

24        A     Terri Gail and I were friends and then I supported

25   someone that she didn't want to support for water board and
```

```
 1  from that point on, we hadn't been friends.

 2      Q    Okay.  Now, who was that person?

 3      A    Ronnie -- Can't remember Ronnie's last name but...

 4      Q    Okay.  That's okay.  What -- What was the -- What

 5  was the problem that at least she thought about Ronnie?

 6      A    To be sure, I'm not sure.

 7      Q    Okay.  And what about before the campaign season in

 8  the 2021 election, did you have any disputes with Matt

 9  Wiggins?

10      A    Before the '21?  He had turned in 2019 for the same

11  reason that Terri turned, that I didn't support their

12  candidate.

13      Q    Okay.  So as the Mayor, tell me what -- what you do

14  on a day-to-day basis.

15      A    Well, this is a strong Mayor city and it's a -- I'm

16  a volunteer, nonpaid.  So for the most part, I'm here once a

17  week during the afternoons, to communicate with our City

18  Administrator and our Police Chief; and then prepare for

19  Council meetings, and, occasionally, might sit in on a

20  meeting.

21      Q    Okay.  So what types of things do you go over with

22  the City Administrator at that meeting each week?

23      A    Well -- So our City government, again, is a strong

24  Mayor.  I'm over the City Administrator and the Police Chief.

25  That's it.  City Administrator's over the City Hall side.
```

CARL JOINER - 7/21/2022

14

 1    Police Chief is over the Police side.  So I don't necessarily

 2    communicate with them, our City staff or police.  And my

 3    duties are to -- Council sets budget and policy.  It's my

 4    responsibility to carry it out.

 5         Q    Okay.  And when you say it's a -- "a strong

 6    Mayor" -- "Kemah's a strong Mayor city," what -- what do you

 7    mean by that?

 8         A    Well, I'm the CEO of the City.

 9         Q    Okay.  And so by contrast, what would be a -- a

10    weak Mayor city; and how is that different?

11         A    Well, the other one would be City Manager form of

12    government.

13         Q    Okay.  And so with respect to matters involving,

14    you know, Building Code enforcement, what role do you play in

15    that --

16         A    None.

17         Q    -- in enforcement actions?

18         A    None.

19         Q    Okay.

20         A    I had staff for that.

21         Q    Okay.  So are there any types of code enforcement

22    actions that require your approval?

23         A    No.

24         Q    Do -- Do you give directives to the City

25    Administrator with respect to matters relating to code

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1   enforcement?

 2        A    No.

 3        Q    Okay.  Let's see.  I think it's Exhibit 1 -- or,

 4   sorry -- Exhibit 5.  I'm handing you what's been marked as

 5   Exhibit 5.

 6             MR. HELFAND:  Let's just put on the record

 7   that Exhibit 5 is -- What was that number, again?  Can I see

 8   that for one second, Mayor.

 9             THE WITNESS:  Sure.

10             MR. HELFAND:  Thanks.  Exhibit 5 is Kemah 834

11   and 835.  Thanks.

12        Q    Okay.  The -- I've just handed Exhibit 5, which is

13   titled "Performance Improvement Plan"?

14        A    Uh-huh.

15        Q    Well, first, let me just ask you.  What is a

16   performance improvement plan?

17        A    In this particular case, Council asked to review

18   Walter Gant and come up with some things that he could

19   improve on; and as Mayor, I was the one responsible to -- to

20   sign it.

21        Q    Okay.  So who -- who drafted this document?

22        A    I'm assuming, the City Secretary.  I don't recall.

23        Q    Okay.  And this was -- If you look down, it's --

24   it's to Walter Gant, City Administrator, from you, Carl

25   Joiner, as Mayor, dated February 8th, 2022.  And it starts
```

CARL JOINER - 7/21/2022

16

```
 1   off by saying, "Over -- Over the course of your assignment as
 2   City Administrator, Police Chief of the City of Kemah, which
 3   began October 1st, 2019, and October 1st, 2021, was modified
 4   to assume only the -- only the duties of City Administrator,
 5   it has become increasingly evident that you have not been
 6   performing your assigned work in accordance with what is
 7   expected of you."
 8           And it says, "You have failed to address major
 9   deficiencies within the City's departments and/or disregard
10   directives given by the Mayor and City Council."
11           And then when you go further down, there's a list
12   of items starting with Item No. 1, that, "You have failed at
13   times to follow Mayor's, Council's directive," and you get --
14   it gives a list of three examples.
15           What was -- What was -- Just as -- as a bigger
16   picture, what was the major problem with Walter Gant's
17   performance?
18           MR. HELFAND:  Objection, vague as to "major
19   problem."  It also assumes facts not in evidence that there
20   was a major problem.
21      Q    You can still answer.
22      A    Again, this is a Council directive.  You know, as
23   Mayor, I don't vote.  I'm responsible for carrying out their
24   actions by signing this document.
25      Q    Okay.  Well, one -- one of the things on here, Item
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1    number -- I -- I guess, under 1-C, it says, "You -- You

 2    failed -- You have failed at times to follow Mayor, Council's

 3    directives, including" -- And one of which was, "including

 4    Brandon Shoaf in the short-term rental subcommittee, when

 5    asked not to include him."  Did I read that correctly?

 6        A    Yes.

 7        Q    Who asked Walter Gant not -- to -- to not include

 8    Brandon Shoaf in the --

 9        A    I wasn't there --

10        Q    -- short-term rental?

11        A    -- and I wouldn't know.

12        Q    Okay.  But you don't -- you -- I mean, you -- you

13    did -- You signed this and did send it to Walter Gant.

14    Correct?

15        A    Right.

16        Q    Okay.  So you don't dispute that somebody asked, on

17    the City Council, for him not to be on the sub-- on the

18    subcommittee.

19             MR. HELFAND:  Objection, speculation.

20        A    This was reviewed by the City Attorney, and I was

21    instructed to sign it.

22        Q    Okay.  So if you -- Do you disagree with any of

23    the -- Well -- And take your time to look it over, but do you

24    disagree with any of the statements in this document?

25             MR. HELFAND:  I'm sorry.  That would call for
```

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

1   him to speculate; and assumes facts not in evidence that he

2   has the background to agree or disagree.

3           But if you have, you can certainly tell him

4   anywhere where you agree or disagree.

5       A    Again, this is a Council document, and I was

6   instructed to sign it.  I was in on the meeting when this was

7   discussed, but again, I don't vote.  It's a --

8       Q    Okay.

9       A    -- Council document, basically.

10      Q    Okay.  So what -- So a majority of the Council

11  members have to vote to approve this.  Is that correct?

12      A    Yes.

13      Q    Okay.  So when was that vote held?

14      A    I don't recall.

15      Q    Would it have been at a City Council meeting?

16      A    It would have had to be, yes.

17      Q    Okay.

18      A    Uh-huh.

19      Q    And if you go to the second page, under A, it says,

20  "Under your supervision, the following known deficiencies

21  existed in the building department and were not addressed in

22  a timely manner, including but not limited to absence of

23  procedures for information, minimum requirements needed for

24  permits, absence of procedures for Council consideration of

25  variances or plat approvals, allowing items on the agenda

1  without properly evaluating documents in a timely manner,"

2  and that one goes on a little bit more.

3          No. 3, "Lack of any explanation of how to -- how

4  proposed International Code changes vary from prior year's

5  codes and why it's necessary to change now.  This shows lack

6  of quality control of the agenda."

7          "Lack of responses from billing department and

8  other staff members to emails from Council -- Council or

9  told, 'Yes, we'll follow up on it,' and then no response for

10  long periods of time."

11          "Lack of communication with Council regarding how

12  Brandon Shoaf became the Fire Marshal; and further, the

13  hiring of Brandon as the building official, when he lacked

14  credentials for the position; and then, even after a year

15  passed, Brandon still lacks the credentials to perform as the

16  building official."  Did I read all that correctly?

17      A    Yes.

18      Q    Do you -- Do you agree with those statements?

19      A    You'll notice, Council is listed in here, not

20  Mayor.

21          MR. HELFAND:  And just for the record, he's

22  saying, "Council," C-I-L, not counsel, S-E-L, since the City

23  Attorney was also involved.

24          THE WITNESS:  Right.

25          MR. KILPATRICK:  Yeah.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1                    THE WITNESS:  Both.

 2                    MR. HELFAND:  Right.

 3                    THE WITNESS:  Yes, sir.

 4                    MR. KILPATRICK:  Okay.

 5                    THE WITNESS:  But, "the" -- "the" --

 6                    MR. HELFAND:  So this is --

 7                    THE WITNESS:  -- "Council," is what it says

 8    right --

 9                    MR. HELFAND:  This is --

10                    THE WITNESS:  -- here.

11                    MR. HELFAND:  Right.

12                    THE WITNESS:  C-I-L.

13                    MR. HELFAND:  That's Council, C-I-L.  Yes.

14                    MR. KILPATRICK:  Right.

15                    MR. HELFAND:  That's what I wanted to make

16    clear.

17                    MR. KILPATRICK:  Right.

18                    THE WITNESS:  Yeah.

19        Q    So -- So you are -- you are -- You've sat in --

20    in -- in the meetings where all these issues were discussed.

21    Correct?

22        A    Correct.

23        Q    Okay.  And -- Well, as -- as the Mayor, was that

24    your impression of Brandon Shoaf's and Walter Gant's

25    performance?
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

21

```
 1      A    Again, I -- I was not involved, really, in the

 2  conversation.  Okay?

 3      Q    Well -- Okay.  But -- Well -- But you, as the -- as

 4  the Mayor, implement what the -- just like when -- how you

 5  signed this document, you'd implement what the City Council

 6  votes on and approves.  Correct?

 7      A    Right.

 8      Q    Okay.

 9      A    And, again, I don't vote.

10      Q    Right.  And -- And you oversee the City

11  Administrator.  Correct?

12      A    Correct.

13      Q    And you oversee the building official.

14      A    No.

15      Q    Okay.  Who oversees the building official?

16      A    City Administrator.

17      Q    Okay.  So with respect to permitting Building Code

18  and certificates of oc-- of occupancy issues, what role do

19  you play in the decision-making with respect to issuance or

20  revocation --

21      A    None.

22      Q    -- of those things?  None?

23      A    None.  None.

24      Q    Okay.  So that's solely the City Administrator's

25  duty or that that -- that's -- that falls under his
```

CARL JOINER - 7/21/2022

22

1   authority?

2        A    Yes.

3        Q    Okay.  And what if -- what if the -- What if

4   there's a difference of -- in agreement between City Council

5   and City Administrator?

6        A    In reference to, what?

7        Q    If -- For example, if a stop work order is issued

8   on a -- on a project by the -- and -- and City Administrator

9   tells the building official to -- to red-tag a building.  If

10  the City Council disagrees with that decision, how is that

11  handled?

12       A    Well, number one, it would have to come and be on

13  the -- the agenda and someone would have to put it on the

14  agenda.

15       Q    Okay.

16       A    Okay?  So -- Trying to think what the policy

17  says -- But I don't recall right now, since I've been Mayor,

18  where Council is overridden.

19       Q    Okay.  So if the building official revokes the

20  certificate of occupancy, for example, that would have to be

21  approved by Council?

22       A    No.

23       Q    Okay.

24            MR. HELFAND:  Let me object.  That calls for a

25  legal conclusion, by the way.  But your answer's fine.

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1    Q    Okay.  Then, who -- who makes that decision?

2    A    Of revoking?

3    Q    Of revoking the cert-- certificate --

4    A    It would come from --

5    Q    -- of occupancy.

6    A    -- the permitting department.

7    Q    And who -- who is in charge of the permitting

8  department?

9    A    Walter Gant.

10    Q    The City Administrator --

11    A    Uh-huh.

12    Q    -- Walter Gant?

13         Okay.  So the building official would have to get a

14  directive from Walter Gant to revoke a certificate of

15  occupancy.  Is that --

16              MR. HELFAND:  Objection --

17    Q    -- your testimony?

18              MR. HELFAND:  -- calls -- Sorry.  Calls for

19  speculation and a legal conclusion.

20    A    The inspector probably could do it without his

21  approval.

22    Q    The -- The building official?

23    A    Uh-huh.

24    Q    Okay.  And what about -- Same question, but who

25  authorizes the issuance of -- of a building permit?

**EXHIBIT 9**

CARL JOINER - 7/21/2022

24

1      A     More often than not, probably the inspector.

2      Q     The -- Is that -- When you say "inspector," do you

3    mean building official?

4      A     Yeah.

5      Q     Okay.  Well, just from your perspective, where --

6    are -- do you think Brandon Shoaf did a good job while he was

7    the building official?

8                    MR. HELFAND:  Objection, calls for

9    speculation.

10     A     Yeah.  That's not my role as Mayor.

11     Q     Well, no.  I'm just asking you from what you know

12   about his performance, do you think he did a good job?

13                   MR. HELFAND:  Objection, asked and answered;

14   and calls for speculation.  The man's already answered the

15   question.  You can answer it again.

16                   MR. KILPATRICK:  No, no.

17     A     Yeah, it's been answered.  You want to read it

18   back?

19     Q     So you -- So you did -- I -- I thought you said,

20   "That's not my role."

21                   MR. HELFAND:  Right.

22     Q     Well, let me just --

23                   MR. HELFAND:  He just --

24     A     That's my answer --

25                   MR. HELFAND:  He told you he doesn't have an

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1   opinion 'cause that's not his job.

 2        Q    Who made the decision to -- to fire Brandon Shoaf?

 3              MR. HELFAND:  Hang on one second.  Don't do

 4   that.  Okay?  You know the --

 5              MR. KILPATRICK:  What?

 6              MR. HELFAND:  You know that Brandon Shoaf

 7   resigned.  We've got a document that --

 8              MR. KILPATRICK:  Hey, don't coach your

 9   witness.

10              MR. HELFAND:  No, no, I'm not coaching my

11   witness.  I'm coaching you.  It's inappropriate for a lawyer

12   to say something they know is false.  You know it's false.

13              MR. KILPATRICK:  I know it's true.

14              MR. HELFAND:  You have the man's resignation.

15   You heard from his supervisor that he resigned.  Don't ask

16   him a question you know isn't true.

17              MR. KILPATRICK:  Don't coach your witness or I

18   will call the Judge.

19              MR. HELFAND:  Call the Judge right now.  We'll

20   read this whole thing back to him.  We'll read Mr. Gant's

21   deposition, and we'll send him a copy of the resignation

22   letter.  Be careful --

23              MR. KILPATRICK:  I've just got enough.

24              MR. HELFAND:  -- what you wish for.  Go ahead.

25   Call the Judge.
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1                    MR. KILPATRICK:  I -- I know you're concerned

 2     about the fact that --

 3                    MR. HELFAND:  Call the Judge.

 4                    MR. KILPATRICK:  -- he got fired but just --

 5                    MR. HELFAND:  Call the Judge.

 6                    MR. KILPATRICK:  Just cut it out.

 7                    MR. HELFAND:  Call the Judge.  I'm waiting.

 8                    MR. KILPATRICK:  I -- I -- I'm asking you to

 9     cooperate and follow the Rules.  That's all I'm asking.

10                    MR. HELFAND:  Don't ask a question that you

11     know is false.  Mr. Shoaf was not fired, and you have no

12     evidence that Mr. Shoaf was fired.  Don't ask --

13                    MR. KILPATRICK:  Actually --

14                    MR. HELFAND:  -- a question --

15                    MR. KILPATRICK:  That's incorrect.

16                    MR. HELFAND:  Show it to me.  Show it to me.

17                    MR. KILPATRICK:  It doesn't have to be a

18     document.

19                    MR. HELFAND:  Show it to me.

20                    MR. KILPATRICK:  I have very good reason to

21     believe that.  And --

22                    MR. HELFAND:  Okay.

23                    MR. KILPATRICK:  -- it's very inappropriate

24     for you to comment on that during the middle of a deposition

25     and you know that.
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1                    MR. HELFAND:  You have another question?

 2                    MR. KILPATRICK:  Of course, I do.

 3                    MR. HELFAND:  Then ask your question.

 4                    MR. KILPATRICK:  Then stop talking.  Thank

 5      you.

 6                    MR. HELFAND:  Ask your question.

 7                    MR. KILPATRICK:  And follow the Rules, please.

 8                    MR. HELFAND:  Ask your question.

 9                    MR. KILPATRICK:  I will.  I'll -- I'll ask it

10      when I'm ready.

11                    MR. HELFAND:  You haven't ask-- No, you never

12      ask when you're ready.  You're going to ask it now or we're

13      done.

14                    MR. KILPATRICK:  I --

15                    MR. HELFAND:  Go.

16                    MR. KILPATRICK:  I will conduct this

17      deposition --

18                    MR. HELFAND:  Stop talking to me --

19                    MR. KILPATRICK:  -- the way I want to --

20                    MR. HELFAND:  -- and ask a question.

21                    MR. KILPATRICK:  -- 'cause I'm following the

22      Rules and you are not.

23                    MR. HELFAND:  Stop talking to me and ask a

24      question.

25                    Every time you've told me I'm not following
```

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1   the Rules --

2              MR. KILPATRICK:  I'm not even talking to you

3   right now.

4              MR. HELFAND:  -- the Judge told me and told

5   you, I was following the Rules, so I'm going to go with --

6              MR. KILPATRICK:  Let me hear one --

7              MR. HELFAND:  -- the Judge's ruling.

8              MR. KILPATRICK:  -- one -- one example.

9              MR. HELFAND:  I'm going to go with the Judge's

10  ruling, Mr. Kilpatrick.

11             MR. KILPATRICK:  I -- I don't think he would

12  agree with this one, can assure --

13             MR. HELFAND:  Stop talking with me --

14             MR. KILPATRICK:  -- can assure you that.

15             MR. HELFAND:  -- and ask a question or we are

16  done.

17      Q    Back to my question.  So why was Brandon Shoaf's

18  employment terminated?

19             MR. HELFAND:  Mr. Shoaf's employment was

20  not --

21             MR. KILPATRICK:  I'm not asking you.

22             MR. HELFAND:  -- terminated.

23             MR. KILPATRICK:  I'm asking him.

24      A    It -- I agree, it was --

25             MR. HELFAND:  I know, but I want you to

**EXHIBIT 9**

CARL JOINER - 7/21/2022

 1  know --
 2                  MR. KILPATRICK:  Will you stop answering his
 3  questions?
 4                  MR. HELFAND:  Stop talking.  I'm going to talk
 5  to my witness.  Mr. Shoaf's employment --
 6                  THE WITNESS:  Resigned.
 7                  MR. HELFAND:  -- was not terminated.
 8                  MR. KILPATRICK:  Okay.  Let's get the Judge on
 9  the phone.  This is ridiculous.
10                  MR. HELFAND:  Okay.  Go right ahead.
11                  MR. KILPATRICK:  I'm not going to let you do
12  this.
13                  MR. HELFAND:  Sure.  You don't have to let me
14  do anything.  I don't need your permission to do anything.
15  I'm doing what the Rules permit.
16                  MR. KILPATRICK:  Answering questions for your
17  witness?  Yeah, that -- that --
18                  MR. HELFAND:  I haven't answered a question,
19  yet.
20                  MR. KILPATRICK:  Yeah.
21                  MR. HELFAND:  Go ahead.  Get the Judge on the
22  phone.  You want his phone number?  I'll get it for you.
23                  MR. KILPATRICK:  Just -- Just cooperate.
24                  MR. HELFAND:  Hold on.  Hold on.  Hold on.
25  That's the second time -- No.  We're stopping.  We're getting

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1    the Judge on the phone.

 2                    MR. KILPATRICK:  Okay.

 3                    MR. HELFAND:  Hang on.  I'll get it for you --

 4    Every time you don't know what you're doing, you want to

 5    threaten me with getting the Judge on the phone.  Well, get

 6    him on the phone.

 7                    MR. KILPATRICK:  Look, I mean, you're

 8    notorious for this, as Judge Hoyt called you, you know, an

 9    obstructionist and, you know, perjuring yourself.

10    You're -- And I've talked to other lawyers, you're -- you're

11    notorious --

12                    MR. HELFAND:  Mr. Kilpatrick --

13                    MR. KILPATRICK:  -- for this, and I'm not --

14    I'm not going to let you do it at my deposition.

15                    MR. HELFAND:  Mr. Kilpatrick, your ad hominem

16    means nothing to me.  You can't be insulted by someone you

17    don't respect.

18                    MR. KILPATRICK:  It's undeniable.

19                    MR. HELFAND:  I can't be -- You can't insult

20    me because I don't respect your opinion.  You have --

21                    MR. KILPATRICK:  It wasn't my opinion.

22                    MR. HELFAND:  -- no basis.

23                    MR. KILPATRICK:  It was Judge Hoyt and -- and

24    other lawyers in your case, so...

25                    MR. HELFAND:  You -- Obviously, you don't know
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1   how to read a Fifth Circuit opinion.  But you keep bringing
 2   that up like it means something.
 3                  You should talk to Judge Hoyt about that
 4   before you tell me what Judge Hoyt thinks 'cause I know what
 5   Judge Hoyt things about that.
 6                  MR. KILPATRICK:  I would think that you'd stop
 7   acting like that after a Judge has sanctioned --
 8                  MR. HELFAND:  You should talk to Judge Hoyt
 9   before you tell people you know what Judge Hoyt thinks
10   because --
11                  MR. KILPATRICK:  I read his Order.
12                  MR. HELFAND:  Did you read the Fifth Circuit
13   opinion?
14                  MR. KILPATRICK:  That -- The technicality.  It
15   doesn't matter.  Doesn't mean it didn't happen.
16                  MR. HELFAND:  Did you read the Fifth Circuit
17   opinion?
18                  MR. KILPATRICK:  Of course, I did.  I read
19   all of it.
20                  MR. HELFAND:  And what -- Do you know what
21   "vacated" means?
22                  MR. KILPATRICK:  Doesn't matter.
23                  MR. HELFAND:  Do you know what "vacated"
24   means?
25                  MR. KILPATRICK:  Doesn't mean it didn't
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1   happen.
 2                MR. HELFAND:  Have you talked to Judge Hoyt
 3   about his opinion?
 4                MR. KILPATRICK:  Did that really happen?
 5                MR. HELFAND:  Have you talked to -- No.
 6   That's why it --
 7                MR. KILPATRICK:  -- really happened.
 8                MR. HELFAND:  -- it was vacated.  Have you
 9   talked to Judge Hoyt about it?
10                MR. KILPATRICK:  No.  I read his Order --
11                MR. HELFAND:  You're on the record saying --
12                MR. KILPATRICK:  -- and his findings of fact.
13                MR. HELFAND:  -- saying, "This is what
14   Judge Hoyt thinks."
15                MR. KILPATRICK:  That's what his findings of
16   facts and --
17                MR. HELFAND:  I know and respect Judge --
18                MR. KILPATRICK:  -- conclusions of law say.
19                MR. HELFAND:  No, it doesn't.  Listen.  Stop
20   talking for a second.  I know what Judge Hoyt thinks 'cause
21   he and I have talked about this.  You haven't.
22                If you want me to go show Judge Hoyt that
23   you're out in the community telling people what he thinks,
24   you got a record of saying that, I'll be happy to do that.
25   Otherwise, you might want to ask Judge Hoyt what he thinks
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

33

```
 1   about --

 2                   MR. KILPATRICK:  The only reason --

 3                   MR. HELFAND:  -- before --

 4                   MR. KILPATRICK:  The only reason that came up

 5   in the first deposition, you asked what -- what basis I have

 6   to say that, and I said I've read Judge Hoyt's Order --

 7                   MR. HELFAND:  You have -- You --

 8                   MR. KILPATRICK:  -- from the "Tollett" -- from

 9   the "Tollett versus City of Kemah" case.

10                   MR. HELFAND:  Mr. Kilpatrick, you --

11   There's -- There's nothing about this proceeding that

12   involves you making personal attacks on opposing counsel.

13                   MR. KILPATRICK:  You asked and I answered.

14   Okay?

15                   MR. HELFAND:  No.  I asked you to stop.

16                   MR. KILPATRICK:  I will stop.

17                   MR. HELFAND:  I did not --

18                   MR. KILPATRICK:  I'm asking you to stop.

19                   MR. HELFAND:  You keep -- No.  You keep making

20   personal attacks.  I get it.  It's borne of an insecurity.  I

21   understand it.  I can see you shaking while we're talking.

22                   MR. KILPATRICK:  No.  Your --

23                   MR. HELFAND:  So it's okay.

24                   MR. KILPATRICK:  Your hands are shaking right

25   now --
```

1          MR. HELFAND:  Yeah, I -- Well, I'm old.

2          MR. KILPATRICK:  -- and you keep picking up

3  other exhibits that I don't have before the witness, trying

4  to get -- answer questions for him.  It's the most

5  inappropriate thing I've seen.

6          MR. HELFAND:  All right.  Stop talking to me.

7  Let me get you Judge Ellison's phone number and you can call

8  Judge Ellison, and we will read him this entire back-and-

9  forth about Mr. Shoaf being fired.

10          His chambers number is (409) 766-3729.  You,

11  probably, should call Mr. Castro at (409) 766-3555.

12          MR. KILPATRICK:  (409) 766?

13          MR. HELFAND:  3555.  But you haven't fared

14  well so far in calling the Judge but...

15          MR. KILPATRICK:  Well, he was out of town the

16  first time, that's true.

17          MR. HELFAND:  I'm sure he'll remember you from

18  last time.

19          THE WITNESS:  Take a little break, so I can

20  get a bottle of water.

21          MR. HELFAND:  Sure.  Absolutely.

22          (Whereupon, briefly off the record.)

23          (Whereupon, Mr. Kilpatrick is on the phone

24  with Court staff.)

25          (Whereupon, Mr. Kilpatrick requests reporter

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1   to locate answer.)

2                   MR. HELFAND:  Do you have some questions for

3   him while you're waiting for the Judge?

4                   MR. KILPATRICK:  Well, she just found the

5   spot.  Hang on.  We'll give it a second, I guess.

6                   (Whereupon, briefly off the record.)

7                   MR. HELFAND:  I need the court reporter to put

8   this on the record, please.

9                   This is the third time --

10                  MR. KILPATRICK:  Let me say what I said.  I

11  just need your cooperation, and I need you to follow the

12  Rules and I -- all I ask is that you don't answer the

13  question for your witness and to state facts that you want

14  your -- the witness to say because that's improper and

15  doesn't follow the Rules.

16                  MR. HELFAND:  I have not yet done that, so we

17  don't have to worry about that.

18                  MR. KILPATRICK:  Just --

19                  MR. HELFAND:  What I -- Mr. Kilpatrick, it's

20  my turn to talk.  Stop talking.

21                  I've told you, if you wish to suspend the

22  deposition under Rule 30D to present a motion to the Court,

23  you may do so.  If you wish to continue asking the Mayor

24  questions, you may do so, but we are not going to sit here

25  right now, so either ask more questions or suspend the

CARL JOINER - 7/21/2022

```
 1   deposition as the Rules permit.

 2                 MR. KILPATRICK:  I would prefer that we work

 3   this out together without having to waste the Court's time

 4   because it's very simple.  All I'm asking is, don't answer

 5   the question for your witness, don't state facts like you did

 6   here.  I asked, "Who made the decision to fire Brandon

 7   Shoaf?"

 8                 And you -- And you interrupted your witness

 9   from answering and said, "He was -- He was -- He didn't -- He

10   wasn't fired.  He -- He resigned."  That is inappropriate.

11                 MR. HELFAND:  That's not --

12                 MR. KILPATRICK:  That's not a legal objection.

13                 MR. HELFAND:  That's not what happened.  The

14   record is clear on what happened.

15                 Do you have more questions for the witness or

16   do you wish to suspend the deposition?

17                 MR. KILPATRICK:  I, of course, have more

18   questions.  All I ask is that you not answer questions for

19   your witness, don't coach your witness and follow the Rules.

20   It's very simple.

21                 MR. HELFAND:  I'm going to tell you for a

22   fourth time.  I haven't coached the witness.  I haven't

23   answered a question for the witness.  And the fact that you

24   think I have doesn't change the fact that it hasn't happened.

25                 But we're not going to agree on that,
```

**EXHIBIT 9**
CARL JOINER - 7/21/2022

1    Mr. Kilpatrick, no matter how many times you say it, so stop.

2              If you have a question for the witness, now's

3    the time to ask; otherwise, we're going to consider the

4    deposition suspended.  Go ahead.

5        Q    Okay.

6              MR. HELFAND:  You know the Talking Heads?

7              MR. KILPATRICK:  Yeah, I like the Talking

8    Heads.

9              MR. HELFAND:  "Singing it don't make it so,"

10   is one of their lines.

11             MR. KILPATRICK:  Oh, you used that one at the

12   last deposition.

13             MR. HELFAND:  It -- It's -- It's apt in your

14   case.

15             MR. KILPATRICK:  The record speaks for itself.

16       Q    Okay.  Mr. Joiner, are you ready to proceed?

17       A    Yes.

18       Q    Okay.

19             MR. HELFAND:  He is Mayor Joiner.

20             MR. KILPATRICK:  Okay.  So Mayor Joiner.

21       Q    Okay.  So back to Brandon Shoaf.  When was his

22   employment with the City terminated as a building official?

23       A    I don't recall.

24       Q    Okay.  But was it approximately in January, 2022?

25             MR. HELFAND:  Objection, witness speculation.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

38

1     A    I -- I don't -- I don't recall really.

2     Q    Okay.  And -- Well, looking at that letter that's

3   sitting in front of you, Exhibit 5 --

4     A    This one?

5     Q    Yes.  It's dated February 8th, 2022.  At this point

6   in time, had -- Well -- And -- And actually look at also the

7   other exhibit, 6, right here.

8          MR. KILPATRICK:  You can take your copy back,

9   Bill.

10         MR. HELFAND:  Exhibit 6 is number --

11         MR. KILPATRICK:  Is -- Is this one.

12         MR. HELFAND:  -- 1032.

13    Q    So I put in front of you Exhibit 6, and it purports

14  to be a letter from Brandon Shoaf, building official, fire

15  marshal, to City of -- City of Kemah, Walter Gant, City

16  Administrator, dated January 25th, 2022.

17    A    Okay.

18    Q    And it states that, "Allow this to serve as my

19  official notice of resignation as the building official and

20  fire marshal for the City of Kemah."  So was this the date --

21    A    I -- I don't know.

22    Q    -- he actually resigned?

23    A    This is the first time I've seen that --

24    Q    Okay.

25    A    -- seen this.

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

39

```
 1        Q    Okay.  So today is the first date you've seen this
 2   document?
 3        A    Yes.
 4        Q    So... Now I'll ask you again in a dif-- about a
 5   different part of this.  What -- What brought about
 6   Mr. Shoaf's resignation?
 7                 MR. HELFAND:  Objection, speculation.
 8        A    I don't know.
 9        Q    If this -- If today's the first time you've seen
10   this document, that's a letter of resignation, how did you
11   even know that he resigned?
12        A    I didn't for awhile, to tell you the truth.  I'm
13   not -- I'm not over him.
14        Q    Sir?
15        A    I'm not over him.  Walter Gant is.
16        Q    Oh, okay.
17        A    And just so you know, there's an ordinance that I
18   don't have firing powers.  Okay?
19        Q    Okay.  So -- So your role as the Mayor, you -- you
20   don't have the power to -- to fire the building official?
21        A    No.
22        Q    Okay.  So --
23        A    I don't even have the power to fire City
24   Administrator.
25        Q    Okay.
```

EXHIBIT 9

CARL JOINER - 7/21/2022

```
 1      A     Only Council can.

 2      Q     Okay.  Thank you, for pointing that out.

 3            So was Mr. Shoaf's resignation brought before

 4   Council in any meetings that you attended?

 5      A     Not specifically.

 6      Q     Okay.

 7      A     It's not required.

 8      Q     Okay.  Well, was the termination of his employment

 9   discussed at any Council meetings?

10      A     I don't think so.

11      Q     Were there any Council meetings where -- that you

12   attended, where Council members expressed their, I guess,

13   complaints about his performance?

14      A     That would not be done in a open Council meeting.

15      Q     Okay.  Do you recall in February -- February 16th,

16   2022, there's a City Council meeting where the -- Veronica

17   Crow and her husband came and addressed Council about issues

18   related to their property on Bay Street?

19      A     Yes.

20      Q     Okay.

21                MR. KILPATRICK:  Oh, wait.

22                (Whereupon, Mr. Kilpatrick is on the phone

23   with Court staff.)

24      Q     Okay.  So the -- Again, back to the February 16,

25   2022, City Council meeting, the Crows expressed their
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1  concerns about what information they were getting from

2  Mr. Shoaf in regard to getting permits for their project

3  that -- on the Bay Street property?

4          MR. HELFAND:  Excuse me.  That assumes facts

5  not in evidence.

6      Q    Do you remember that?

7          MR. HELFAND:  Do you remember whether that was

8  what happened?

9          THE WITNESS:  No.

10     A    I remember that they were at the meeting, yes.

11     Q    Okay.  Well, tell me what you remember about what

12  they had to say at that City Council meeting.

13     A    It was somewhat of a contentious Council meeting,

14  in that the neighbors were -- were very upset at them, that

15  it appeared they were doing things on their site without

16  permits, et cetera, and so they brought it to City Council.

17     Q    Okay.  And do you recall Doug Meisinger stating

18  what he learned about the situation during the City Council

19  meeting?

20     A    Somewhat, yeah.

21     Q    Okay.  And -- Well -- And -- And you actually met

22  with the Crows before that City Council meeting to discuss

23  their project.  Correct?

24     A    Yes.

25     Q    And isn't it true you didn't want them putting

CARL JOINER - 7/21/2022

1    short-term rentals on that property?  Is that a fair

2    statement?

3         A    No.

4         Q    Okay.  What -- What -- What did you discuss with

5    the Crows with respect to the short-term rental part of that

6    project?

7         A    Number one, I don't recall that it was short-term

8    rental.  What it was, was a barndominium, and the neighbors

9    were upset about that.

10        Q    Okay.  Just -- At this City Council meeting, do you

11   recall stating that --

12             MR. KILPATRICK:  Oh, that's your phone.

13        Q    (CONTINUING) -- do you recall stating something

14   along the lines of you were glad that they took out the

15   short-term rental component of their project?

16             MR. HELFAND:  Objection, assumes facts not in

17   evidence.

18        A    I don't recall that.

19        Q    Okay.  And do you also recall Doug Meisinger

20   making -- making statements about how the City had targeted

21   certain businesses in the City that they've shut down even

22   though they had permits?

23        A    No.

24        Q    You don't remember that?

25             MR. HELFAND:  Excuse me.  That also assumes

**EXHIBIT 9**

CARL JOINER - 7/21/2022

43

1   facts not in evidence.

2        Q     Do you --

3        A     No.

4        Q     Okay.  So there was also a gentleman who spoke at

5   the hearing about his project for the food -- food truck

6   park.  Do you recall that?

7        A     At that meeting?

8        Q     Yes.

9        A     No.

10       Q     Or -- Or -- Was there an agenda item on that for

11   the approval of a food truck park?

12       A     I don't recall.

13       Q     You don't?  Are you familiar with the -- the food

14   truck park at -- for the property called Bu-- Bubble

15   Jungle --

16       A     Yes.

17       Q     -- next door to -- And it -- That's next door to

18   Palapas.

19       A     Yes.

20       Q     Okay.  And did the City approve a food truck park

21   to be located at -- at that property adjacent to Palapas'

22   property?

23       A     Yes.

24       Q     Okay.  And -- So from the time that you have been

25   Mayor, approximately, how many food trucks in the City of

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1    Kemah had City permits to operate food trucks within the
 2    City?
 3                   MR. HELFAND:  Objection, calls for
 4    speculation.
 5         A    I -- I don't recall.
 6         Q    Okay.  Do you recall Brandon Shoaf speaking at a
 7    City Council meeting in August, 2021, stating that there was
 8    only one food truck in the City that had a City permit?
 9                   MR. HELFAND:  Hang on.  That's a multifarious
10    question.  There's two questions there.  Does he consider --
11    remember him speaking; and do you -- does he know what he
12    said?  Which one do you want him to answer?
13                   MR. KILPATRICK:  Either one.
14                   MR. HELFAND:  Well, no.  He -- We have to know
15    which one he's answering 'cause if he says yes to one and no
16    to the other.  Look, just -- Do you want to know if he
17    recalls Mr. Shoaf speaking at all at that Council meeting or
18    do you want him to -- to tell you whether he remembers
19    Mr. Shoaf ever saying what you claim you think Mr. Shoaf
20    said?
21         Q    Did you understand my question?
22         A    Could you repeat that, please.
23                   MR. HELFAND:  It doesn't matter whether he
24    understands it.  He's not answering it, so -- You either --
25    It's a multifarious question.  It's not a fair question
```

1    'cause it's a multifarious question.  Just break it up into

2    two questions.

3        Q    Okay.  Do you recall Brandon Shoaf speaking at any

4    City Council meeting about the number of food truck permits

5    that had been issued by the City?

6        A    No.

7        Q    Never?

8        A    Correct.

9        MR. HELFAND:  He does that a lot, where he'll

10    say something and you tell him the answer and then he says,

11    "That's your answer?", so you have to say it twice sometimes.

12    It's just a -- That's his thing.

13        MR. KILPATRICK:  Whose phone is that?  Oh,

14    that's yours.

15        Q    Okay.  Let's see.  Do you recall the food truck at

16    the Palapas property being towed on October 11th, 2021?

17        A    No, I was not a part of it.

18        Q    Okay.  But -- But you -- you know now, sitting here

19    today, that that -- it was towed around that time?

20        A    I don't even know that it was towed.  Okay.  I

21    wasn't a part of it.

22        Q    Okay.  Who was part of that?

23        MR. HELFAND:  Objection, calls for

24    speculation.

25        A    You need to talk to Walter Gant about that.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

46

```
 1        Q    Well, I did, and -- and he didn't know.

 2                 MR. HELFAND:  No, no, don't -- No, don't do

 3      that.  Don't tell him what happened in another deposition.

 4      Ask him a question.

 5                 MR. KILPATRICK:  I'm asking.  You -- You

 6      interrupted --

 7                 MR. HELFAND:  'Cause that's not what --

 8                 MR. KILPATRICK:  -- me.  I wasn't done.

 9                 MR. HELFAND:  That's not what Walter said, so

10      don't --

11                 MR. KILPATRICK:  I wasn't done talking.

12                 MR. HELFAND:  You tell me when you're done

13      talking.  I'll tell you the same thing.  You ask him

14      questions.  You don't tell him what you think another witness

15      said in a deposition 'cause you're mischaracterizing

16      Mr. Gant's testimony.

17                 MR. KILPATRICK:  There's nothing wrong with me

18      starting off my question like that.

19                 MR. HELFAND:  Stop interrupting.  You're not

20      listening.

21                 MR. KILPATRICK:  You're interrupting me and my

22      deposition.

23                 MR. HELFAND:  No, no, it's our deposition.

24      Who made it your deposition.

25                 MR. KILPATRICK:  This is my one chance to
```

```
 1    depose --
 2                    MR. HELFAND:  Yes.
 3                    MR. KILPATRICK:  -- Mayor Joiner.
 4                    MR. HELFAND:  So ask him questions.  Don't
 5    tell him things.  What you told him is incorrect.
 6                    MR. KILPATRICK:  You're --
 7                    MR. HELFAND:  Now ask him a question.
 8                    MR. KILPATRICK:  Stop coaching, again.  Mark
 9    that.
10                    MR. HELFAND:  Yeah, mark that.  That's
11    coaching, according to Mr. Kilpatrick.  Mark that as
12    coaching.  Put a big C next to it.
13                    Do you have a question for the man?
14                    MR. KILPATRICK:  Yes, of course, I do.
15                    MR. HELFAND:  Ask a question.
16                    MR. KILPATRICK:  Sorry for the interruption.
17    Q    So -- So the only person who would know who
18    authorized, that would be Walter Gant?
19                    MR. HELFAND:  Objection, calls for speculation
20    as to who -- who the only person, the only people who would
21    know are.
22    Q    Well, who -- From your understanding, who -- who
23    would know, who would I need to ask about the food truck
24    being towed on October 11th, 2020?
25                    MR. HELFAND:  Objection, calls for
```

1   speculation.

2        Q    You can answer.

3                 MR. HELFAND:  Do you know?

4                 THE WITNESS:  No.

5                 MR. HELFAND:  Well, tell him that.

6        Q    Well, you said Walter Gant a second ago.

7                 MR. HELFAND:  Well --

8        Q    Anyone else?

9                 MR. HELFAND:  -- he did say Walter Gant.

10       Q    That's it?

11       A    Right.

12       Q    Okay.  And so if Walter Gant didn't know, then

13  what?

14       A    I have no idea.

15       Q    Okay.  Okay.  I'm going to hand you what's been

16  marked as Exhibit 12.

17                 (Exhibit 12 marked.)

18                 MR. HELFAND:  Okay.  Once again, we run into a

19  problem that is a document that's not been produced in this

20  case.  I'm not going to do anything about it 'cause it

21  reports to be City Council meeting minutes of

22  September 1st -- Or, sorry -- the agenda for September 1st,

23  2021.

24                 But I'm going to tell you, Mr. Kilpatrick, the

25  Rules do not allow you to use documents in a deposition that

```
 1   have not been produced.
 2              MR. KILPATRICK:  Well, do you have a problem
 3   with me using this to ask him questions?
 4              MR. HELFAND:  I -- I feel like you're not
 5   listening to me.  I said I'm not going to make an issue of it
 6   as to this document because it looks like it's a public
 7   record.  But if you have other documents that have not been
 8   produced, you're not going to be able to use them.
 9              MR. KILPATRICK:  Okay.
10              MR. HELFAND:  You can't question a witness
11   about a document you haven't disclosed or otherwise
12   exchanged.
13        Q    Okay.  Anyway, let's go to the -- Page 3.
14        A    Okay.
15        Q    Or -- Or actually make that page -- Page 4, at the
16   top, where we see No. 3.  It's -- So in this Exhibit 12, it
17   says, on Page 4 of 4 of the agenda, Item 3, at the top, says,
18   "Possible legal action on lack of enforcement of
19   Ordinance 1178, 1188, and 1189, and the City adopted 2009
20   International Building Code, which requires changing from
21   single family to hotel-motel building codes for STRs."  And
22   then has a "Joiner" in parentheses to the right.  Do you see
23   that?
24        A    Yes.
25        Q    Was this an item that you put on the agenda for the
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1   executive session?

 2        A     Yes, obviously.

 3        Q     Okay.  So do you believe that --

 4              MR. HELFAND:  Go ahead and ask your question.

 5   I want him to wait.

 6        Q     Okay.  Do you believe that STRs, that's short-term

 7   rentals, require changing from the single family to hotel-

 8   motel building codes?

 9              MR. HELFAND:  Let me object that that invades

10   the legislative privilege, and he will not answer questions

11   involving the legislative privilege.

12        Q     Okay.  And -- Yeah.  Don't -- Don't answer that to

13   the extent it involves anything that's, you know, attorney-

14   client privilege or legislative privilege.  But I'm just

15   asking you, as the Mayor of the City, irrespective of what

16   was discussed at the -- during executive session, do you

17   believe that short-term rentals are required to change from

18   single family to hotel-motel Building Code?

19              MR. HELFAND:  Okay.  I'm -- I'm afraid you

20   don't understand the legislative privilege; although, I

21   warned you of this when you asked for the Mayor's deposition.

22   You are not permitted to ask the Mayor his thought processes

23   regarding why he put something on the agenda, conversations

24   he has with Council members.  You're not entitled to his

25   thought processes regarding the -- the business of the City.
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1      Q    Okay.
 2               MR. HELFAND:  That's legislative privilege.
 3      Q    And I -- I don't want to ask you about why you put
 4  it on the agenda, why -- or what you discussed in executive
 5  session --
 6               MR. HELFAND:  But that's not the limitation.
 7  You can't even ask him what -- what he thinks about it, which
 8  is what you just asked.
 9      Q    I'm just ask-- I'm just asking what you,
10  personally, do you believe that short-term rentals are
11  required to change from single family to hotel-motel building
12  codes?
13               MR. HELFAND:  You're -- He -- There's no him,
14  personally.
15               No offense.
16               You're -- He's the Mayor.  You're asking him
17  questions as the Mayor of somebody he put on the agenda.
18  It's within the legislative privilege, and he's not going to
19  answer it.  Move on.  And if you think the law requires it,
20  tell the Judge or show it to me, and I'll look at it.  But
21  that's directly within the legislative privilege.
22               I warned you this, when you told me you wanted
23  the Mayor's deposition, and you told me, "I'm not going to
24  get into the Mayor's thought processes regarding how he
25  conducts himself as the Mayor."
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

52

```
 1                   MR. KILPATRICK:  Well, no.  Initially, you --
 2       you refused to produce him altogether --
 3                   MR. HELFAND:  No, that's not --
 4                   MR. KILPATRICK:  -- until, once again, I
 5       proved that -- that -- that doesn't apply.
 6                   MR. HELFAND:  Brian.  Brian.  If you have
 7       another question for the man, ask him.  He's not asking (SIC)
 8       questions about his thought processes as a member of the
 9       legislative body.
10          Q    And I'm not asking you that.  That's not my
11       question.  I just want to know, do you believe that STRs,
12       short-term rentals, have -- or have -- are required to change
13       from single family to hotel and motel building codes?
14                   MR. HELFAND:  What -- what he believes as the
15       Mayor is privileged.  He's not answering the question.
16       You've now asked it three times.  I've told you it's
17       privileged.  He's not asking (SIC) it.
18                   And then what you say is, "I don't want to
19       know what you believe.  Now, do you believe?"
20                   You have another question 'cause this one's
21       done?
22          Q    Well, you recall stating in open sessions during
23       City Council meetings that you believe that STR, short-term
24       rentals, are required to comply with hotel-motel building
25       codes.  Correct?
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

53

```
 1                  MR. HELFAND:  That assumes facts not in
 2    evidence.
 3                  Have you said that?
 4                  THE WITNESS:  I don't recall.
 5                  MR. HELFAND:  Okay.
 6        Q    Never -- So sitting here today, you don't recall
 7    ever saying --
 8        A    I don't recall.
 9        Q    -- those words.
10        A    I don't recall.
11        Q    And you don't be-- So -- And you won't answer my
12    question whether you believe -- I'm not talking about what
13    you discussed with the City Council.  Talking about outside
14    of your role as the Mayor on City Council in your legislative
15    capacity, your role as the Mayor and implementing what City
16    Council has enacted, what your position is, if -- do -- does
17    a short-term-rental property have to comply with hotel-motel
18    building codes?
19                  MR. HELFAND:  Mayor, don't answer that
20    question.  It's privileged.  But it's now been asked four
21    times, and if you ask it again, we're going to leave.
22                  MR. KILPATRICK:  I'm asking a different way.
23                  MR. HELFAND:  I know, but it's the same
24    question.
25                  MR. KILPATRICK:  And it's a baseless
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

54

```
 1    objection.
 2                    MR. HELFAND:  It's the same question.
 3                    MR. HELFAND:  Okay.  Well, we'll take that one
 4    up with the Judge, too.
 5                    MR. HELFAND:  Okay.  Now, move on to a
 6    different one, though.
 7         Q    So since you testified earlier that you don't play
 8    a role in Building Code enforcement, why -- why were you
 9    meeting with the Crows at their property?
10         A    Because the neighbors had asked me to meet with
11    them.
12         Q    Okay.  So sometimes you get involved in certain
13    permit code enforcement, things of that nature, those issues.
14         A    Yes.
15         Q    Okay.  And --
16         A    I miss -- met with Mr. Placek because some of his
17    neighbors asked me to do it.
18         Q    Okay.  Which neighbors asked you to meet with
19    Mr. Placek?
20         A    One of the bars there.
21         Q    Okay.  Which -- Which bar?
22         A    I think it was Voodoo.
23         Q    The Voodoo Lounge?
24         A    (NODS HEAD AFFIRMATIVELY.)
25         Q    Who -- Who's the person at Voodoo Lounge that asked
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

55

```
1    you to do that?
2         A    I think it was him.  That was Harry -- Harry.
3         Q    Okay.  So you remember the meeting you had with
4    Mr. Placek?
5         A    Yes, we met one evening at a restaurant.
6         Q    Okay.  Where was the restaurant?
7         A    In Clear Lake Shores.
8         Q    Okay.  And do you -- What did you discuss at that
9    meeting?
10        A    He had concerns and asked me to set up a meeting at
11   City Hall, I think it was that following Monday, that he'd
12   been in town and wanted to get everyone together, so I did
13   set that up.
14        Q    Okay.  And tell me what happened at the meeting.
15        A    It didn't happen.
16        Q    Oh, there was no meeting?
17        A    Yeah, Mr. Placek -- I don't remember exactly what
18   happened, but he couldn't make the meeting, so it didn't
19   happen.
20        Q    Okay.  And do you recall telling Mr. Placek that if
21   he got rid of the short-term rentals, that you would get him
22   a certificate of occupancy for the bar?
23        A    No.
24        Q    No?
25             MR. HELFAND:  Objection, leading.  Object that
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

56

```
1    that assumes facts in evidence.

2                  What don't you ask him if he said something,

3    not that he said something, 'cause I'm going to have to

4    object every time you say, "Do recall saying," something,

5    unless you lay a predicate that he actually said it.

6                  But the Mayor's already rejected that one, so

7    move on to the next question.

8        Q    Okay.  So what exactly did you discuss with Matt

9    Placek when you did -- when -- when you met with him at the

10   restaurant?

11       A    I've answered that.

12       Q    What particular issues?

13       A    I don't recall.  It's been a long time ago.

14       Q    Okay.  Well, let me just throw out some things that

15   may refresh your recollection.  Did you discuss the

16   short-term rental units on the third --

17       A    I don't recall.

18       Q    -- and fourth floors?

19       A    I don't recall.

20       Q    Did you discuss the food truck?

21       A    I don't recall.

22       Q    Did you discuss the first and second floors inside

23   the building?

24       A    I don't recall.

25       Q    Do you -- Do you recall even generally what the --
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

57

1    what the issue was at that time?

2         A    Getting his permit.  That's what I recall.

3         Q    Okay.  And what was your understanding of the

4    problem with getting the permit?

5         A    That's why I set the meeting up.

6         Q    But --

7         A    Because I'm not -- I'm not involved in that

8    process.  I was asked to set the meeting up and I did.

9         Q    Okay.  Was it -- Anyone -- Did anybody else attend

10   that meeting?

11        A    It didn't happen.

12        Q    No.  I meant the meeting at the restaurant.

13        A    No.

14        Q    Okay.  How often do you meet with business owners

15   that are ex-- experiencing issues getting permits?

16        A    Not very often.

17        Q    Okay.  So since you've been Mayor, approximately,

18   how many times have you done that?

19        A    Less than five, probably.

20        Q    Okay.  Which -- Which other business owners have

21   you had to meet with?

22        A    Bubble Jungle; this one we talked about; the Crows.

23   I think that's it.

24        Q    Okay.  Those three?

25        A    (NODS HEAD AFFIRMATIVELY.)

1    Q    Okay.  What about Doug Meisinger?

2    A    What about him?

3    Q    Did -- Did you meet with him about issues with

4    permits or certificates of occupancy with his property --

5    A    No.

6    Q    -- or -- or his business?

7    A    No.

8    Q    No?  What about Matt Wiggins?

9    A    No.  They don't speak to me.

10   Q    Okay.  Well, within -- within your experience as an

11   architect, do -- do you have an understanding of the -- the

12   Building Code -- the applicable Building Codes?

13   A    Yes.

14   Q    Okay.  So in the City of Kemah, the 2009

15   International Building Code that we've marked as

16   Exhibit 11 --

17   A    Uh-huh.

18   Q    -- is this the Code that applies --

19        MR. HELFAND:  Is the Code?

20   Q    -- the Building Code that applies in the City of

21   Kemah?

22        MR. HELFAND:  Object that it calls for a legal

23   conclusion; speculation.

24   Q    Well -- And -- Let me rephrase that, actually.  For

25   anything that is built after 2009, would the 2009

```
 1    International Building Code be the applicable Code that an

 2    owner would have to comply with?

 3                   MR. HELFAND:  Objection, calls for a legal

 4    conclusion; and speculation.

 5         Q    You can still answer.

 6         A    Yes.

 7         Q    Okay.  What about if something was built in 2008 --

 8                   MR. HELFAND:  Objection, calls for a legal --

 9         Q    -- which Code would apply?

10                   MR. HELFAND:  Pardon me.  Calls for a legal

11    conclusion; speculation.

12                   THE REPORTER:  What?

13                   MR. KILPATRICK:  Sorry.  He keeps

14    interrupting.

15                   THE REPORTER:  "What about if something was

16    built in 2008, which" --

17         Q    What about if something was built in 2008, which

18    Code would apply?

19                   MR. HELFAND:  Objection, calls for a legal

20    conclusion; and speculation.

21         Q    You can answer.

22                   MR. HELFAND:  You can answer if you know.

23         A    Well, where is it being built at?

24         Q    Well, I guess the point I'm getting at is,

25    generally speaking, the -- the 2009 Code is going to apply to
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

60

1    anything that was built after 2-- on -- in 2009 and after.

2    Right?

3        A    Correct.

4              MR. HELFAND:  Objection, legal conclusion;

5    speculation.

6        Q    So if something was built in the '80s or '90s, the

7    2000 Code -- 2009 Code, generally speaking, would not apply

8    to something that's -- that was built before that.

9              MR. HELFAND:  Objection, legal --

10       Q    Correct?

11             MR. HELFAND:  -- conclusion; speculation.

12       Q    Is that a fair statement?

13       A    No.

14       Q    Okay.  Well, tell me what would apply in -- under

15   those circumstances.

16             MR. HELFAND:  Objection, legal conclusion;

17   speculation.

18       Q    You can answer.

19       A    As an architect or as a Mayor?

20       Q    Well, I'm -- I'm just saying, you know, with your

21   experience as an architect, you know -- you -- you said you

22   know these things, so which -- which Code would someone have

23   to comply with...

24       A    Depending on the amount of work --

25       Q    Okay.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

61

1      A    -- it would be this Code.

2      Q    Right.  So -- There -- And there are provisions

3   that say, if you build more than fifty percent of the value,

4   and things of that nature, that -- that it could -- that you

5   have to bring it up to current Code.  Correct?

6              MR. HELFAND:  Excuse me.  Mischaracterizes the

7   document; calls for speculation and a legal conclusion.

8      Q    That's fine.  You can answer.

9      A    No, I -- I'd have to research that.  Okay?

10     Q    Yeah, I understand there's specific situations but

11  just broadly speaking, the --

12     A    I can't broadly speak.

13             MR. HELFAND:  Yeah.  He can't broadly speak of

14  what a statute says.

15     Q    Okay.  So in the 2009 Building Code that's sitting

16  in front of you as Exhibit 11 --

17     A    Uh-huh.

18     Q    -- is there anywhere in there that authorizes a

19  building official to issue a zero occupancy red tag?

20             MR. HELFAND:  Objection, calls for speculation

21  and a legal conclusion.

22             Do you know?

23             THE WITNESS:  No.

24     Q    Okay.  Are you aware of any red tags being placed

25  on any buildings in the City of Kemah since you've been

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1   Mayor, that provide for or that state a zero occupancy for a

 2   building?

 3        A    No.

 4        Q    No?  Did you know that Brandon Shoaf put a zero

 5   occupancy red tag on Palapas?

 6             MR. HELFAND:  Objection, assumes facts not in

 7   evidence.

 8        A    No.

 9        Q    Okay.  In your ex-- With your experience as an --

10   as an architect, how do you determine the -- the occupancy

11   number for a building?

12        A    "Occupancy number," what do you mean?

13        Q    Like the -- the actual occupancy, the number of

14   people that can be inside of a building.

15        A    Well, first, you start with what the occupancy is,

16   then you go to that section.

17        Q    The occupancy type?

18        A    Uh-huh.

19        Q    Okay.  So you -- Occupancy type.  And then from

20   there, how do you arrive at a number for any given --

21        A    Follow that section in the Code.

22        Q    Okay.  So would it be the occupancy type, times the

23   square foot -- or -- and then look at the square footage --

24        A    Depends what it -- Depends what this Code says.

25        Q    Okay.  But it's all in -- in -- It's all in the
```

CARL JOINER - 7/21/2022

63

1     Code?

2         A     Uh-huh.

3         Q     Okay.  So when a building official goes out and

4     makes determinations on the number of occupants that can be

5     in a property pursuant to a certificate of occupancy, that

6     would be determined based on the calculation in the Code.

7               MR. HELFAND:  I'm sorry.  Now you want him to

8     testify what a building per-- official's supposed to do?

9     That's speculation.

10              MR. KILPATRICK:  Well, that's also what

11    architects do.

12              MR. HELFAND:  Let me just stop for just a

13    moment here.  You asked to take the deposition of the Mayor

14    of the City of Kemah about issues relating to -- standing in

15    this case.

16              You've now found out that he's an architect,

17    which I'm impressed, too, but we're -- he's not an expert

18    witness on building Codes or architecture.  I'm letting him

19    answer 'cause you -- it's just -- it -- it -- you're using up

20    time that has nothing to do -- goes nowhere and does nothing,

21    as they say on the U-- USS Enterprise.

22              But he can't testify -- It's speculating as to

23    what a building official is supposed to do.  He can testify

24    what architects do.

25              MR. KILPATRICK:  If he knows, he can answer.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

64

```
 1                 MR. HELFAND:  Sure.  That's why I said, it's
 2   speculation.
 3                 MR. KILPATRICK:  Okay.
 4                 MR. HELFAND:  But I will say this.  I'm not
 5   going to sit here for several hours and have you ask
 6   questions about architects and -- and neither is he.
 7   That's -- He's --
 8                 MR. KILPATRICK:  Oh, don't worry.  I'm not.
 9                 MR. HELFAND:  -- to do.  Okay.
10                 THE WITNESS:  How about if we take a little
11   break?
12                 MR. HELFAND:  Yeah, that'd be great.
13                 MR. KILPATRICK:  Okay.
14                 THE VIDEOGRAPHER:  Off the record at
15   2:37 p.m., ending Card 1.
16                 (Whereupon, briefly off the record.)
17                 MR. HELFAND:  Five-minute break,
18   Mr. Kilpatrick.  If you're leaving the room, we're leaving.
19                 MR. KILPATRICK:  Look, we -- we skipped lunch
20   to get started at 1:00 'cause you had to take a phone call
21   earlier, so I -- I expect you to --
22                 MR. HELFAND:  I took a phone call for four
23   minutes.  It's on my phone.  Listen to me again --
24                 MR. KILPATRICK:  We're going to go eat lunch
25   in the other room.  I'm not going -- I'm not going to let you
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

65

```
 1   tell me what to do.
 2                 MR. HELFAND:  Okay.  We're -- Then, we're
 3   leaving.  I want you to know the Mayor's leaving.
 4                 MR. KILPATRICK:  You're not -- No, you're not.
 5                 MR. HELFAND:  Yes, we are.
 6                 MR. KILPATRICK:  No.
 7                 MR. HELFAND:  The Mayor is leaving.
 8                 MR. KILPATRICK:  We're going to -- We're going
 9   to take --
10                 MR. HELFAND:  We told you --
11                 MR. KILPATRICK:  -- ten minutes to eat lunch.
12                 MR. HELFAND:  -- the Mayor would start at
13   1:00 o'clock --
14                 MR. KILPATRICK:  That's a five-minute
15   difference.  Same --
16                 MR. HELFAND:  -- and you would --
17                 Mr. Kilpatrick, tell me when done.
18                 MR. PLACEK:  We're not eating lunch, then.
19                 MR. HELFAND:  Okay.  We're leaving.
20                 MR. KILPATRICK:  No, you're not.
21                 MR. HELFAND:  We're leaving 'cause you're
22   walking out while I'm talking to you and you don't do that.
23   You don't drop something and then walk out of a room.  This
24   is not a discussion with a family member.  You act like a
25   professional.  Listen to me.
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1              You told me you would start at 1:00 o'clock
 2   and keep going, and the Mayor said he would stay, so you
 3   could finish.  Now you're telling me you want to go eat
 4   lunch.  No.
 5              If you're not back here when the Mayor's back
 6   here, we're leaving.  Do you understand?
 7              MR. KILPATRICK:  We were supposed to be done
 8   by noon --
 9              MR. HELFAND:  We were.
10              MR. KILPATRICK:  -- but because of you, we
11   were not, not only because you've delayed it and you had to
12   take a phone call, but, also, I let you -- you cut into all
13   my time by making speaking objections and doing other
14   inappropriate things that you've done in all the depositions
15   now.
16              MR. HELFAND:  My phone call took three
17   minutes.  If you're not here when the Mayor's ready to go,
18   we're leaving.  Do you understand that?  That --
19              MR. KILPATRICK:  Are you --
20              MR. HELFAND:  -- simple.
21              MR. KILPATRICK:  Are you serious?
22              MR. HELFAND:  Yeah, I'm dead serious.  We're
23   not wasting that gentleman's time.
24              MR. KILPATRICK:  You said you wanted --
25              MR. HELFAND:  You've already wasted asking
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

67

```
 1   questions --
 2                MR. KILPATRICK:  -- a five-minute break.
 3   We're asking for another five more minutes.
 4                MR. HELFAND:  Listen.  You asked me a
 5   question.  I'm telling you the answer.  You've already wasted
 6   his time asking questions about architects.  You already
 7   wasted his time by pretending to -- make facts and ask him to
 8   answer to them.
 9                If you're not here, and he's ready to go, he
10   said five minutes, we're ready to go.  Are you ready to go?
11   If not, we're leaving.
12                MR. KILPATRICK:  Well, five minutes hasn't
13   started yet --
14                MR. HELFAND:  That's all --
15                MR. KILPATRICK:  -- 'cause I've been wasting
16   my time talking to you.
17                MR. HELFAND:  Mr. Kilpatrick, sit down and ask
18   more questions or we're done.
19                MR. KILPATRICK:  No.
20                MR. HELFAND:  Okay?  All right.  Well, then,
21   we're done.  We'll put on the record that we're done.  Our
22   agreement --
23                MR. KILPATRICK:  No, no.
24                MR. HELFAND:  -- was the Mayor would -- would
25   appear at 1:00 o'clock --
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

68

```
 1                  MR. KILPATRICK:  No.

 2                  MR. HELFAND:  -- to do his deposition --

 3                  MR. KILPATRICK:  Mr. Helfand --

 4                  MR. HELFAND:  You don't have any more

 5     questions for him, it's fine.

 6                  MR. KILPATRICK:  -- had to take a phone call

 7     in the last deposition, so -- it lasted longer than we had

 8     agreed --

 9                  MR. HELFAND:  Mr. Kilpatrick.

10                  MR. KILPATRICK:  -- and now he's --

11                  MR. HELFAND:  I don't care --

12                  MR. KILPATRICK:  -- being argumentative.

13                  MR. HELFAND:  -- what your rationale is --

14                  MR. KILPATRICK:  He's still interrupting me.

15                  MR. HELFAND:  You have a choice.

16                  MR. KILPATRICK:  -- as we speak right now,

17     he's interrupting me.  He's being rude, unprofessional, and

18     not been following the Rules all day.  We're -- We're asking

19     for a five-minute break to -- to eat the lunch --

20                  MR. HELFAND:  A five-minute break is fine.

21     Five minutes.  It is 2:42.  You should have taken a five-

22     minute break when the Mayor took a five-minute break.  Be

23     back here ready to ask questions at 2:50 or we won't be here.

24                  (Break.)

25                  MR. KILPATRICK:  I, Brian Kilpatrick, am back
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1   now pursuant to our agreement to take a break for five

 2   minutes.  It's now 2:49 and Bill is not in the room, and we

 3   are waiting on him, so -- I just want to make the record

 4   clear that we're waiting on -- on Bill Helfand, and my client

 5   and I have been ready to proceed.

 6                    (Whereupon, briefly off the record.)

 7                    THE VIDEOGRAPHER:  On the record at 2:50 p.m.,

 8   beginning Card 2.

 9        Q    Okay.  Mayor Joiner, I'm handing you what will be

10   marked Exhibit 13.

11                    (Exhibit 13 marked.)

12                    MR. HELFAND:  This is marked Kemah 2.

13        Q    Okay.  And so Exhibit 13 is a document with

14   Resolution Number 2017-11 at the top.  Do you recognize this

15   document, Mayor Joiner?

16        A    Yes.

17        Q    Okay.  And in the body of this document it says,

18   that, "A variance is hereby granted for a special commercial

19   area that is hereby created in or -- in a corridor along the

20   south side of 6th Street, from Bradford Street to Kipp

21   Street, wherein the owners of the lots abutting 6th Street

22   will be allowed to install, use and utilize structures up to

23   the street right-of-way."  Did I read that correctly?

24        A    Yes.

25        Q    Okay.  And at the bottom, it -- I guess this was
```

1    enacted when you were Mayor?

2         A    Yes.

3         Q    Okay.  And what was the purpose of enacting this

4    resolution?

5              MR. HELFAND:  Sorry.  That's a legislative

6    permit.  The doc-- The ordinance speaks for itself -- The

7    resolutions speaks for itself.  You're not entitled to know

8    the purpose, the thought process, the ideas, the goals behind

9    adopting it.  That's the legislative privilege.

10             MR. KILPATRICK:  Okay.  Fair enough.  I'll --

11   I'll agree with you there.

12        Q    So this resolution creates a commercial zone on the

13   side of 6th Street that Palapas is on.  Correct?

14        A    Yes.

15        Q    Okay.  And the other businesses along that same

16   stretch of 6th Street have built decks out to the point

17   pursuant to this document.  Is that a fair statement?

18             MR. HELFAND:  Sorry.  That assumes facts not

19   in evidence and it's also multi-- also multifarious.

20        Q    Okay.  Well, let me ask you this way.  Are you

21   familiar with the business Scallywag's?

22        A    Yes.

23        Q    Okay.  And are you familiar with the deck that they

24   built out towards the street that covers the parking spaces

25   that used to be along the south side of 6th Street?

```
 1        A    Yes.

 2        Q    Okay.  So Scallywag's, the area -- the point to

 3   which Scallywag's built out that deck, is that the area

 4   that's covered by this document?

 5                MR. HELFAND:  Objection, calls for a legal

 6   conclusion.

 7        A    I can't say, specifically, that it does, but it's

 8   got to be close.

 9        Q    Okay.  And then, there's a -- there's another

10   business on the street called Shot Bar.

11        A    Uh-huh.

12        Q    Are you familiar with that business?

13        A    (NODS HEAD AFFIRMATIVELY.)

14        Q    And they built a deck out towards the street, as

15   well?

16        A    That is correct.

17        Q    And the point at which the deck ends, is that the

18   area that's within the commercial zone approved by this

19   document?

20                MR. HELFAND:  Objection, mischaracterizes the

21   document; and also calls for speculation.

22        Q    You can answer.

23        A    It -- It's got to be close like Scallywag's.

24        Q    Okay.  And then are you familiar with the deck that

25   was built at the Palapas property?
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

72

1    A    That one, I'm not as familiar with.

2    Q    Okay.  So if that deck is built out to the same

3    point that the other -- that those two other properties are

4    built, that would be within the area of the special

5    commercial zone.  Is that a fair statement?

6              MR. HELFAND:  Objection, assumes facts not in

7    evidence; and again, calls for speculation.  Moreover, it

8    mischaracterizes the resolution.

9    Q    You can answer.

10   A    To the best of my knowledge, yes.

11   Q    Okay.  So while -- Since you've been Mayor in the

12   latest election, you know, after the 2021 election, have you

13   ever asked Brandon Shoaf to do anything with respect to, you

14   know, Code enforcement or issuing permits related to any

15   business in Kemah?

16   A    No.

17   Q    Do you ever email with Brandon Shoaf about Code

18   enforcement issues?

19   A    I could have.

20   Q    Okay.  But you -- you never asked him to actually

21   go inspect a property or go issue a permit or deny a permit,

22   anything like that?

23   A    There's several questions in that.

24   Q    Okay.  Well -- Well -- Yeah.  Let's -- Let's go one

25   by one.  Have you ever asked Brandon Shoaf to perform any

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1    type of inspection on a property in the City of Kemah?

2         A    I don't recall.

3         Q    Okay.  Have you ever asked him to request that any

4    third party perform an ADA compliance inspection?

5         A    Possibly.

6         Q    Okay.  What -- So -- Is there something you recall

7    with respect to ADA compliance?

8         A    Sir, I just know, as an architect, that all

9    facilities need to comply.  Okay?

10        Q    Okay.  Yeah.  And I'm just trying to get an idea of

11   the situations in which you become involved in the Code

12   enforcement process.

13             MR. HELFAND:  Well, ask him a question --

14        Q    So --

15             MR. HELFAND:  -- 'cause that's a statement.

16             MR. KILPATRICK:  I know.

17             MR. HELFAND:  That statement that

18   mischaracterizes --

19             MR. KILPATRICK:  Now I'm going to ask a

20   question.

21             MR. HELFAND:  Okay.

22        Q    So, you know, we talked about before, for example,

23   like you got involved in some capacity with the -- with

24   Veronica Crow and her husband.

25        A    Uh-huh.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

74

1      Q    Right?  And what other properties have you asked --

2   What other properties have you asked Brandon to do something

3   in connection with -- with permits?

4      A    I don't recall.

5      Q    Are you aware that Brandon Shoaf put a red tag on

6   the building located at 707 Bradford?

7            MR. HELFAND:  Excuse me.  That assumes facts

8   not in evidence.

9      A    No.

10     Q    No?

11     A    No.

12     Q    Are you aware of any issues with certificates of

13  occupancy or permits at 707 Bradford?

14     A    Ask the question again.

15     Q    Are you aware of any issues with Code compliance,

16  permitting, certificates of occupancy at the property located

17  at 707 Bradford?

18     A    All's I know, it was issued a certificate --

19  certificate of occupancy.

20     Q    And when was that issued?

21     A    I have no idea.  I don't recall.

22     Q    Recently?

23     A    Last three months or so, maybe.

24     Q    Okay.  So before that, were there issues that you

25  became involved in, with Brandon Shoaf and that -- and that

CARL JOINER - 7/21/2022

75

 1    property?

 2         A    I did not become involved.  They might have asked

 3    me some questions but that was it.

 4         Q    Okay.

 5         A    I don't call the shots.

 6         Q    Okay.  So Brandon -- When you say "they," Brandon

 7    Shoaf is one of the people who may have asked you some

 8    questions about it?

 9         A    Or Walter.

10         Q    Okay.  Did you ever ask Brandon Shoaf to send an

11    email to the -- to any fire marshal's office to -- to do an

12    ADA inspection on the 707 Bradford property?

13              MR. HELFAND:  Objection, assumes facts not in

14    evidence.

15         A    No, because the fire marshal doesn't do ADA.

16         Q    Okay.  Well, did you --

17              MR. HELFAND:  He's right, you know.

18         Q    -- ask him to contact the -- any fire marshal to do

19    any type of inspection on the 707 Bradford property?

20         A    No.

21         Q    Okay.  Now, with respect to food trucks, do you

22    recall, in August of 2021, for -- the -- there being a

23    discussion in the open session about proposed revisions to

24    the food truck ordinance?

25              MR. HELFAND:  Objection, assumes facts not in

```
 1   evidence.
 2                  THE WITNESS:  Do I answer?
 3                  MR. HELFAND:  If you -- If -- If you have a
 4   recollection of that happening.  But just because counsel
 5   says something happened, it doesn't mean it happened.  That's
 6   my objection.  If you remember that happening, though, you
 7   can --
 8       A    I recall it being revised numerous times.
 9       Q    Okay.  And in October, 2021, at the first City
10   Council meeting, the City Council approved a revised food
11   truck ordinance.  Do you recall that?
12       A    I don't recall the date.
13       Q    Okay.  And within a few days after that, Mr. Shoaf
14   went out and towed the food truck from Palapas.  Do you --
15       A    I was not aware of that.
16       Q    Okay.  Do you ever drive down Kipp --
17       A    Yeah, I --
18       Q    -- Street?
19       A    -- live on Kipp.
20       Q    Right.  So do you ever drive by the corner of Kipp
21   and 6th Street?
22       A    Yes.
23       Q    Okay.  So you don't recall -- You recall seeing a
24   food truck there for a period of time.  Right?
25       A    I didn't see a food truck.  I saw a trailer.
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1      Q    Oh, yeah.  Food -- Actually, yeah.  Correct.  It

2    was a food trailer.  You -- At the Palapas property.  Right?

3      A    Yes.

4      Q    Okay.  And is it -- Was it there the last time you

5    drove by?

6      A    Just recently?

7      Q    Yeah.

8      A    I don't think so.

9      Q    Okay.  So you understand now that Brandon Shoaf had

10   it towed from the property.  Right?

11     A    I -- I don't know that for a fact.

12     Q    Okay.  So you never talked to Brandon about that or

13   Mr. Brandon Shoaf about it?

14     A    I -- I was totally unaware of it.

15     Q    Okay.  So you have no role in the towing of that

16   food truck.  Is that your testimony?

17     A    I -- I've had no role in that project since the

18   meeting was cancelled.

19     Q    Okay.  Has the City issued any citations to any

20   food truck operators that you're aware of?

21              MR. HELFAND:  Objection, calls for

22   speculation.

23     A    I'm not involved in that.

24     Q    Okay.  So if a citation is issued, who authorizes

25   that?

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1      A     Walter Gant.

2      Q     Okay.  So Brandon Shoaf does not have the power to

3   issue citations without his approval?

4                MR. HELFAND:  Sorry.  That calls for a legal

5   conclusion.  It mischaracterizes the witness' prior

6   testimony.

7      A     What --

8      Q     You can answer.

9      A     What's the question again?

10     Q     So Walter Gant -- or, sorry -- Brandon Shoaf does

11   not have the power to issue a citation without getting

12   Mr. Gant's approval?

13                MR. HELFAND:  Restate my objections, please.

14     A     I don't know for sure what their arrangement is.

15     Q     Okay.  Who -- Who determines the -- what powers the

16   building official has?  How is that determined?

17     A     I would assume it's in his job description.

18     Q     Okay.  And who prepares the job description?

19     A     Walter Gant.

20     Q     Okay.  So -- So Walter Gant has -- in essence, has

21   those powers, and he -- he's allowed to authorize the

22   building official to do certain things, such as towing a food

23   truck.

24                MR. HELFAND:  Objection, legal conclusion.

25     A     Again, I wasn't involved in that.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1    Q    Okay.  Do you know of any other food trucks in the

2  City of Kemah that have been towed since the -- the new

3  ordin-- food truck ordinance was passed in October, 2021?

4    A    No.

5    Q    No?  Do you know if the reason that food truck was

6  towed from Palapas was due -- a violation of the new food

7  truck ordinance that was enacted in --

8    A    No, no.

9    Q    Hold on one second.  -- that was enacted in

10  October, 2021?

11    A    No.

12    Q    No?  Do you -- Have you read the food truck

13  ordinance that was enacted in October, 2021?

14    A    I'm sure I did at that time.

15    Q    Okay.  Do you have a general understanding of what

16  would constitute a violation of that ordinance?

17    A    Like I said, it's been changed a number of times,

18  but I believe the latest one says that if you're within

19  200 feet of a residence, you can't have it.

20              THE REPORTER:  "Can" or "can't"?

21              THE WITNESS:  Cannot.

22    Q    Okay.  And that would apply to anyone who applies

23  for a permit after that revised ordinance was enacted.

24              MR. HELFAND:  Objection, calls for a legal

25  conclusion.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

80

1    A    There's a "depends" on that because the -- when the

2  set of plans that are submitted to be reviewed on a project,

3  at that time, it falls within the ordinance that the plans

4  were reviewed.  Okay?

5    Q    Okay.  So at the time the plan -- At the time the

6  permit is filed, whatever ordinance was in effect at that

7  time, that's the applicable ordinance?

8              MR. HELFAND:  Objection, legal conclusion.

9    A    Yeah, that would be a legal thing to review.

10   Q    Okay.  Okay.  Let me ask you this.  So if someone

11 applies for a permit for a food truck and it's put on -- put

12 on hold, what -- what's the process for dealing with permits

13 that are placed on hold?

14             MR. HELFAND:  Objection, calls for speculation

15 and a legal conclusion.

16   A    I'm not sure.

17   Q    Okay.  Is there anything that you're aware of in --

18 in the City ordinances that allows the building official to

19 place applications on hold?

20             MR. HELFAND:  Objection, legal conclusion and

21 speculation.

22   A    I don't -- I'm not aware of it.

23   Q    I'm handing you what's been marked Exhibit 14.

24             (Exhibit 14 marked.)

25             MR. HELFAND:  This is Kemah 85 through 87.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1      Q    Okay.  I've handed you a document.  It's been

2   labeled Exhibit 14.

3      A    Okay.

4      Q    It's a email chain between you, and it looks like,

5   Kyle Burks and Nick Haby, Wendy Ellis; and the subject is

6   6th Street.  And -- Well, let me ask you this.  Who is Nick

7   Haby?

8      A    He was, at the time, our community development

9   person.

10      Q    Okay.  Has he had any other positions in the City,

11   in the City of Kemah?

12      A    No.

13      Q    Okay.  So -- Well, did he ever serve as the -- He

14   never served as a -- the building official?

15      A    No.

16      Q    Okay.  So what was his -- What were his -- the

17   scope of his job duties?

18      A    He would have been over the building official.

19      Q    Okay.  So this was before the City Administrator

20   position was created?

21      A    No.  Wendy Ellis is the City Administrator.

22      Q    Okay.  And, let's see.  You make a comment in

23   here -- Who's -- Who's James Gartrell?

24      A    Must be -- Well, looks like he's an engineer.

25      Q    Okay.  Do -- Do you re-- What were y'all discussing

1   in this email, if you recall?

2       A    Looks like we were interested in utilities in the

3   right-of-way that we were allowing people to build over.

4       Q    Okay.  And on February 15th, 2018, you -- you sent

5   an email pointing out the -- Or, you say "all."  "It will be

6   important that -- that all these line up," period.

7       A    Uh-huh, and we have discussed that.

8       Q    Okay.  So is that -- When -- When you're talking

9   about lining up, are you talking about the decks --

10      A    All of it.

11      Q    -- that are going to be built out --

12      A    Right.

13      Q    -- under that 2017 --

14      A    Right.

15      Q    -- resolution?  Okay.

16      A    But I've never looked at them, if --

17      Q    Sure.

18      A    -- that's what you're saying -- Yeah.

19      Q    Okay.  Okay.

20              (Exhibit 15 marked.)

21              MR. KILPATRICK:  Okay.  Here you go.

22              MR. HELFAND:  Thanks.

23      Q    Okay.  I've handed you what's been marked as

24   Exhibit 15.

25              MR. HELFAND:  This is 102 -- Kemah 102 through

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1   105.
 2       Q    And it's a -- At the top it says, "City of Kemah,
 3   Application for Short-Term Rental STR Permit."
 4            And if you go to the second page, you'll see that
 5   the -- Matt -- Matt Placek shows as the owner.
 6            And on the third page, it shows 606 6th Street,
 7   Units C and D and --
 8            Okay.  So this is the application that someone's
 9   required to file in order to get a permit to operate
10   short-term rental units?
11       A    Appears so.
12       Q    Okay.  And if you look on the -- on -- on the first
13   page, the top right, it says, "On hold."
14       A    Okay.
15       Q    Do you know why this short-term rental application
16   was placed on hold?
17            MR. HELFAND:  No.  Hang on.  Assumes facts not
18   in evidence.  Does he know why it -- the words "on hold" are
19   on there --
20       Q    Okay.
21            MR. HELFAND:  -- is all he could answer.
22       A    This is the first time I've seen this.
23       Q    Okay.  Well, let me ask you this.  Did you know
24   that Matt Placek had -- and Paige Pitonyak had submitted an
25   application for a short-term rental permit?
```

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Okay.  So you never discussed this with Mr. Shoaf? |
| 3 | A | (NO VERBAL RESPONSE.) |
| 4 | Q | "No"?  You got to -- |
| 5 | | THE REPORTER:  Your answer? |
| 6 | A | No.  Sorry.  I'm sitting here... |
| 7 | Q | Okay.  And this was submitted -- Well, at least |

it -- it's dated May 27th, 2021, right after you were elected

Mayor.

    A    Right.

    Q    And then if you look on the third page, it --

There's another -- There's some more handwriting.  It says,

"A change of occupancy permit must be filed, first."  Do you

see that?

    A    Uh-huh.

    MR. HELFAND:  Actually, what it says is, "A

change of OCC permit must be filed, first."

    Q    Okay.

    MR. HELFAND:  If you're going to quote the

document, let's quote it correctly.

    Q    What do you -- What is -- Do you know what's being

referred to as "OCC permit"?

    MR. HELFAND:  Calls for speculation as to what

somebody else meant as to "OCC permit."

    Q    You can answer.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

85

```
 1        A     You know, I don't.

 2        Q     Okay.  Is it possible that that was a "change of

 3   occupancy permit"?

 4               MR. HELFAND:  Everything is possible.

 5        Q     Okay.

 6               MR. HELFAND:  But that's not a good question.

 7   Let me object for spec--

 8               MR. KILPATRICK:  It's a good question to me.

 9               MR. HELFAND:  -- speculation.

10               MR. KILPATRICK:  It's your opinion.

11               MR. HELFAND:  Let me know when you're done

12   talking.

13               Anything is possible, but that's not a good

14   question.  That's speculation.

15               MR. KILPATRICK:  I like it.

16        Q     So if -- if you read that right now --

17               MR. HELFAND:  I imagine you would.

18        Q     -- in the context of a short-term rental

19   application, what -- what does that handwriting mean to you?

20               MR. HELFAND:  Objection, speculation.  It's

21   been asked and answered.  He told you he doesn't know.

22               Do you have another question?

23        Q     You can answer.

24        A     Yeah, I don't know.

25        Q     Okay.
```

1      A      Like I said, I've never seen this before.

2      Q      So do all -- If -- If a -- a property that -- If a

3   person that owns a home in Kemah wants to start -- wants to

4   get a short-term rental permit, do they also have to file a

5   change of occupancy permit, first?

6              MR. HELFAND:   Objection, calls for a legal

7   conclusion and speculation.

8      A      I don't know the answer to that.

9      Q      Okay.   So you don't know?

10     A      No.

11     Q      Okay.

12             (Exhibit 16 marked.)

13     Q      Okay.   I've handed to you what's been marked as

14   Exhibit 16.

15             MR. HELFAND:   This is Kemah 106.

16     Q      And it's a certificate of occupancy application,

17   and it's the business name T&W Holding, LLC; business

18   address, 606 6th Street; owner, Matt Placek.   And is this

19   what someone -- Is this the application that a owner's

20   required to file to get a certificate of occupancy?

21     A      It appears so.

22     Q      Okay.   And, looks like, down here, it shows the

23   permit fee, $200.   If that -- If -- If -- If those three

24   lines at the bottom right are filled in, does that indicate

25   that the permit fee was paid?

CARL JOINER - 7/21/2022

87

```
 1                  MR. HELFAND:  Object.  It calls for
 2    speculation.
 3         A    It appears so.
 4         Q    Okay.  Did you know that T&W -- T&W Holding filed
 5    this application for a certificate of occupancy?
 6         A    This is the first I've seen it.
 7         Q    Okay.  Are you -- Are you familiar with Bureau
 8    Veritas?
 9         A    Yes.
10         Q    Okay.  What does -- What does Bureau Veritas do?
11         A    They review plans.
12         Q    Okay.  What else do they do?
13         A    Depending on what they were hired for, maybe,
14    inspections.
15         Q    Okay.  And who orders inspections from Bureau
16    Veritas within the City of Kemah?
17         A    It depends, when it was.
18         Q    Okay.
19         A    What's the date on it?
20         Q    This would have been July 8th, 2021.
21         A    That, probably, would have been Walter Gant.  July.
22    Yeah.
23         Q    Okay.  So Walter Gant, the -- Just walk me through
24    how that process works.  The -- Walter Gant contacts Bureau
25    Veritas to perform --
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

88

1        A     Services.

2        Q     -- inspections.  And then what -- what is -- what

3    happens after that?

4        A     You'd have to ask Walter.

5        Q     Okay.  So you're not involved in that process --

6        A     No.

7        Q     -- in any way?

8        A     No.

9        Q     Okay.  But sort of like the Crows and Palapas, for

10   example, sometimes you've -- you've gotten involved in

11   dealing with permits and inspections and certificates?

12       A     Rarely.

13             MR. HELFAND:  That mischaracterizes the

14   witness' former testimony.

15             And then, did you record his answer?

16             THE REPORTER:  Yes.

17             MR. HELFAND:  Thank you.

18       A     (CONTINUING)  I said rarely.

19       Q     Rarely?  Okay.  Do you know Daniel Conrad?

20       A     Yes.

21       Q     Okay.  How do you know him?

22       A     He's a resident in Kemah.

23       Q     Okay.  Does -- Does he ever get involved in the

24   City's, like, issuance or denial of permits to business

25   owners?

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1        A     Not that I know of.

2        Q     Had -- Do you recall the City receiving any

3   complaints from Mr. Conrad about certain businesses in -- in

4   the City of Kemah?

5        A     No, I don't recall.

6        Q     Okay.  Are y'all friends?

7        A     No.

8        Q     Does he -- Well, at some point a dispute arose

9   between the two of you.  Correct?

10        A     Correct.

11        Q     Was that related to a business that he owns?

12        A     I don't know that he owns a business.

13        Q     Okay.  Well, what's the -- What -- What was the

14   nature of that dispute?

15        A     It's going on right now, and I'm in a lawsuit with

16   him, and I prefer not to spend any more time on --

17              MR. HELFAND:  We're not going to talk about

18   that.

19        Q     Okay.  All right.

20              THE REPORTER:  Say -- What?

21              MR. HELFAND:  I said, we're not going to talk

22   about that.

23        Q     Okay.  Fair enough.

24              MR. HELFAND:  I need to use the bathroom, when

25   you have time.  Just need -- I just need a minute or two, but

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1    I need to use the bathroom.  Don't -- You don't have to stop

 2    right now, but when you get to a natural stopping point, let

 3    me know.

 4              MR. KILPATRICK:  Okay.  Well, yeah.  Why don't

 5    you go ahead right now.

 6              MR. HELFAND:  Thank you.

 7              MR. KILPATRICK:  Some of these are before his

 8    tenure, so...

 9              THE VIDEOGRAPHER:  Off the record at 3:26 p.m.

10              (Break.)

11              THE VIDEOGRAPHER:  On the record at 3:36 p.m.

12    Q    Okay.  Mayor Joiner, I'm going to -- handing you

13    what we marked as Exhibit 17.

14              (Exhibit 17 marked.)

15              MR. HELFAND:  Do you have a copy for me?

16              MR. KILPATRICK:  Oh, yeah, I do.

17              MR. HELFAND:  Thank you.

18              MR. KILPATRICK:  Sorry.

19              MR. HELFAND:  That's Kemah 77 and 78.

20    Q    And this is an email chain between you, Brandon

21    Shoaf, Dick Gregg, and Walter Gant; and it says, "Regarding

22    Palapas meeting, 8-23-21."

23              MR. HELFAND:  Hang on.  This -- We -- I need

24    to claw this back.  This is attorney-client privileged

25    communication.  I'm sorry.  We -- We can't use this; and
```

 1   consistent with the Rules, I'll write you a letter clawing it

 2   back.  I should not have produced a document with the City

 3   Attorney.

 4            MR. KILPATRICK:  Well, I'm not going to get

 5   into what y'all -- what they talked about.

 6            MR. HELFAND:  Well, you're not even allowed to

 7   have this email.  That was my mistake.  And the Rules provide

 8   that I'll notify you that I -- I -- I need it back.  It's an

 9   attorney-privileged communication.

10            MR. KILPATRICK:  This is one of the first

11   documents you produced.

12            MR. HELFAND:  The timing of the production

13   doesn't have anything to do with what I've just told you.  Do

14   you have other questions about something else?

15            You can either agree -- I'll give you the

16   Rule.  You can either agree to give it to me today and

17   destroy any other copies or I'll write you a letter about it.

18   But we're not going to answer questions about it because I

19   shouldn't have given it to you.  That was my mistake, but the

20   Rules provide a remedy for that.  But it is an

21   attorney-client privileged document.

22            MR. KILPATRICK:  Well, I won't ask him about

23   it now, but I reserve the right to take this up with the

24   Judge, if we need to.

25            MR. HELFAND:  I -- I will send you what people

1  call a "clawback letter," and if you do not wish to return it

2  because you don't think you're required to under the Rules,

3  then we'll -- we can take that up with the Judge.

4                    And if the Judge believes that it's not

5  privileged and that you're entitled to ask questions about

6  it, then we can deal with that at that time.

7                    MR. KILPATRICK:  Yeah, that's what I'm saying.

8                    MR. HELFAND:  But why don't we -- We can pre--

9  We can, probably, preclude the necessity of a round trip.

10  What do you want to ask him about that, that wouldn't be

11  privileged, about a meeting he had with the City Attorney?

12                    MR. KILPATRICK:  Well, look, I'll ask the

13  question and see if you --

14                    MR. HELFAND:  Sure.

15                    MR. KILPATRICK:  -- if you have a problem with

16  it and then --

17                    MR. HELFAND:  Yeah.

18                    MR. KILPATRICK:  -- we'll deal with it, as --

19  question by question.

20                    MR. HELFAND:  But we're not -- I'm not going

21  to allow --

22                    MR. KILPATRICK:  I'm not going to ask a lot

23  about it.

24                    MR. HELFAND:  Hang on.  I'm not going to allow

25  this to be part of the deposition transcript, in light of the

CARL JOINER - 7/21/2022

```
 1  fact that I pointed out that it was inadvertently produced.

 2              We'll ask the court reporter, put this in a

 3  separate, sealed envelope.  Okay?  She'll keep it but put it

 4  in a separate sealed envelope.  Is that okay with you?

 5              MR. KILPATRICK:  That's fine.

 6              MR. HELFAND:  Pending a ruling by the Court.

 7              MR. KILPATRICK:  Okay.  That's fine.

 8              MR. HELFAND:  Great.

 9    Q    Okay.

10              MR. HELFAND:  Anyway, she'll know that.

11    Q    Mr. Joiner, do you recall -- Or, sorry --

12  Mayor Joiner, do you recall attending a meeting in August,

13  2021 --

14              MR. HELFAND:  Don't do it --

15    Q    -- regarding --

16              MR. HELFAND:  -- with reference to this

17  letter.  Sorry.

18              THE WITNESS:  Okay.

19              MR. HELFAND:  He's asking if you -- Because

20  we're not supposed to be using that letter.

21    Q    And I'm -- I'm not ask-- going to ask what y'all

22  talked about at the -- the meeting I'm asking about.  I'm

23  just asking you some basic questions.

24              Did you meet with Brandon Shoaf and Walter Gant to

25  discuss the -- the issues related to the Palapas in August of
```

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

94

1   2021?

2         A     If I hadn't seen that, I would not recall that.

3         Q     And, you know, I'm just asking about whether you

4   ever -- you had a meeting with them to discuss issues related

5   to Palapas.  So is the answer, yes?

6               MR. HELFAND:  He's answered the question.

7         A     Yeah.  I -- I don't recall, and I won't go any

8   further.

9         Q     But -- Well -- But sitting here today, you -- you

10  recall having a meeting at some point with Brandon Shoaf and

11  Walter Gant to discuss issues related to --

12        A     No, I don't.

13        Q     -- Palapas.

14        A     That's why I'm...

15        Q     Well, you did see the email, and I know we're

16  clawing it back, but it doesn't mean it erased your memory.

17  I'm just asking if you had the meeting.

18              MR. HELFAND:  Do you remember having a

19  meeting?

20        A     Like I say, I saw that, and I said, "Let's meet at

21  City Hall."  I don't remember the meeting.

22        Q     Okay.  But you -- But you -- And I'm not saying

23  what happened at the meeting.  I'm saying do you recall --

24        A     No.

25        Q     -- whether y'all met or not?

**EXHIBIT 9**

CARL JOINER - 7/21/2022

95

1    A    No.

2    Q    Okay.  Since you've been Mayor, how many times have

3  you met with Walter Gant to discuss issues related to

4  Palapas?

5    A    Just with Walter Gant?  I only recall one meeting.

6    Q    Okay.  Approximately, when was that?

7    A    It was when we were going to have a meeting here,

8  and it got cancelled.

9    Q    Okay.  And was that the meeting that I was going --

10  going to attend, along with Mr. Gregg, to discuss Palapas?

11    A    I don't know if you were attending or, what.

12    Q    Okay.  And there was a -- if -- you may recall,

13  there was a weather event that Mr. Gregg had to cancel the

14  meeting because there was a -- some emergency issues the City

15  was dealing with at that point?

16         MR. HELFAND:  I'm sorry.  That assumes facts

17  not in evidence.

18         Do you want to ask him if he knows why it was

19  cancelled?  You can't tell him the answer to -- what you want

20  the answer to be.  That assumes facts not in evidence.  Do

21  you want to ask him why it was cancelled?

22    A    I don't recall that meeting.

23    Q    You don't -- You don't know why it was cancelled?

24    A    No.

25    Q    Okay.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1          MR. HELFAND:  By the way, the Rule is

2    26(b)(5)(B), and I am telling you now that -- I'm notifying

3    you that you received information that is subject to

4    attorney-client privilege.

5          You are required to promptly return, sequester

6    or destroy the information and any copies.  You may not use

7    it or disclose the information until the claim is resolved.

8    If you disagree with the claim, you should tell me, and we'll

9    take it up with the Judge.  But you can't do anything with it

10   until that claim's been resolved.

11          But if you, honestly, think an email like --

12   like that is not a -- privileged, you let me know.

13          MR. KILPATRICK:  All -- All I said is that

14   I -- I reserve the right to -- I'm going to look -- I'm going

15   to look into this after the deposition --

16          MR. HELFAND:  The Rule requires --

17          MR. KILPATRICK:  -- and if --

18          MR. HELFAND:  -- that you sequester it and not

19   use it for any purpose or show it to anyone else.  As long as

20   you do that, that's fine.  And you --

21          MR. KILPATRICK:  That's what I'm doing.

22          MR. HELFAND:  -- let me know if you believe

23   that it's not privileged.  But right now, we can't use it for

24   any purpose.

25          MR. KILPATRICK:  That's fine.

1        MR. HELFAND:  But since it's been a -- made

2    a -- since we've been -- identified on the record of the

3    deposition, we'll have the court reporter seal it up and,

4    she'll keep it sealed.  And then you and I will give her

5    joint instructions on what to do with it, either we've agreed

6    or the Court ordered.

7        MR. KILPATRICK:  That's fine.

8        MR. HELFAND:  Great.

9        THE REPORTER:  Okay.

10        MR. HELFAND:  Thirty-five years without a

11    mistake and then, there you go.  And I went through these

12    things really carefully on my own.

13        UNIDENTIFIED SPEAKER:  No, that's not what

14    happened.

15    Q    Okay.  Mayor Joiner, have you ever asked Brandon

16    Shoaf, when -- when he was the building official, to enforce

17    deed restrictions for any subdivisions in the -- the City of

18    Kemah?

19    A    I have not asked him to enforce deed restrictions.

20    Q    Okay.  Did you ask him to do anything in connection

21    with the Bay Breeze subdivision?

22    A    I -- Yes, I asked him -- Because we have an

23    ordinance, I said, "Please, do not permit any facility in

24    Bay Breeze that is not single family," as the deed

25    restrictions say.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

98

1      Q    Okay.  And what -- Which ordinance are you

2  referring to?

3      A    I -- It's a number.  Okay?

4      Q    Okay.  But, I mean, it -- Just in general, what

5  does it say?

6      A    Just what I said.  It, basically, says, if it's not

7  single family, it is not to be permitted.

8      Q    Okay.  If there are deed restrictions?

9      A    In this particular case, there are.

10     Q    Okay.  Well -- And just to clarify.  You know --

11     A    We're talking about Bay Breeze.

12     Q    -- does that ordinance only apply to a subdivision

13  that has deed restrictions?

14     A    Yes.

15     Q    Okay.  Have you -- And so -- Well, what -- what

16  exactly did you tell Brandon Shoaf to do in connection with

17  that?

18     A    I just, in passing, said, "Moving forward, you

19  weren't aware of this ordinance.  Please, follow it."

20     Q    Okay.  So no building permits for anything other

21  than single-family in the Bay Breeze subdivision.  Is that --

22     A    Correct.

23     Q    Okay.  Have you done that, something similar for

24  other subdivisions in the City of Kemah?

25     A    I don't recall doing it in any other subdivision,

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

99

| | |
|---|---|
| 1 | except Bay Breeze. |
| 2 | Q    Did you ever instruct Brandon Shoaf to not issue |
| 3 | any short-term rental permits in any subdivisions on the same |
| 4 | basis? |
| 5 | A    There was discussions, but our City Attorney |
| 6 | stated that -- |
| 7 | MR. HELFAND:  Oh.  Wait. |
| 8 | THE WITNESS:  Wait.  I can't say anything, can |
| 9 | I? |
| 10 | MR. HELFAND:  Yeah.  You can't talk about what |
| 11 | the City Attorney you told you. |
| 12 | THE WITNESS:  Okay. |
| 13 | Q    Well, was this discussed in an -- in an open |
| 14 | session City Council meeting? |
| 15 | A    I don't know -- recall if it was closed or open. |
| 16 | Q    Okay.  What other types of directives or |
| 17 | instructions have you given Brandon Shoaf that would -- that |
| 18 | are somewhat similar, you know?  And just to clarify my |
| 19 | question, in -- With Bay Breeze, you're referring to an |
| 20 | ordinance that only allows single family in a deed-restricted |
| 21 | subdivision.  Correct? |
| 22 | A    Let me clarify. |
| 23 | Q    Okay. |
| 24 | A    I never really gave Brandon specific instructions. |
| 25 | I went through Walter Gant -- |

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1          MR. HELFAND:  I was just about to --

2    A    -- who gave those instructions.

3    Q    Okay.

4          MR. HELFAND:  I was just about to object that

5    you mischaracterized his testimony.  What he said was, he

6    pointed out the existence of an ordinance that he thought

7    Mr. Shoaf was not aware of.

8    Q    Okay.  So you mentioned -- So I think you said

9    something about, in passing, you mentioned something to

10   Brandon Shoaf about -- about that.  What did you mean by

11   that?

12   A    Well, it was probably in our meeting.  I never met

13   with Brandon by himself.  It was always with Mr. Gant.

14   Q    Okay.  So you and Brandon have never, just the two

15   of you, met?

16   A    No, I don't recall ever doing that.

17   Q    Okay.

18   A    I haven't met with any City staff by myself.

19   Q    Okay.

20   A    That's not my role.

21   Q    Have you give -- Have you given Walter Gant any

22   directives for anything related to -- at the Palapas

23   property?

24   A    No.

25   Q    Okay.  Have you approved any directives,

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1    suggestions or other recommendations that Walter Gant made --

 2    may have made to you about anything related to Palapas?

 3                    MR. HELFAND:  Object to vague.  But you can

 4    answer.

 5         A    I don't recall any.

 6         Q    Okay.  So back when you were Mayor the first time

 7    around, who was the building official back then?

 8         A    You know, we went through so many.  I don't recall

 9    their names.

10         Q    Okay.  Do you recall a building official, Jack

11    Friday?

12         A    Oh, wow, he goes way back.

13                    MR. HELFAND:  Is that what he did after he

14    left the LAPD?

15         A    He -- He -- He was not building inspector or

16    whatever, when I've been Mayor.

17         Q    Okay.

18         A    It goes back further than that.

19         Q    Okay.  Well -- And how -- how long have you lived

20    in the City of Kemah, again?

21         A    2001.

22         Q    2001.  Okay.  So was he the building official --

23    He -- He was the building official for a period of time while

24    you lived -- since you've lived in the City of Kemah.  Right?

25         A    Correct.
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1    Q    Okay.  Do you remember, there -- there were some

2    news articles that came out back then, about how he had not

3    hit -- he had not documented or kept good records of all the

4    certificates of occupancy with respect to most of the

5    businesses in the City, you know...

6    A    I wouldn't have been a part of any of that.

7    Q    But I -- I just -- Do you -- Do you remember that

8    happening?

9    A    No.

10    Q    No?  So when -- when a ordinance or -- or -- or

11    when any agenda item, I guess, is -- is approved at a City

12    Council meeting, what -- how is there -- what records are

13    kept to show that City Council approved any given item on the

14    agenda?

15    A    As Mayor, I'm not the keeper of the records.

16    Q    Okay.  Well, the -- Is it the City Secretary?

17    A    Correct.

18    Q    Okay.  And would those -- any agenda items that are

19    approved at City Council meetings, would those be reflected

20    in the minutes that the City Secretary prepares?

21    A    Should be.

22    Q    Okay.  So if someone wanted proof that a certain

23    item on the agenda was voted on and approved by Council, that

24    would be -- you -- you would look at the meeting minutes

25    to -- to show proof that it was approved.  Is that a fair

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1   statement?

2        A    You should be able to do that.

3        Q    Okay.  And when permits, certificates of occupancy,

4   and, you know, registrations, things of that nature, what's

5   the chain of custody for -- for those documents?

6                   MR. HELFAND:  Let me just object that it

7   assumes facts not in evidence, that is, is there any -- any

8   chain of custody, which is a criminal law issue but -- not a

9   civil law issue.  But -- If what you mean is, where do they

10  go, is that what you're asking?

11       Q    Or -- Yeah.  Just to put it in more simple words,

12  what -- what -- how are those records maintained?

13       A    You'd have to ask Walter, who's over our City -- or

14  who works with our City Secretary.

15       Q    Okay.  Is -- Are -- Are there -- Are they kept in

16  paper files, digital files or both?

17       A    I would say we're both.

18       Q    Okay.  And how do you control who has access to the

19  paper files?

20       A    It's not under my duties.

21       Q    Okay.  And that file room that we walked by, on the

22  way in here that has the door laying on the ground, is that

23  where the records are -- are kept?

24       A    Some of them, I believe.

25       Q    Okay.  So right now, there's no door on -- on that

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

104

```
 1    room --

 2         A    That's correct.

 3         Q    -- as we sit here today?

 4         A    That is correct.

 5         Q    Well, why --

 6              MR. HELFAND:  But you also don't know what's

 7    in that room, so what difference does that make to this case?

 8              MR. KILPATRICK:  Well, it does matter to this

 9    case.

10              MR. HELFAND:  No, it does not.  It has no

11    bearing on any issue in this lawsuit, whether there is or is

12    not a door on a room in City Hall, the contents of which you

13    don't know.

14         Q    Okay.

15              MR. HELFAND: But I'll --

16         Q    If there's a --

17              MR. HELFAND:  If you think that the --

18         Q    If there's a permit or certificate of occupancy for

19    Palapas property, would it be kept in that room?

20              MR. HELFAND:  Objection, calls for

21    speculation.

22         A    I -- I don't know.  I'm -- I'm not the filer.

23    It could be in a file cabinet.  I don't know.

24         Q    Okay.  Well, why -- why was the door taken off of

25    that room, just out of curiosity?
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1    A    That used to be two rooms, and it was combined into

2  one room, and it took a lot of time to order the door.  And

3  the door will be installed by Public Works, but they're down

4  two people right now, so, hadn't been a high priority --

5    Q    Okay.

6    A    -- for them.

7    Q    It -- Well, isn't it true, City Council approved

8  something to put that -- a door on that room to control

9  access to the files?

10    A    Uh-huh.

11    Q    And so you, as Mayor, unilaterally decided to take

12  it off?

13    A    I don't have that con-- control.  Sorry.

14    Q    Okay.  Okay.  When was that door removed?

15    A    Last couple of months.

16    Q    Okay.

17    A    About the time that the Council said, "Let's get a

18  door."

19    Q    So what was the concern -- What -- What was

20  discussed at the City Council meeting in the open session

21  about putting a door on there?  What -- What was the

22  concern?

23              MR. HELFAND:  There's two questions there.

24  "What was discussed in open session?", he can answer.  "What

25  was somebody's concern?", is within the legislative

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1   privilege.  So which --
 2        Q    Okay.  What was discussed in open session about --
 3              MR. HELFAND:  About --
 4        Q    -- the door?
 5              MR. HELFAND:  -- putting a door on the room.
 6        A    Said that it would be under lock and key.
 7        Q    Okay.  Have there been problems with missing files
 8   or anything in the past?
 9        A    There's another case that I can't really talk about
10   at City Hall, which is concerned about records.
11              MR. HELFAND:  But it's not about -- But -- You
12   can answer his question as to whether anybody's identified
13   missing records --
14        A    (CONTINUING)  Yeah.  I'm not aware.
15              MR. HELFAND:  -- records that the City had but
16   now are missing.
17              That's what you're asking.  Right?
18              MR. KILPATRICK:  Yeah.
19              MR. HELFAND:  Okay.
20        A    (CONTINUING)  I don't know of any.
21              MR. HELFAND:  The Mayor's talking about
22   something else.
23              MR. KILPATRICK:  Okay.
24        Q    And with respect to -- Have there been any issues
25   with files being altered or documents being added that
```

 1   weren't supposed to be there?

 2        A    Not that I'm aware of.

 3        Q    Okay.  Do you recall when the -- Veronica Crow and

 4   her husband, when they attended the February 16th, 2022, City

 5   Council meeting, pointed out that there were maps that had

 6   been swapped out in their permit application?  Do you

 7   remember her talking about that?

 8        A    No.

 9             MR. HELFAND:  Let me object that that assumes

10   facts not in evidence.  It mischaracterizes the witness'

11   prior testimony.

12        Q    Well, to refresh your recollection, do you remember

13   there being discussion in open session about the flood

14   rate -- or, the flood map that was in her file?

15        A    I recall discussion on the -- really, the civil

16   drawings.  That's all recall.

17        Q    Okay.  So part of the reason that, in open session,

18   the Council discussed putting a door on there is not just for

19   missing files but for files that were altered?

20        A    Oh, no.

21             MR. HELFAND:  No.  You just mis-- completely

22   mischaracterized.  He just said they just want them locked

23   up.  There's been no evidence of alteration, no evidence of

24   missing files.

25             MR. KILPATRICK:  Okay.  That's fine.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
1        Q    Okay.  So the answer's, no?

2              MR. HELFAND:  But it also has nothing to do

3   with this case, so -- You're not going to -- You're -- You're

4   not just going to use your deposition time to ask interesting

5   questions about what you walked by when you came in to do the

6   deposition.

7              MR. KILPATRICK:  Well, sorry, but Brandon

8   Shoaf, on several occasions, said that there are no permits

9   on file.  And I do have proof --

10             MR. HELFAND:  Well, then, let's show that --

11             MR. KILPATRICK:  -- that -- that there --

12             MR. HELFAND:  -- to the Court.  But why the

13  door --

14             MR. KILPATRICK:  Yeah, I know.

15             MR. HELFAND:  -- isn't on the room --

16             MR. KILPATRICK:  Well, that's why I'm asking.

17  That's why it's relevant.

18             MR. HELFAND:  No.  Why the door isn't on the

19  room has nothing to do with this case.

20             MR. KILPATRICK:  That's why I'm asking about

21  it.

22             MR. HELFAND:  You --

23             MR. KILPATRICK:  And I can ask --

24             MR. HELFAND:  You didn't know there wasn't a

25  door on the room 'til you came here to take a deposition.
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1              MR. KILPATRICK:  That's right.

 2              MR. HELFAND:  Okay.  So it has nothing to do

 3    with this case.

 4              Do you have other questions for the Mayor?

 5              MR. KILPATRICK:  Of course, I do.

 6              MR. HELFAND:  And, of course --

 7    Q    What --

 8              MR. HELFAND:  -- it bears pointing out --

 9    Q    What's the --

10              MR. HELFAND:  -- there was a door on the room

11    at all times that Mr. Shoaf worked here --

12    Q    Is --

13              MR. HELFAND:  -- according to the Mayor's

14    testimony.

15    Q    Is the door on the -- on the file room what

16    Mr. Gant has referred to as a lock-down procedure?

17              MR. HELFAND:  Well, hang on.  He can't testify

18    what Mr. Gant referred to.  That calls for speculation.

19              MR. KILPATRICK:  Well, if he knows.

20              MR. HELFAND:  Well, then -- then, you have to

21    ask a different question.

22              MR. KILPATRICK:  I said --

23              MR. HELFAND:  "Has Mr. Gant ever told you what

24    he meant by a lock-down procedure?"

25              MR. KILPATRICK:  That's a trial objection,
```

```
 1   like --
 2               MR. HELFAND:  No, no.  You can't -- Man.  He's
 3   not going to testify --
 4               MR. KILPATRICK:  Okay.
 5               MR. HELFAND:  -- to what Mr. Gant means by
 6   something 'cause that's speculation, unless he says he knows.
 7               MR. KILPATRICK:  That's what -- Exactly my
 8   point and I --
 9               MR. HELFAND:  Okay.
10               MR. KILPATRICK: -- I think by --
11               MR. HELFAND:  Well, that's my objection.
12               MR. KILPATRICK:  -- inserting your comments,
13   it's, you know -- Anyway...
14               MR. HELFAND:  (MAKES SOUND.)  You have this
15   bad habit of saying a lot of stuff under your breath that's
16   just totally inappropriate in a deposition.
17               If you have a question, ask the question and
18   wait for the answer.  If there's an objection, you have to
19   wait for that and then see if the witness has an answer.
20               Would you like the answer to the question
21   whether he knows what Mr. Gant means by that term, whether it
22   has --
23               MR. KILPATRICK:  Yeah.
24               MR. HELFAND:  -- anything to do with the door?
25               Okay.  Do you know?
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1   A    What was the question?

2   Q    Lock-down procedure.

3        MR. HELFAND:  Yeah.  What was the procedure?

4   A    I've never heard that.

5   Q    Okay.  Well, Mr. Gant's never used that term?

6   A    No.

7   Q    Okay.

8   A    Not around me.

9        MR. HELFAND:  Okay.  It got resolved.

10       MR. KILPATRICK:  Okay.  See how easy that was.

11  Q    What is Collin Jones' position with the City?

12  A    He's a police chief.

13  Q    Police chief?

14  A    Yes.

15  Q    Okay.  And when did -- when did he start in that

16  role?

17  A    Seems like it was late September, October of last

18  year.

19  Q    Did -- Did he implement lock-down procedure for the

20  file room?

21  A    I've never heard that from him, either.

22  Q    Or -- Or -- Well, what -- what -- Is there another

23  term that he used for the locking up the file room?

24  A    He's been going through and securing City Hall.

25  Q    Okay.

CARL JOINER - 7/21/2022

```
 1        A     Uh-huh.

 2        Q     So who -- who instructed him to do that?

 3        A     I believe he took that on himself --

 4        Q     Okay.

 5        A     -- as our police chief.

 6        Q     So what -- what kind of things has -- has he done

 7   thus far to secure City Hall?

 8        A     They've added some Coded doors.

 9        Q     Okay.

10        A     And, pretty much, that's it.

11        Q     Okay.  So that wasn't part of -- that's not why the

12   door was added to the file room?

13        A     The door was added because we did renovations in

14   there to make that room larger.  What had happened is, we had

15   a plan room down here, and they chose to use it as an office,

16   so they moved the plan room in with the files.

17        Q     So is that door supposed to be locked when -- when

18   it's on?

19        A     Yes.

20        Q     Okay.  And so who maintains who -- who goes in and

21   out of that room or who controls that?

22        A     At that point, it would be only those people that

23   should go in and have access to the files.

24        Q     Okay.  And who within the City has access to those

25   files?
```

CARL JOINER - 7/21/2022

113

1      A    To me, it would be the Court side and possibly City

2  Secretary.

3      Q    Okay.  No -- No one else?

4      A    But, again, I don't make that call.  Okay.  That'd

5  be a Walter Gant call.

6      Q    Okay.  Have any files from that room been taken out

7  of this building?

8      A    I would not know that.

9      Q    Okay.  So as far as you're aware, none --

10     A    No.

11     Q    -- have been taken.

12          Have you ever asked Brandon Shoaf to prepare a

13  report or spreadsheet showing all the properties that are not

14  in compliance with any Code or ordinance?

15     A    No.

16     Q    Has Brandon Shoaf ever provided you a spreadsheet

17  or other report showing a list of all properties that were

18  not in compliance with Code or any ordinance?

19     A    I don't recall ever seeing one.

20     Q    Okay.  What -- In the event of a declaration of

21  disaster or, I guess, hurricane, freeze or something of that

22  nature, you, as the Mayor, have the power to declare a -- a

23  disaster.

24     A    Yes.

25     Q    Is that right?

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1          Okay.  And if a disaster is declared, how -- how

2   does that change the process for making repairs or getting

3   building permits?

4               MR. HELFAND:  Objection, legal conclusion.

5       A    Best of my knowledge, that's never happened since

6   I've been Mayor.

7       Q    Okay.  You recall the -- the freeze in February,

8   2021, when the City...

9       A    Yes; I was not Mayor.

10      Q    Right.  But -- But you lived in Kemah?

11      A    Yeah, uh-huh.

12      Q    Okay.  And Mayor -- So Mayor Gail -- or, excuse --

13  Terri Gail was the Mayor at that time.  Correct?

14      A    Right.

15      Q    And do you recall if she declared a -- a disaster

16  and invoked the emergency management plan?

17              MR. HELFAND:  Let me object that those --

18  That's a multifarious question 'cause those are two different

19  things.

20              MR. KILPATRICK:  Okay.  I'll rephrase.

21              MR. HELFAND:  All right.

22      Q    Do you recall that Terri Gail declared a disaster

23  in the City of Kemah in February, 2021?

24      A    I do not recall that.

25              MR. HELFAND:  Let me object.  That assumes

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1    facts not in evidence.

2         Q    Okay.  Have you ever declared a disaster in the

3    City of Kemah in --

4         A    No.

5         Q    -- while you were Mayor?

6         A    No.

7         Q    No?  Does the City of Kemah have an emergency

8    management plan?

9         A    Yes.

10        Q    Okay.  Is it -- And it's a written document.

11   Correct?

12        A    Yes, yes.

13        Q    Where -- Where can that be found?

14        A    Our Chief, police chief, is our emergency

15   management coordinator.

16        Q    Okay.  And have you read the emergency management

17   plan?

18        A    Yes, 'cause I'm the emergency management director.

19        Q    Okay.  So as the emergency management director, do

20   you -- you have the power to take certain actions without

21   Council approval?

22        A    That is correct.

23        Q    Okay.  Do any of those powers relate to building

24   permits, Code compliance --

25        A    No.

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

116

```
1        Q    -- or any things of that nature?

2        A    No.

3        Q    What -- What types of things, for example?

4        A    This is like calling for voluntarily evacuation --

5        Q    Okay.

6        A    -- keeping our citizens informed.  I -- I've called

7   a voluntary evacuation one time and -- and so we were on

8   Facebook and Blackboard Connect to keep our citizens updated

9   and things like that.

10       Q    Okay.  Understand.  Is there a place online to find

11  that document, to your rec--

12       A    I -- I -- You know, I'm not a tech person, so I

13  don't know.

14       Q    Okay.

15       A    I would -- I would assume so.

16       Q    Okay.  Just sitting here today and based on what

17  you know about the Palapas property, what does Mr. Placek

18  need to do to get a certificate of occupancy for his

19  building?

20            MR. HELFAND:  Don't answer that question

21  because it invades the attorney-client privilege.

22       Q    Well -- And don't -- don't answer it to the extent

23  that it involves communications with your lawyer.  But, you

24  know, if -- if my client wanted to go do everything required

25  to get a certificate of occu-- occupancy for the building,
```

EXHIBIT 9

CARL JOINER - 7/21/2022

```
 1    what does he need to do?

 2                 MR. HELFAND:  That is privileged information

 3    because it comes from communications with the City Attorney

 4    and the City's attorney.  Don't answer that question.

 5                 But let me see if we can fix privilege

 6    problem.  Do you know of the compliance or noncompliance of

 7    any of the plaintiff properties with City ordinances and

 8    Codes.

 9                 THE WITNESS:  No.

10                 MR. HELFAND:  Okay.  Then we don't need to

11    worry what specifics there are.

12        Q    Who -- Who would know?

13                 MR. HELFAND:  Speculation.

14        A    I would think you'd need to ask Walter Gant.

15        Q    Okay.  Well, if Walter Gant testified that he

16    doesn't know, then who would -- who would know?

17                 MR. HELFAND:  Excuse me.  I don't think Walter

18    Gant was asked that question.  But, again, you shouldn't ask

19    questions based upon your interpretation of somebody else's

20    testimony.

21                 What you're asking him is, "Anybody other than

22    Mr. Gant at the City that you're aware of who would know the

23    compliance status?"  That's what you're asking.

24                 MR. KILPATRICK:  I can ask the question

25    however I want to --
```

1          MR. HELFAND:  No, you can't.

2          MR. KILPATRICK:  -- and you can object.

3          MR. HELFAND:  You can't ask an objectionable

4  question.

5          MR. KILPATRICK:  You can object --

6          MR. HELFAND:  Yes, that's --

7          MR. KILPATRICK:  -- and I can rephrase the

8  question.

9          MR. HELFAND:  -- what I did.  Yeah, that's

10  what I just did.

11          MR. KILPATRICK:  But that's just so

12  unnecessary how you're doing this over and --

13          MR. HELFAND:  Well, what's unnecessary --

14          MR. KILPATRICK:  -- over and over again.

15          MR. HELFAND:  -- is for you to make speeches,

16  then ask a question.  You just ask questions.

17          The deposition is to proceed as if it were in

18  Court.  In Court you're not allowed to tell a -- a witness

19  what you think some other witness testified to.  You're just

20  supposed to ask questions.

21          MR. KILPATRICK:  That's a trial objection.

22          MR. HELFAND:  There's no such thing as a trial

23  versus deposition --

24          MR. KILPATRICK:  Yes, there is.

25          MR. HELFAND:  Do you understand -- No.

```
 1   Listen.  The Rule, I'll read it to you, says, "The deposition
 2   shall proceed under the same Rules at -- as if in Court,"
 3   with the exception of Rules 6, 15, and one other of the Rules
 4   of Evidence.  That's --
 5                    MR. KILPATRICK:  Really?
 6                    MR. HELFAND:  -- what the Rule says.  Yeah.
 7                    MR. KILPATRICK:  So you can make a hearsay
 8   objection that -- during -- an objection --
 9                    MR. HELFAND:  You don't have to make a hearsay
10   objection, but, yes, you can make a hearsay objection.
11                    MR. KILPATRICK:  It's not appropriate in a
12   deposition.
13                    MR. HELFAND:  But this is not -- I'm not
14   making a hearsay objection.  I'm making a speculation
15   objection, so leave hearsay somewhere else because it's got
16   nothing to do with what we're talking about.
17                    The deposition proceeds as if in Court.
18   There's no such thing as "that's a trial objection."
19                    MR. KILPATRICK:  Yeah, it is.  Hearsay.
20                    MR. HELFAND:  In your mind.  I get it.  He's
21   not -- If you want him to answer the question whether he
22   knows of anybody else, that's fine; but you don't predicate
23   it by saying, "If Mr. Gant told me this," 'cause that's not a
24   question --
25                    MR. HELFAND:  I can say whatever I want to.
```

CARL JOINER - 7/21/2022

1   Here --

2                    MR. HELFAND:  Right.  But he's not going to

3   answer that.

4                    MR. KILPATRICK:  Let's proceed.

5        Q    So if Mr. Gant doesn't know the answer to that

6   question, then who would my client go to, to find out the

7   answer to that question?

8                    MR. HELFAND:  Objection, speculation.

9        A    I still say that Mr. Gant is the place to go.

10       Q    Okay.  To your knowledge, has Mr. Gant ever told my

11  client what needs to be done to get a certificate of

12  occupancy issued?

13       A    I have no idea.

14       Q    Just wrap up that issue.  You know, sitting here

15  today, you don't know of any issues at the Palapa property

16  that are not in compliance with any Code, City Code or -- or

17  Building Code or City ordnance?

18                   MR. HELFAND:  Objection.

19       A    No.

20                   MR. HELFAND:  Witness has tes-- That

21  mischaracterizes his testimony.  He's testified he doesn't

22  know one way or the other.

23       Q    You can answer.

24       A    No.

25                   MR. KILPATRICK:  Want to take a short break?

CARL JOINER - 7/21/2022

121

```
 1              MR. HELFAND:  Sure.
 2              THE VIDEOGRAPHER:  Off the record at
 3   4:17 p.m., ending Card 2.
 4              (Break.)
 5              THE VIDEOGRAPHER:  On the record 4:28 p.m.,
 6   beginning Card 3.
 7        Q    Okay.  Mayor Joiner, who -- who is the current
 8   building official for the City of Kemah?
 9        A    His name's Alfonso.  He just started working with
10   us.
11        Q    Okay.  You don't -- Do you know his last name?
12        A    No.  Sorry, I don't.
13        Q    Oh, that's okay.  Was a -- Was there a committee
14   formed to vet candidates and interview them and things of
15   that nature?
16        A    Yes.
17        Q    Okay.  Was there a similar process that you're
18   aware of for Brandon Shoaf?
19        A    I don't know.  He was before my time.
20        Q    Okay.  And so how many -- how -- how long did it
21   take to find a new building official after Brandon Shoaf's
22   employment was terminated?
23        A    I couldn't tell you the number of days, but it
24   wasn't too long.
25        Q    Okay.  And so, in the interim, who -- who -- during
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
1    that period of time where there was no building official,

2    who -- who handled the duties of the building -- building

3    official?

4         A    Probably, Veritas.

5         Q    Bureau of Veritas?

6         A    Uh-huh.

7         Q    Okay.  Were -- Were you on the committee --

8         A    No.

9         Q    -- to select -- Okay.

10        A    No.

11        Q    Who -- who was on that committee?

12        A    You know, I'm not sure who all was on it.  I

13   believe Isaac Saldana and, maybe, Teresa Vazquez-Evans from

14   the Council and then I'm not sure here.

15        Q    Okay.  And to hire the -- the new -- to hire

16   Alfonso, the new building official, was that put up for a

17   vote before City Council?

18        A    You know, I -- I -- I'm really not sure.  I believe

19   it was because he was a community development director for

20   us, so I think it would have taken Council approval.

21        Q    Okay.  So do you -- Comparing Alfonso to -- to

22   Brandon Shoaf, do you think Alfonso's more qualified for the

23   job?

24        A    I didn't do the interview.

25             MR. HELFAND:  Yeah.
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1    Q    Okay.  Well -- But he's been -- How long has he

2    been in that role?

3    A    I don't know.  Six weeks, maybe.

4    Q    Okay.  Have -- Any complaints so far?

5    A    Not that I'm aware of.

6    Q    Okay.  I notice there have been some videos made of

7    City Council meetings made by Wayne Dolcefino?

8    A    Yes.

9    Q    Did you hire him to --

10   A    No.

11   Q    -- to make those -- or -- Directly or indirectly?

12   A    No.

13   Q    So you -- you haven't paid any compensation to

14   Wayne Dolcefino --

15   A    No.

16   Q    -- directly or indirectly?

17   A    No.

18   Q    Do you know who hired him?

19   A    No.

20   Q    Okay.  Well, we've talked about the short-term

21   rental ordinances, but, in general, are -- are you in favor

22   or opposed to short-term rentals?

23            MR. HELFAND:  That's in the executive

24   privilege -- sorry -- legislative privilege.  He's not going

25   to answer questions about what he -- positions related to the

CARL JOINER - 7/21/2022

124

```
 1   City that he favors, disfavors, or his opinion on those.

 2               MR. KILPATRICK:  Well, he doesn't vote -- vote

 3   on them.

 4               MR. HELFAND:  That's an interesting point that

 5   has nothing to do with what I just told you.  He's privileged

 6   not to answer questions about his position on issues that

 7   come before the City.

 8       Q    Before you were the Mayor, before you were elected

 9   as Mayor in 2021, were you in favor or against short-term

10   rentals?

11               MR. HELFAND:  You -- You -- I don't think you

12   understand the privilege.  When he had the opinion doesn't

13   matter now that he's a public official.  You're not entitled

14   to inquire as to his thought processes regarding matters that

15   come before the City.  No.  Any other questions?

16               MR. KILPATRICK:  I don't think you're right

17   about that but --

18               MR. HELFAND:  Well, I --

19               MR. KILPATRICK:  -- it's not a big deal.

20               MR. HELFAND:  You're entitled to your opinion,

21   but I'm not going to change anything today.

22               It also has no bearing on this case

23   whatsoever, since, as you pointed out, the Mayor takes no

24   action as it relates to any plaintiff in this lawsuit.

25               MR. KILPATRICK:  Well, that's not necessarily
```

1   true, unless it's been demonstrated --

2                  MR. HELFAND:  It is necessarily true because

3   he does not act as the -- as -- on the -- He does not vote,

4   and he does not direct the actions of staff, as he's

5   testified.  So it is not -- not necessarily true.  It is

6   actually necessarily true.  It has nothing to do with this

7   lawsuit.

8                  MR. KILPATRICK:  I disagree, but doesn't

9   matter.  We'll go ahead.

10                  MR. HELFAND:  It's okay.

11                  MR. KILPATRICK:  Okay.

12                  MR. HELFAND:  You know what deGrasse Tyson

13  would say, "You can have your own opinions, but you can't

14  have your own facts."

15                  MR. KILPATRICK:  Got to come up with some

16  better ones than that.

17                  MR. HELFAND:  I'm sorry.  I didn't hear what

18  you said.

19                  MR. KILPATRICK:  Don't -- Don't worry about

20  it.

21                  MR. HELFAND:  I don't worry about it, but I

22  don't appreciate it.

23                  (Whereupon, reporter asks for clarification;

24  briefly off the record.)

25       Q    I'm handing you what's been marked as Exhibit 18.

1                    (Exhibit 18 marked.)

2                    MR. HELFAND:  This is Kemah 165 to 167.

3          Q    Okay.  Mayor, Mayor Joiner, I've handed to you

4    what's been marked as Exhibit 18.

5          A    Okay.

6          Q    And it is a document entitled "City of Kemah,

7    Texas, Position Titles, City -- City Building Official."

8          A    Okay.

9          Q    Are you familiar with this document?

10         A    No.

11         Q    Well -- Well, this is a document that was produced

12   by the City as Kemah 105 through 107 --

13                   MR. HELFAND:  Okay.

14         Q    -- and sets forth the scope of responsibilities,

15   essential functions, necessary knowledge, skills, and

16   abilities of the building official.  Is that a fair

17   statement?

18         A    It appears so.

19         Q    Okay.  So is this something that the City

20   Administrator would have created or is this something City

21   Council would create?

22         A    No.  This would be the City Administrator.

23         Q    The City administrator would prepare this?

24         A    (NODS HEAD AFFIRMATIVELY.)

25         Q    Okay.  Do you recall the February 16th, 2022, City

CARL JOINER - 7/21/2022

```
 1    Council meeting where Mr. Meisinger, one of the City Council
 2    members, pointed out that the City had targeted certain
 3    businesses that were permitted and shut them down?  Do you
 4    recall that?
 5                 MR. HELFAND:  Excuse me.  I -- I object.  That
 6    assumes facts not in evidence.
 7                 Do you recall something like that happening
 8    with Mr. Meisinger saying that at a meeting?
 9                 THE WITNESS:  No.
10        Q    Okay.  You don't remember any -- any of that
11    discussion?
12        A    No.
13        Q    Okay.
14                 MR. HELFAND:  Let me object that the last
15    question assumes facts not in evidence, as well.
16        Q    So certificates of occupancies in the City of Kemah
17    are -- are issued to businesses.  Correct?
18                 MR. HELFAND:  Object to form of the question,
19    calls -- calls for a legal conclusion.  Sorry.  Object to the
20    form of the question because it calls for a legal conclusion.
21                 THE WITNESS:  Do I answer or --
22                 MR. HELFAND:  If you know the answer.
23        Q    You can answer.
24        A    Okay.  Ask your question again.
25        Q    Certificates of occupancy in the City of Kemah
```

CARL JOINER - 7/21/2022

128

```
 1   are -- are issued to businesses.  Correct?
 2                MR. HELFAND:  Let me object.  That now calls
 3   for a legal conclusion.
 4       A    It's more than just businesses.  Anyone that
 5   applies for a permit, complies with all the documents, then a
 6   certificate of occupancy is issued to say that they are --
 7   they have complied with the Codes and ordinances to the best
 8   of their knowledge.
 9       Q    Okay.  But -- But a -- for a single-family
10   residence, for example, you don't need to get a certificate
11   of occupancy in order to occupy your own house.
12       A    I believe you do.
13       Q    Is that a fair -- Do you have a certificate of
14   occupancy for your house?
15       A    You know, I don't recall.  It's been a long time.
16       Q    Okay.
17       A    And it would have been taken care of by the
18   contractor.
19       Q    But you don't -- you don't -- you don't have
20   possession of a certificate of occupancy in your house, do
21   you?
22       A    I could.
23       Q    You just -- You don't know?
24       A    No.  It's been twenty years ago.
25       Q    So if the building official came over to your house
```

CARL JOINER - 7/21/2022

```
 1   and said to you, "I want to see your certificate of
 2   occupancy," and -- and you say you don't have it, is he going
 3   to kick you out of the house?
 4        A    No.
 5        Q    Probably not.  Right?
 6        A    No.
 7        Q    Okay.  And...
 8             MR. KILPATRICK:  Let me just talk to -- Go off
 9   the record real quick.  Just talk to my client and see if...
10             MR. HELFAND:  Sure.
11             THE VIDEOGRAPHER:  Off the record at 4:44 p.m.
12             (Break.)
13             THE VIDEOGRAPHER:  On the record at 4:50 p.m.
14        Q    Okay.  Let's see.  So if you know, what's the
15   process for getting permits to -- to make repairs after, you
16   know, a freeze, for example?
17        A    I can't say for sure about the City, but I would
18   assume that you would get professionals involved and go
19   through all the areas that need to be covered, documented on
20   a set of documents, get a seal from a professional and submit
21   it for a permit.
22             Then make sure the inspections are made and
23   assuming all the work is done per the documents, then the
24   certificate of occupancy should be submitted.
25             Then one of the advantages of that is, is when a
```

```
 1    professional puts a seal on a set of documents, he's, pretty

 2    much, saying that it complies with Codes and ordinances.

 3         Q    Okay.  So in the -- Back in the February, 2021,

 4    freeze that affected, pretty much, all of Texas,

 5    especially --

 6                   MR. HELFAND:  Object.

 7         Q    -- these areas.

 8                   MR. HELFAND:  I'm sorry.  I thought you were

 9    done.  Go ahead.

10         Q    The -- Here, let me -- Let me start over.  In 2021,

11    February, 2021, do you re-- you recall the freeze that froze

12    most of Texas over.

13         A    Yes.

14         Q    You weren't the Mayor at that time, but at your

15    home, did you have any frozen pipes burst or anything like

16    that?

17         A    No froze pipes.

18         Q    Okay.

19         A    Just frozen landscaping.

20         Q    Okay.  And so did you repair the frozen landscaping

21    pipes?

22         A    Wait.  There wasn't any pipes.

23                   MR. HELFAND:  He didn't say pipes.

24         Q    Oh, just frozen plants.

25         A    Plants.
```

1      Q    Plants.  Okay.  Yeah.  I understand.

2           So did you know other people who had broken pipes,

3    things of that nature?

4      A    Really, no.  We drove around, when we could finally

5    get out, and Kemah came through Harvey really pretty well.

6      Q    Okay.  So -- Or, yeah.  Sorry.  Not Harvey, not --

7    not Hurricane Harvey but the -- the freeze --

8      A    Oh, the freeze.

9      Q    -- of February --

10     A    Yeah, yeah.

11     Q    -- 2021.

12     A    Yeah.  You know, again, I just was worried about

13   myself.

14     Q    Okay.  Well, do -- do you know what the City's

15   procedures, policies or ordinance -- ordinances say about

16   making repairs when there's been an emergency freeze?

17               MR. HELFAND:  Objection.

18     A    No.

19               MR. HELFAND:  Assumes facts not in evidence;

20   and calls for a legal conclusion.  But he's answered the

21   question.

22     Q    Is that something that is in the 2009 Code?

23               MR. HELFAND:  Well, let me object.  "The 2009

24   Code" is too vague for anyone to answer.

25               MR. KILPATRICK:  Okay.  No.  I'll -- I'll --

**EXHIBIT 9**

CARL JOINER - 7/21/2022

132

```
 1   I'll -- I'll clarify.  I was also pointing to it.

 2       Q    Is that also found in the 2009 International

 3   Building Code?

 4             MR. HELFAND:  Objection.  That calls for

 5   speculation.

 6       A    I don't know.

 7       Q    You don't know?

 8       A    No.

 9       Q    Okay.

10       A    Never had to search it.

11       Q    Okay.  That's a good thing.  So -- Okay.  Okay.  So

12   if -- if pipes burst in -- in a property and then -- and they

13   need to be repaired, can the owner make the repair first and

14   then apply for a permit?

15             MR. HELFAND:  Objection, a legal conclusion.

16       A    I have no idea.

17       Q    Okay.  When -- Regardless of -- Well, let's say

18   that they do make -- and that they apply for a permit, first.

19   Do they have to do a plan review to make repairs to plumbing?

20       A    I have no idea.

21             MR. HELFAND:  Objection, legal conclusion.

22       Q    You don't know?  Okay.  Do you know if --

23             MR. HELFAND:  Did you get my objection?

24             THE REPORTER:  Yes.

25             MR. HELFAND:  Thanks.
```

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1       Q    -- the 2009 International Building Code speaks to

 2  that issue?

 3                 MR. HELFAND:  Objection, speculation.

 4       A    I have no idea.

 5       Q    Okay.  Is that not -- That's not in your

 6  wheelhouse, as far as, you know, being an architect?

 7       A    I've never had to search it.

 8       Q    Okay.  No.  That's fine.  That's my question.

 9  Okay.

10       A    That's a thick book.

11       Q    Yeah.  No.  I understand.

12                 Okay.  Do you know if the City has failed -- or has

13  refused to issue any permits or have plumbing permits for

14  property that was damaged in that freeze?

15                 MR. HELFAND:  Objection, call for speculation.

16       A    No.

17       Q    Okay.  And so getting -- getting those permits to

18  make repairs, that would be something that the building

19  official would be in charge of?

20                 MR. HELFAND:  Objection, speculation.

21       A    I would assume it would be Walter Gant.

22       Q    Oh, Walter Gant?

23       A    Yeah.

24       Q    Okay.

25       A    Through the -- And the building inspector.
```

CARL JOINER - 7/21/2022

1          MR. KILPATRICK:  Okay.  I'll pass the witness.

2                    E X A M I N A T I O N

3     BY MR. HELFAND:

4          Q    Mayor, do you know, one way or another, whether any

5     of Mr. Placek's properties situated within the City of Kemah,

6     are or not -- are or are not in compliance with City Code?

7          A    Do I know of any?

8          Q    Do you know, one way or another, whether they are

9     or are not --

10         A    No, I don't.

11         Q    -- in compliance?

12              Okay.  If Mr. Placek has previously been advised by

13    some representative of the City of Kemah that he cannot have

14    a certificate of occupancy because his building does not meet

15    Code, whether it's Mr. Placek or any other person in Kemah,

16    what would you tell that person to do to get a certificate of

17    occupancy?

18         A    I think I just said that awhile ago, but I'll

19    repeat it, is, is get professionals, architect, mechanical,

20    electrical, plumbing, engineers, to come out, document what

21    you have.  Okay?  And then they need to put a set of

22    documents together to -- to fix whatever problems might be

23    out there.

24              And then they should seal that set of documents

25    stating that to the best of their ability, they've complied

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

EXHIBIT 9

CARL JOINER - 7/21/2022

135

1   with the Codes and ordinances of Kemah.

2            Then you take that to the City.  They review the

3   set.  There may be a couple of things that the engineers

4   maybe -- not a -- maybe, didn't miss but that the City

5   requires.  So they send the documents back.  They fix them.

6            Then it comes back, and if they've been fixed, then

7   they should issue you a permit.  And then make sure that it's

8   inspected and that it -- it complies with those documents.

9   And when that's done, the certificate of occupancy will be

10  issued.

11           MR. HELFAND:  Okay.  Thank you.  I have no

12  other questions.

13           MR. KILPATRICK:  Okay.  One, maybe, two more

14  questions.

15           MR. HELFAND:  Sure.

16           F U R T H E R   E X A M I N A T I O N

17  BY MR. KILPATRICK:

18    Q    Mayor Joiner, did you know that the plaintiffs have

19  done all those things you just mentioned --

20           MR. HELFAND:  Okay.

21    Q    -- and still don't have a permit after over a

22  year-and-a-half?

23           MR. HELFAND:  Okay.  Object.  That's not true

24  and that assumes facts not in evidence.  So --

25           MR. KILPATRICK:  That's not a -- That's not a

**EXHIBIT 9**

CARL JOINER - 7/21/2022

136

```
 1    legal objection.  What's your legal objection?
 2                    MR. HELFAND:  It assumes facts we both know
 3    are not only not in evidence but are not true.
 4                    MR. KILPATRICK:  That's coaching.
 5                    MR. HELFAND:  You can't ask --
 6                    MR. KILPATRICK:  You're telling him that's not
 7    true is coaching your witness.
 8                    MR. HELFAND:  No.  I'm telling you.  I'm
 9    looking at you, and I'm telling you --
10                    MR. KILPATRICK:  Oh, you think he can't hear
11    you?
12                    MR. HELFAND:  You let me know when it's my
13    turn to talk and that you're not going to interrupt me.
14                    MR. KILPATRICK:  Well, I'm doing my best to
15    try to stop the coaching before you -- well --
16                    MR. HELFAND:  This gentleman is -- This
17    gentleman doesn't need any coaching to know what he does and
18    doesn't know, but he also is not -- You're not permitted to
19    say something that's untrue and then ask a question.
20                    I'm coaching you.  Stop telling him things you
21    know are untrue.  It's not the first time.
22                    Now, do you have a question for him, as
23    opposed to a statement?
24                    MR. KILPATRICK:  My -- I, actually, asked a
25    question.
```

```
1              MR. HELFAND:  No.  You said, "Did you know
2    that this happened?"  That's a statement because it
3    isn't proven --
4              MR. KILPATRICK:  That's a question.
5              MR. HELFAND:  -- in the records.
6              Show us where that happened and then you can
7    ask him questions about that.  You can't pretend a fact and
8    say, "Did you know this?"
9              MR. KILPATRICK:  We've already shown the
10   application to him.
11             MR. HELFAND:  You want to ask the -- the --
12   the witness whether he knows if your client is or isn't in
13   compliance, a question that was already asked, or whether
14   your client has done those things, then go ahead and ask him
15   that but don't tell him something.
16             You're allowed to communicate --
17   Q    Did you know --
18             MR. HELFAND:  Go ahead.
19   Q    Did you know that T&W Holdings applied for a
20   plumbing permit after making repairs after the freeze and
21   still doesn't have that permit?  Did you know that?
22   A    They applied for a permit?
23   Q    Yes.
24   A    I did not know that.
25   Q    Okay.  Did you know that T&W Holdings applied for
```

CARL JOINER - 7/21/2022

138

1    an electrical permit?

2         A    Did not know that.

3         Q    And did -- Okay.  Well, then, I guess, it's also

4    true to follow that you don't know that they -- T&W Holdings

5    was actually issued the -- the electrical permit.

6         A    Did not know that.

7         Q    Okay.  Do you know why the City will not issue a

8    plumbing permit to T&W Holdings?

9              MR. HELFAND:  I object, assumes facts not in

10   evidence that the City will not issue a permit.  But --

11        Q    You can answer.

12             MR. HELFAND:  Do you know whether the City

13   will or will not issue a permit?

14             THE WITNESS:  No.  I -- I mean, I don't know

15   the situation.

16        Q    Okay.  Well -- And we already looked at this

17   earlier, but you saw that the short-term rental application

18   was placed on hold.

19             MR. HELFAND:  No.  Again, that's not what he

20   said and that's not what the document says.  The document has

21   the words "On Hold" written on it.  There's no evidence in

22   this case that the short-term rental application was placed

23   on hold.

24             MR. KILPATRICK:  Anyone with --

25             MR. HELFAND:  Ask questions.

EXHIBIT 9

CARL JOINER - 7/21/2022

```
1                   MR. KILPATRICK:  -- common sense would know --

2                   MR. HELFAND:  Ask --

3                   MR. KILPATRICK:  -- that that means it's on

4      hold.

5                   MR. HELFAND:  No.

6                   MR. KILPATRICK:  Okay.

7                   MR. HELFAND:  We're in Court.  We're in Court.

8                   MR. KILPATRICK:  Well, he --

9                   MR. HELFAND:  Your common sense --

10                  MR. KILPATRICK:  Then -- Then -- Then you can

11     cross me.

12                  MR. HELFAND:  -- may not be -- your common

13     sense may not be his common sense.  Ask questions.  Don't

14     talk to him.  Ask questions.

15                  MR. KILPATRICK:  No.  The way it actually

16     works is I ask questions and then you object and --

17                  MR. HELFAND:  Ask questions.

18                  MR. KILPATRICK:  -- then you re-direct.

19                  MR. HELFAND:  Ask questions.  Don't make --

20                  MR. KILPATRICK:  That's what I --

21                  MR. HELFAND:  -- statements.

22                  MR. KILPATRICK:  You -- You don't -- I'm not

23     going to listen to what you tell me to do.

24                  MR. HELFAND:  I know.

25                  MR. KILPATRICK:  I follow the Rules.
```

EXHIBIT 9

CARL JOINER - 7/21/2022

```
 1              MR. HELFAND:  I know.  That's unfortunate, but
 2   you've made that clear.
 3              MR. KILPATRICK:  Well, no.  I'm glad.  I'm
 4   really glad that I don't have to.
 5              MR. HELFAND:  Ask questions.
 6              MR. KILPATRICK:  Your reputation --
 7              MR. HELFAND:  Do you have more questions?
 8              MR. KILPATRICK:  Yes, I do.
 9              MR. HELFAND:  Go ahead.
10              MR. KILPATRICK:  If you -- We'd get through
11   much --
12              MR. HELFAND:  Just ask a question.
13              MR. KILPATRICK:  Get through it much faster
14   if --
15              MR. HELFAND:  Don't make comments to me.
16              MR. KILPATRICK:  -- you wouldn't interrupt me.
17              MR. HELFAND:  Just ask a question.
18              MR. KILPATRICK:  You done?
19              MR. HELFAND:  If I'm done, I'm leaving.  Do
20   you have another question?
21              MR. KILPATRICK:  I'm -- I just don't want to
22   interrupt you again.
23              MR. HELFAND:  Do you have another question?
24              MR. KILPATRICK:  Just -- Just going on --
25              MR. HELFAND:  Don't --
```

EXHIBIT 9

CARL JOINER - 7/21/2022

141

1            MR. KILPATRICK:  -- and on and on.

2            MR. HELFAND:  You know, what?  Act like a

3    professional adult.  Do you have another question?

4            MR. KILPATRICK:  Yes, I do.

5            MR. HELFAND:  Now's the time to ask.

6        Q    Okay.  Mayor Joiner, you saw the document we looked

7    at earlier, the short-term rental application.  Correct?

8        A    I did.

9        Q    You saw the words "On Hold," on the front of it.

10   Correct?

11       A    I did.

12       Q    And you saw the words say, "Needs change of

13   occupancy."

14            MR. HELFAND:  No.  It says, "Needs change

15   OCC."

16       Q    Well, anyone with common sense knows that means

17   change of occupancy, if anyone --

18            MR. HELFAND:  Or, maybe, it stands -- Maybe

19   "OCC" stands for something.  Again, you're not testifying.

20   Ask questions.

21            MR. KILPATRICK:  I'm not asking you a

22   question, and I don't want your side-bar comments, either,

23   but...

24            MR. HELFAND:  Well, you -- Here's the thing.

25   You can't make a comment like, "Anyone with common sense

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1    knows," and then say your opinion of something; and then say,

2    "But I don't want you to tell me what you think about that."

3    Just ask questions like you were in Court.

4                    MR. KILPATRICK:  And just make objections --

5                    MR. HELFAND:  Yeah.

6                    MR. KILPATRICK:  -- in accordance with --

7                    MR. HELFAND:  I'm telling you right now.

8                    MR. KILPATRICK:  -- the Rules.

9                    MR. HELFAND:  Stop speechifying.

10                   MR. KILPATRICK:  You're -- You're the only one

11   that's still --

12                   MR. HELFAND:  Do you have another question?

13                   MR. KILPATRICK:  You done?

14                   MR. HELFAND:  One more time, and we're walking

15   out the door.  Do you have another question?

16                   MR. KILPATRICK:  Oh, no.  Yeah, I do.

17                   MR. HELFAND:  All right.  You do that again,

18   and we're done.  You're not going to talk to me like that.

19   That's unprofessional and rude.

20                   MR. KILPATRICK:  I didn't say anything.

21                   MR. HELFAND:  Yes, you did.  Do you have

22   another question?

23                   MR. KILPATRICK:  Yes, I do.

24                   MR. HELFAND:  It's on the record.  When you

25   say, "I don't say anything," you're on video, and you're on

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1    the record of what you said.

2                    Okay.  Ask your question.

3                    MR. KILPATRICK:  Oh, I know.  Yeah, I know

4    that.

5                    MR. HELFAND:  Ask your question.

6                    MR. KILPATRICK:  I paid for it.

7         Q    So, anyway.  Sorry for the distraction.

8                    MR. HELFAND:  Ask your question.

9         Q    Let's see.  Get back to where I was.

10                   Okay.  Did you know that T&W Holdings applied for a

11   permit for the deck with engineered drawings attached to it,

12   and the City still has not issued a permit for that?

13                   MR. HELFAND:  Excuse me.  Object to that.

14   Assumes facts not in evidence.

15                   Do you know whether that happened?

16                   THE WITNESS:  No.

17        Q    Okay.  And when you had the -- that meeting at the

18   restaurant with Matt Placek, you didn't tell him that he

19   needed to get a permit for the deck, did you?

20        A    I don't think we got into that level or anything

21   else.  Basically, I -- I said before, he wanted to get a

22   meeting together, everybody, and I did that and the meeting

23   didn't happen.

24                   MR. HELFAND:  And my objection was, assumes

25   facts not in evidence that there was a discussion about the

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

1    need for a permit or the deck at all.

2        Q    And one last question.  When making repairs to

3    plumbing that's already been installed in the building,

4    there's no need to have -- have a plan review to make repairs

5    to plumbing.  Correct?

6        A    I don't know what the requirements are.

7        Q    You don't know.

8                MR. KILPATRICK:  Okay.  I'll pass the witness.

9                MR. HELFAND:  Thank you.  We'll reserve all

10   the rest of our questions for another time.  Thank you,

11   Mr. Mayor.

12               THE VIDEOGRAPHER:  Ending deposition at

13   5:06 p.m., with Card 3.

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 9**

CARL JOINER - 7/21/2022

145

```
 1                    CHANGES AND SIGNATURE

 2      PAGE       LINE       CHANGE    REASON

 3      _____

 4      _____

 5      _____

 6      _____

 7      _____

 8      _____

 9      _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23      _____

24      _____

25      _____
```

**EXHIBIT 9**
CARL JOINER - 7/21/2022

146

1    I, CARL JOINER, have read the foregoing deposition and
hereby affix my signature that same is true and correct,
2    except as noted above.

3

4                              _____
                               CARL JOINER
5

6
THE STATE OF _____:
7    COUNTY OF _____:

8    Before me, _____, on this day personally
appeared CARL JOINER, known to me (or provided to me under
9    oath or through _____) (description of identity
card or other document) to be the person whose name is
10   subscribed to the foregoing instrument and acknowledged to me
that they executed the same for the purposes and
11   consideration therein expressed.

12   Given under my hand and seal of office this _____ day of
_____, _____.
13

14

15                              _____
                               NOTARY PUBLIC   IN   AND   FOR
16                             THE STATE OF _____

17

18

19

20

21

22

23

24

25

**EXHIBIT 9**

CARL JOINER - 7/21/2022

```
 1    THE STATE OF TEXAS:

 2    COUNTY  OF  HARRIS:

 3
            I, Sheila J. Nieto, a Certified Shorthand Reporter
 4
      in and for the State of Texas, certify that the statements in
 5
      the caption hereto are true; that the above and foregoing
 6
      answers of the witness, CARL JOINER, to the interrogatories
 7
      as indicated were made, before me, by the said witness after
 8
      being first duly sworn to testify the truth, the whole truth,
 9
      and nothing but the truth, and same were reduced to
10
      typewriting under my direction; that the above and foregoing
11
      statement, as set forth in typewriting, is a full, true, and
12
      correct transcript of the proceedings had at the time of
13
      taking said statement.
14
            GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this,
15
      the 5th day of August,  2022.
16

17
                          _____
18                        Sheila J. Nieto, Texas CSR 1676
                          Expiration Date:  11/30/2023
19                        Carol Davis Reporting,
                          Records & Video, Inc.
20                        Firm Registration No. 47
                          7838 Hillmont
21                        Houston, Texas  77040
                          Telephone:  713.547.5100
22                        Fax:  713.647.5157

23

24

25
```

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

EXHIBIT 9
CARL JOINER - 7/21/2022

148

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                     GALVESTON COUNTY

3    T&W HOLDING COMPANY, LLC;      :
     PALAPAS, INC.; AND IT'S FIVE   :
4    O'CLOCK HERE, LLC;             :
                                    :
5         Plaintiffs;              :
                                    :
6    v.                             :Civil Action No. 3:22-cv-7
                                    :
7    CITY OF KEMAH, TEXAS;          :
                                    :
8         Defendant.                :

9                       AFFIDAVIT

10        I, Sheila J. Nieto, do hereby certify that I was the
     officer before whom the oral deposition of CARL JOINER was
11   taken on July 21, 2022.

12   I do hereby certify that on _____.

13          _____ The signature page of the deposition, along
                  with a condensed copy was submitted to the
14                witness to obtain his signature thereon.

15          _____ The original deposition was submitted to
                  _____ for examination and
16                signature.

17          _____ Notification was given to _____
                  that the original deposition given in the
18                above cause was complete and ready for
                  examination and signature at the offices of
19                Carol Davis Reporting, Records & Video, Inc.,
                  within thirty days of said date.

20
     _____     More than thirty days have elapsed since the
21              submission.  The original deposition, unsigned,
                together with all exhibits, is being forwarded
22              to _____ on _____.

23   _____     More than thirty days have elapsed since the
                submission of the original deposition and it
24              has not been returned to the offices of
                Carol Davis Reporting, Records & Video, Inc.

25
```

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

**EXHIBIT 9**

CARL JOINER - 7/21/2022

149

1     _____        The original deposition has been signed or the
                    original signature page was signed and
2                   notarized.  The attached page (s) contains
                    changes, if any, made by the witness and the
3                   reasons therefore.  The original deposition,
                    together with all exhibits, is being forwarded
4             to _____ on _____.

5         That a copy of this Affidavit was served on all
      parties shown herein, pursuant to information made a part
6     of the record at the time said testimony was taken:

7     FOR THE PLAINTIFFS:

8         Mr. Brian Kilpatrick
          WILSON, CRIBBS & GOREN, P.C.
9         2500 Fannin Street
          Houston, Texas  77002
10        Telephone:  713.222.9000
          Fax:  713.229.8824
11        Email:  bkilpatrick@wcglaw.com

12    FOR THE DEFENDANT:

13        Mr. William S. Helfand
          LEWIS BRISBOIS BISGAARD & SMITH LLP
14        24 Greenway Plaza, Suite 1400
          Houston, Texas  77046
15        Telephone:  713.659.6767
          Fax:  713.759.6830
16        Email:  bill.helfand@lewisbrisbois.com

17
          SUBSCRIBED AND SWORN TO, on this, the _____ day
18    of _____, 2022.

19

20

21                          _____
                            Carol Davis Reporting,
22                          Records & Video, Inc.
                            Firm Registration No. 47
23                          7838 Hillmont
                            Houston, Texas  77040
24                          Telephone:  713.547.5100
                            Fax:  713.647.5157
25