READING COPY FOR SIGNATURE

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON COUNTY

T&W HOLDING COMPANY, LLC;  :
PALAPAS, INC.; AND IT'S FIVE  :
O'CLOCK HERE, LLC;  :
                                              :
      Plaintiffs;            :
                                              :
v.                              :Civil Action No. 3:22-cv-7
                                              :
CITY OF KEMAH, TEXAS;   :
                                              :
      Defendant.          :
****************************

ORAL AND VIDEO DEPOSITION OF
CARL JOINER
JULY 21, 2022
(VOLUME 1 OF 1)
****************************

ORAL AND VIDEO DEPOSITION OF CARL JOINER, produced as a
witness at the instance of the Plaintiffs, and duly sworn,
was taken in the above-styled and numbered cause on the 21st
of July, 2022, from 1:10 p.m. to 5:06 p.m., before Sheila J.
Nieto, CSR, in and for the State of Texas, reported
stenographically, at Kemah City Hall, 1401 State Highway 146,
Kemah, Texas 77565; pursuant to Notice, the Federal Rules of
Civil Procedure, and the provisions stated on the record or
attached hereto.

**Page 2**

I N D E X
                                                    PAGE NO.
Appearances ............................................ 3
CARL JOINER
   Examination by Mr. Kilpatrick ................... 4
   Examination by Mr. Helfand ...................... 134
   Further Examination by Mr. Kilpatrick ......... 135
Changes and Signature ............................ 145
Reporter's Certificate ............................... 147

E X H I B I T S

NO./DESCRIPTION                          PAGE NO.
NOTE: Exhibits 1 through 11 were marked in Volume 1
   and Volume 2 of Mr. Walter Gant's deposition.)
12 ................................................ 48
9-1-2021 Kemah City Council Meeting agenda
13 ................................................ 69
Resolution Number 2017-11
14 ................................................ 80
Email string re: 6th Street
15 ................................................ 82
City of Kemah application for short-term rental
permit
16 ................................................ 86
Certificate of Occupancy application
17 ................................................ 86
(NOTE: THIS EXHIBIT IS IN SEALED ENVELOPE PER
MR. HELFAND'S INSTRUCTION)
Email string re: Palapa's meeting
18 ................................................ 126
The City of Kemah, Texas, city building official
scope of responsibilities

**Page 3**

A P P E A R A N C E S
FOR THE PLAINTIFFS:
   Mr. Brian Kilpatrick
   WILSON, CRIBBS & GOREN, P.C.
   2500 Fannin Street
   Houston, Texas  77002
   Telephone:  713.222.9000
   Fax:  713.229.8824
   Email:  bkilpatrick@wcglaw.com
FOR THE DEFENDANT:
   Mr. William S. Helfand
   LEWIS BRISBOIS BISGAARD & SMITH LLP
   24 Greenway Plaza, Suite 1400
   Houston, Texas  77046
   Telephone:  713.659.6767
   Fax:  713.759.6830
   Email:  bill.helfand@lewisbrisbois.com
THE VIDEOGRAPHER:
   Mr. Keith Bowman
   Carol Davis Reporting, Records & Video, Inc.
   7838 Hillmont
   Houston, Texas  77040
   Telephone:  713.647.5100
   Fax:  713.647.5157

ALSO PRESENT:

   Mr. Matthew Placek

*[handwritten notes in margin:]*
- Statements were supplemental written amended prior to submittal to court
- Perjurious statements don't go to the merit of the case!
- Which maybe a witness to these things if investigated by K.P.D.
- undermines the ability to defend itself before the court has had the ability to rule on the merits

**Page 4**

(Whereupon, the reading of the introduction
into the record, pursuant to Rule 30(b)(5), by the reporter,
was waived by all counsel present.)
   THE REPORTER:  Stipulations on the record?
   MR. HELFAND:  Federal Rules of Civil
Procedure.
   MR. KILPATRICK:  Yeah.
   THE VIDEOGRAPHER:  On the record on July 21,
2022, at 1:10 p.m., beginning Card 1.
   CARL JOINER,
Having been first duly sworn, testified as follows:
   E X A M I N A T I O N
BY MR. KILPATRICK:
   Q  Good afternoon, Mr. Joiner.  I'm Brian Kilpatrick,
and you -- you understand I represent the plaintiffs in this
lawsuit?
   A  Yes.
   Q  Okay.  I just want to go over some ground rules.
Have you given your deposition before?
   A  Have I given one?
   Q  Yes.
   A  Yes.
   Q  Okay.  Approximately, how many times?
   A  Less than five.
   Q  Less than five?

READING COPY FOR SIGNATURE

5

1   A   Yeah.
2   Q   Okay.  And what was -- Were you a party in the
3   lawsuit, in which you gave a dep-- deposition, an attorney --
4   any of those depositions?
5   A   We were suing.
6   Q   Okay.
7   A   My wife and I.
8   Q   Okay.  So you understand the -- basically, how it
9   works.  I'm going to ask questions, you -- and you wait 'til
10  I finish my question before you give an answer, so we have a
11  clear record.
12  A   Yes.
13  Q   Okay.  And so I'm going to be referring to the
14  property or Palapas and you understand I'm referring to 606
15  and 608 6th Street, in Kemah, Texas?
16  A   Yes.
17  Q   Okay.  And when I refer to "defendant," I'm,
18  obviously, re-- referring to the City of Kemah.  And the
19  plaintiffs are the -- the three plaintiffs in this lawsuit,
20  T&W Holding Company, LLC, Palapas, Inc., and It's Five
21  O'Clock --
22       MR. HELFAND:  Here.
23  Q   -- Here --
24       MR. KILPATRICK:  Yeah.
25  Q   -- It's 5:00 O'Clock Here, LLC.  So I'll re-- I'll

6

1   refer to those three as "the plaintiffs."  Okay?
2       Now -- Okay.  Tell me a little bit about your
3   background.  Where did you -- Where'd you go to college and
4   any post-graduate studies you have?
5   A   Grew up in Kansas.  I went to University of Kansas.
6   Moved to Houston in 1973.  Moved to Lake Charles, Louisiana,
7   in 1977.  Came back to the Houston area, in Kingwood, in
8   1983.  Raised our family in Kingwood.  In the late '90s, when
9   our kids were out of high school, we started coming down
10  here, on the weekends, and, eventually, built a weekend home.
11  And since then, have sold our Kingwood house and live here
12  full time.
13  Q   Okay.  And do you -- do you have any professional
14  licenses or certifications, designations, things of that
15  nature?
16  A   Yes, I'm a registered architect in Texas.
17  Q   Okay.  And any other professional certifications or
18  designations in connection with that?
19  A   National Council of Architectural Registration
20  Board, American Institute of Architects.
21  Q   Okay.  And so do you -- let -- let's -- how -- how
22  did you get -- Where did you start in the architecture
23  practice?
24  A   In Houston.
25  Q   Okay.  Did you work for another company?

7

1   A   Yes.
2   Q   What company was that?
3   A   The Klein Partnership.
4   Q   Okay.  And what -- what type of properties did --
5   did you des-- or -- or what type of buildings did you design
6   or develop?
7   A   Well, when you're first starting out, you're not
8   designing anything.  You're --
9   Q   Okay.
10  A   -- maybe, doing -- working drawings or whatever.
11  But The Klein Partnership is where I started my
12  apprenticeship.  To be a registered architect, you have to
13  have a five-year degree and then work for three years for a
14  firm before you can take your exam.  So I started at
15  The Klein Partnership; and they did, mostly, hospitals.
16  Q   Okay.  And currently, now, what type of
17  architecture work do you do?
18  A   Well, we've had our firm for forty-five years, but
19  I'm in the process of selling our firm, and so I'm not active
20  in the day-to-day business.  I'm more of a PR person.  But we
21  had been doing schools and municipal work for over forty
22  years.
23  Q   Okay.  What school districts and municipalities
24  have you worked for?
25  A   All the way up to Huntsville, Willis, Humble,

8

1   Houston, Cy-Fair, Hitchcock, Clear Creek.  There's probably
2   some more but that's what I know right now.
3   Q   Okay.  And City of Kemah?
4   A   I've done no work for City of Kemah.
5   Q   Okay.  Who -- What architect-- architecture firm
6   designed the City Hall building that we're in right now?
7   A   Okay.  So there's two buildings here.  I'm not sure
8   about over there.  This one was done by a local architect
9   here in Kemah.  For some reason, I can't remember his name.
10  Q   That's okay.  So the other building?
11  A   Yeah, I have no idea who did -- That was done back
12  before my time in Kemah.
13  Q   Okay.  Is there a company called -- named Duron
14  Tech?
15  A   Yeah, that's a contractor, uh-huh.
16  Q   Okay.  You -- You don't work for Duron Tech?
17  A   No.  They're a construction company.
18  Q   Okay.  Does your architecture firm do work for
19  them?
20  A   They have been the contractor on a number of our
21  projects that we were the architect on.
22  Q   Okay.  Okay.  So to prepare for your deposition
23  today, did you review any documents?
24  A   No.
25  Q   No?

READING COPY FOR SIGNATURE

---

9

1      A   No.

2      Q   Did you talk to anyone? I mean, other than

3   Mr. Helfand.

4      A   No.

5      Q   So do you feel like you have a good recollection of

6   what transpired since you became Mayor through today?

7      A   Just let me say this, that I had very little input

8   on this project --

9      Q   On the --

10     A   -- when I came.

11     Q   On the Palapas?

12     A   Yeah, right.

13     Q   Okay. So who with the City was kind of, I guess,

14  you can say, taking the lead on the Palapas project?

15     A   Walter Gant.

16     Q   Okay.

17     A   The City Administrator.

18     Q   And so what was -- what was he doing in connection

19  with the Palapas project and the permits?

20        MR. HELFAND: Objection, calls for

21  speculation.

22     A   Again, that's a day-to-day operation. I'm the

23  Mayor. I don't get into that.

24     Q   Okay. But you -- It -- It was your understanding,

25  he was taking the lead on the Palapas project.

---

10

1         MR. HELFAND: Objection, calls for

2   speculation; assumes facts not in evidence.

3         THE WITNESS: Do I need to answer?

4         MR. HELFAND: And, also, vague as to "the

5   Palapas project."

6         MR. KILPATRICK: Oh. Well, I'm sorry. He --

7   He referred to it as "the -- the -- the project," so --

8         MR. HELFAND: I know, but he didn't --

9         MR. KILPATRICK: We'll --

10        MR. HELFAND: -- refer to it as "the Palapas

11  project." And it doesn't matter what he said. Your question

12  is vague.

13        Again, don't talk to me, just ask another

14  question or let him ask one that's -- that's bad, either way.

15     Q   Don't worry. You -- You can answer the question.

16      So it was your under-- understanding Mr. Gant was

17  taking the lead with respect to the Palapas property?

18     A   Walter Gant is our City Administrator and is over

19  permitting, public works, and that's why I assume he was in

20  charge.

21     Q   Okay. What about -- Let's see. So did you look

22  through your emails to prepare for today?

23     A   No.

24     Q   No. So... Hold on. Okay. So when you became --

25  You were elected Mayor in May of 2021. Is that correct?

---

11

1      A   Correct.

2      Q   So after you took office, what were the primary

3   objectives that you wanted to accomplish as Mayor?

4      A   To make sure Maritage project moved forward; get

5   our Evergreen Memorial Parkway paved; carry out our drainage

6   study; and meet with Council and work together to develop a

7   strategic -- strategic plan for Kemah.

8      Q   Okay. What about short-term rentals?

9      A   That wasn't in my plan for the City.

10     Q   Okay. How about with respect to food trucks?

11     A   Wasn't in my plan.

12     Q   Okay. At some point did the City create a

13  short-term rental subcommittee?

14     A   Yes; I was not on it.

15     Q   Okay. Who was on the -- the subcommittee?

16     A   You know, I'm -- I'm not totally sure. I just know

17  that Teresa Vazquez Evans, our -- a Council member, was, I

18  think, was head of it.

19     Q   Okay. And was Walter Gant on the short-term rental

20  subcommittee?

21     A   I'm not sure.

22     Q   And what about Brandon Shoaf?

23     A   I'm not sure.

24     Q   Okay. How many times have you been elected Mayor

25  of Kemah?

---

12

1      A   Three times.

2      Q   Okay. And when -- what -- when was the first time

3   you were elected Mayor?

4      A   2015.

5      Q   Okay. And the second?

6      A   2017.

7      Q   And the third was 2021?

8      A   Uh-huh.

9      Q   Okay. Okay. And who -- who were your opponents in

10  each of those elections?

11     A   In 2015, Bob Cummings; 2017, I didn't have an

12  opponent; and in 2021, it was Terri Gail and Matt Wiggins.

13     Q   Okay. Okay. So the -- How would you characterize

14  the campaign season leading up to the election in 2021,

15  between you, Terri Gail, and Matt Wiggins?

16     A   Contentious.

17     Q   Okay. What -- What types of things were happening

18  that made it contentious?

19     A   Negative emails, negative billboards, those types

20  of things.

21     Q   Okay. And out-- out-- outside of the campaign

22  season, were there any disputes between you and Terri Gail

23  before y'all were running against each other?

24     A   Terri Gail and I were friends and then I supported

25  someone that she didn't want to support for water board and

---

READING COPY FOR SIGNATURE

13

1   from that point on, we hadn't been friends.
2      Q   Okay.  Now, who was that person?
3      A   Ronnie -- Can't remember Ronnie's last name but...
4      Q   Okay.  That's okay.  What -- What was the -- What
5   was the problem that at least she thought about Ronnie?
6      A   To be sure, I'm not sure.
7      Q   And what about before the campaign season in
8   the 2021 election, did you have any disputes with Matt
9   Wiggins?
10     A   Before the '21?  He had turned in 2019 for the same
11  reason that Terri turned, that I didn't support their
12  candidate.
13     Q   Okay.  So as the Mayor, tell me what -- what you do
14  on a day-to-day basis.
15     A   Well, this is a strong Mayor city and it's a -- I'm
16  a volunteer, nonpaid.  So for the most part, I'm here once a
17  week during the afternoons, to communicate with our City
18  Administrator and our Police Chief; and then prepare for
19  Council meetings, and, occasionally, might sit in on a
20  meeting.
21     Q   Okay.  So what types of things do you go over with
22  the City Administrator at that meeting each week?
23     A   Well -- So our City government, again, is a strong
24  Mayor.  I'm over the City Administrator and the Police Chief.
25  That's it.  City Administrator's over the City Hall side.

14

_city sec_

1   Police Chief is over the Police side.  So I don't necessarily
2   communicate with them, our City staff or police.  And my
3   duties are to -- Council sets budget and policy.  It's my
4   responsibility to carry it out.
5      Q   Okay.  And when you say it's a -- "a strong
6   Mayor" -- "Kemah's a strong Mayor city," what -- what do you
7   mean by that?
8      A   Well, I'm the CEO of the City.
9      Q   Okay.  And so by contrast, what would be a -- a
10  weak Mayor city; and how is that different?
11     A   Well, the other one would be City Manager form of
12  government.
13     Q   Okay.  And so with respect to matters involving,
14  you know, Building Code enforcement, what role do you play in
15  that --
16     A   None.   _True_
17     Q   -- in enforcement actions?
18     A   None.   _True_
19     Q   Okay.
20     A   I had staff for that.
21     Q   Okay.  So are there any types of code enforcement
22  actions that require your approval?
23     A   No.
24     Q   Do -- Do you give directives to the City   _potential_
25  Administrator with respect to matters relating to code   _witness conflict_

15

1   enforcement?
2      A   No.
3      Q   Okay.  Let's see.  I think it's Exhibit 1 -- or,
4   sorry -- Exhibit 5.  I'm handing you what's been marked as
5   Exhibit 5.
6         MR. HELFAND:  Let's just put on the record
7   that Exhibit 5 is -- What was that number, again?  Can I see
8   that for one second, Mayor.
9         THE WITNESS:  Sure.
10        MR. HELFAND:  Thanks.  Exhibit 5 is Kemah 834
11  and 835.  Thanks.
12     Q   Okay.  The -- I've just handed Exhibit 5, which is
13  titled "Performance Improvement Plan"?
14     A   Uh-huh.
15     Q   Well, first, let me just ask you.  What is a
16  performance improvement plan?
17     A   In this particular case, Council asked to review
18  Walter Gant and come up with some things that he could
19  improve on; and as Mayor, I was the one responsible to -- to
20  sign it.
21     Q   Okay.  So who -- who drafted this document?
22     A   I'm assuming, the City Secretary.  I don't recall.
23     Q   Okay.  And this was -- If you look down, it's --
24  it's to Walter Gant, City Administrator, from you, Carl
25  Joiner, as Mayor, dated February 8th, 2022.  And it starts

16

1   off by saying, "Over -- Over the course of your assignment as
2   City Administrator, Police Chief of the City of Kemah, which
3   began October 1st, 2019, and October 1st, 2021, was modified
4   to assume only the -- only the duties of City Administrator,
5   it has become increasingly evident that you have not been
6   performing your assigned work in accordance with what is
7   expected of you."
8         And it says, "You have failed to address major
9   deficiencies within the City's departments and/or disregard
10  directives given by the Mayor and City Council."
11        And then when you go further down, there's a list
12  of items starting with Item No. 1, that, "You have failed at
13  times to follow Mayor's, Council's directive," and you get --
14  it gives a list of three examples.
15        What was -- What was -- Just as -- as a bigger
16  picture, what was the major problem with Walter Gant's
17  performance?
18        MR. HELFAND:  Objection, vague as to "major
19  problem."  It also assumes facts not in evidence that there
20  was a major problem.
21     Q   You can still answer.
22     A   Again, this is a Council directive.  You know, as
23  Mayor, I don't vote.  I'm responsible for carrying out their
24  actions by signing this document.
25     Q   Okay.  Well, one -- one of the things on here, Item

READING COPY FOR SIGNATURE

17

1  number -- I -- I guess, under 1-C, it says, "You -- You
2  failed -- You have failed at times to follow Mayor, Council's
3  directives, including" -- And one of which was, "including
4  Brandon Shoaf in the short-term rental subcommittee, when
5  asked not to include him."  Did I read that correctly?
6      A   Yes.
7      Q   Who asked Walter Gant not -- to -- to not include
8  Brandon Shoaf in the --
9      A   I wasn't there --
10     Q   -- short-term rental?
11     A   -- and I wouldn't know.
12     Q   Okay.  But you don't -- you -- I mean, you -- you
13  did -- You signed this and did send it to Walter Gant.
14  Correct?
15     A   Right.
16     Q   Okay.  So you don't dispute that somebody asked, on
17  the City Council, for him not to be on the sub-- on the
18  subcommittee.
19         MR. HELFAND:  Objection, speculation.
20     A   This was reviewed by the City Attorney, and I was
21  instructed to sign it.
22     Q   Okay.  So if you -- Do you disagree with any of
23  the -- Well -- And take your time to look it over, but do you
24  disagree with any of the statements in this document?
25         MR. HELFAND:  I'm sorry.  That would call for

18

1  him to speculate; and assumes facts not in evidence that he
2  has the background to agree or disagree.
3         But if you have, you can certainly tell him
4  anywhere where you agree or disagree.
5      A   Again, this is a Council document, and I was
6  instructed to sign it.  I was in on the meeting when this was
7  discussed, but again, I don't vote.  It's a --
8      Q   Okay.
9      A   -- Council document, basically.
10     Q   Okay.  So what -- So a majority of the Council
11  members have to vote to approve this.  Is that correct?
12     A   Yes.
13     Q   Okay.  So when was that vote held?
14     A   I don't recall.
15     Q   Would it have been at a City Council meeting?
16     A   It would have had to be, yes.
17     Q   Okay.
18     A   Uh-huh.
19     Q   And if you go to the second page, under A, it says,
20  "Under your supervision, the following known deficiencies
21  existed in the building department and were not addressed in
22  a timely manner, including but not limited to absence of
23  procedures for information, minimum requirements needed for
24  permits, absence of procedures for Council consideration of
25  variances or plat approvals, allowing items on the agenda

19

1  without properly evaluating documents in a timely manner,"
2  and that one goes on a little bit more.
3         No. 3, "Lack of any explanation of how to -- how
4  proposed International Code changes vary from prior year's
5  codes and why it's necessary to change now.  This shows lack
6  of quality control of the agenda."
7         "Lack of responses from billing department and
8  other staff members to emails from Council -- Council or
9  told, 'Yes, we'll follow up on it,' and then no response for
10  long periods of time."
11         "Lack of communication with Council regarding how
12  Brandon Shoaf became the Fire Marshal; and further, the
13  hiring of Brandon as the building official, when he lacked
14  credentials for the position; and then, even after a year
15  passed, Brandon still lacks the credentials to perform as the
16  building official."  Did I read all that correctly?
17     A   Yes.
18     Q   Do you -- Do you agree with those statements?
19     A   You'll notice, Council is listed in here, not
20  Mayor.
21         MR. HELFAND:  And just for the record, he's
22  saying, "Council," C-I-L, not counsel, S-E-L, since the City
23  Attorney was also involved.
24         THE WITNESS:  Right.
25         MR. KILPATRICK:  Yeah.

20

1         THE WITNESS:  Both.
2         MR. HELFAND:  Right.
3         THE WITNESS:  Yes, sir.
4         MR. KILPATRICK:  Okay.
5         THE WITNESS:  But, "the" -- "the" --
6         MR. HELFAND:  So this is --
7         THE WITNESS:  -- "Council," is what it says
8  right --
9         MR. HELFAND:  This is --
10        THE WITNESS:  -- here.
11        MR. HELFAND:  Right.
12        THE WITNESS:  C-I-L.
13        MR. HELFAND:  That's Council, C-I-L.  Yes.
14        MR. KILPATRICK:  Right.
15        MR. HELFAND:  That's what I wanted to make
16  clear.
17        MR. KILPATRICK:  Right.
18        THE WITNESS:  Yeah.
19     Q   So -- So you are -- you are -- You've sat in --
20  in -- in the meetings where all these issues were discussed.
21  Correct?
22     A   Correct.
23     Q   Okay.  And -- Well, as -- as the Mayor, was that
24  your impression of Brandon Shoaf's and Walter Gant's
25  performance?

READING COPY FOR SIGNATURE

---

**21**

1    A   Again, I -- I was not involved, really, in the
2    conversation.  Okay?
3    Q   Well -- Okay.  But -- Well -- But you, as the -- as
4    the Mayor, implement what the -- just like when -- how you
5    signed this document, you'd implement what the City Council
6    votes on and approves.  Correct?
7    A   Right.
8    Q   Okay.
9    A   And, again, I don't vote.
10   Q   Right.  And -- And you oversee the City
11   Administrator.  Correct?
12   A   Correct.
13   Q   And you oversee the building official.
14   A   No.
15   Q   Okay.  Who oversees the building official?
16   A   City Administrator.
17   Q   Okay.  So with respect to permitting Building Code
18   and certificates of oc-- of occupancy issues, what role do
19   you play in the decision-making with respect to issuance or
20   revocation --
21   A   None.
22   Q   -- of those things?  None?
23   A   None.  None.
24   Q   Okay.  So that's solely the City Administrator's
25   duty or that that -- that's -- that falls under his

**22**

1    authority?
2    A   Yes.
3    Q   Okay.  And what if -- what if the -- What if
4    there's a difference of -- in agreement between City Council
5    and City Administrator?
6    A   In reference to, what?
7    Q   If -- For example, if a stop work order is issued
8    on a -- on a project by the -- and -- and City Administrator
9    tells the building official to -- to red-tag a building.  If
10   the City Council disagrees with that decision, how is that
11   handled?
12   A   Well, number one, it would have to come and be on
13   the -- the agenda and someone would have to put it on the
14   agenda.
15   Q   Okay.
16   A   Okay?  So -- Trying to think what the policy
17   says -- But I don't recall right now, since I've been Mayor,
18   where Council is overridden.
19   Q   Okay.  So if the building official revokes the
20   certificate of occupancy, for example, that would have to be
21   approved by Council?
22   A   No.
23   Q   Okay.
24          MR. HELFAND:  Let me object.  That calls for a
25   legal conclusion, by the way.  But your answer's fine.

**23**

1    Q   Okay.  Then, who -- who makes that decision?
2    A   Of revoking?
3    Q   Of revoking the cert-- certificate --
4    A   It would come from --
5    Q   -- of occupancy.
6    A   -- the permitting department.
7    Q   And who -- who is in charge of the permitting
8    department?
9    A   Walter Gant.
10   Q   The City Administrator --
11   A   Uh-huh.
12   Q   -- Walter Gant?
13   Okay.  So the building official would have to get a
14   directive from Walter Gant to revoke a certificate of
15   occupancy.  Is that --
16          MR. HELFAND:  Objection --
17   Q   -- your testimony?
18          MR. HELFAND:  -- calls -- Sorry.  Calls for
19   speculation and a legal conclusion.
20   A   The inspector probably could do it without his
21   approval.
22   Q   The -- The building official?
23   A   Uh-huh.
24   Q   Okay.  And what about -- Same question, but who
25   authorizes the issuance of -- of a building permit?

**24**

1    A   More often than not, probably the inspector.
2    Q   The -- Is that -- When you say "inspector," do you
3    mean building official?
4    A   Yeah.
5    Q   Okay.  Well, just from your perspective, where --
6    are -- do you think Brandon Shoaf did a good job while he was
7    the building official?
8          MR. HELFAND:  Objection, calls for
9    speculation.
10   A   Yeah.  That's not my role as Mayor.
11   Q   Well, no.  I'm just asking you from what you know
12   about his performance, do you think he did a good job?
13          MR. HELFAND:  Objection, asked and answered;
14   and calls for speculation.  The man's already answered the
15   question.  You can answer it again.
16          MR. KILPATRICK:  No, no.
17   A   Yeah, it's been answered.  You want to read it
18   back?
19   Q   So you -- So you did -- I -- I thought you said,
20   "That's not my role."
21          MR. HELFAND:  Right.
22   Q   Well, let me just --
23          MR. HELFAND:  He just --
24   A   That's my answer --
25          MR. HELFAND:  He told you he doesn't have an

---

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

## 25

1  opinion 'cause that's not his job.
2    Q  Who made the decision to -- to fire Brandon Shoaf?
3        MR. HELFAND:  Hang on one second.  Don't do
4  that.  Okay?  You know the --
5        MR. KILPATRICK:  What?
6        MR. HELFAND:  You know that Brandon Shoaf
7  resigned.  We've got a document that --
8        MR. KILPATRICK:  Hey, don't coach your
9  witness.
10       MR. HELFAND:  No, no, I'm not coaching my
11 witness.  I'm coaching you.  It's inappropriate for a lawyer
12 to say something they know is false.  You know it's false.
13       MR. KILPATRICK:  I know it's true.
14       MR. HELFAND:  You have the man's resignation.
15 You heard from his supervisor that he resigned.  Don't ask
16 him a question you know isn't true.
17       MR. KILPATRICK:  Don't coach your witness or I
18 will call the Judge.
19       MR. HELFAND:  Call the Judge right now.  We'll
20 read this whole thing back to him.  We'll read Mr. Gant's
21 deposition, and we'll send him a copy of the resignation
22 letter.  Be careful --
23       MR. KILPATRICK:  I've just got enough.
24       MR. HELFAND:  -- what you wish for.  Go ahead.
25 Call the Judge.

## 26

1        MR. KILPATRICK:  I -- I know you're concerned
2  about the fact that --
3        MR. HELFAND:  Call the Judge.
4        MR. KILPATRICK:  -- he got fired but just --
5        MR. HELFAND:  Call the Judge.
6        MR. KILPATRICK:  Just cut it out.
7        MR. HELFAND:  Call the Judge.  I'm waiting.
8        MR. KILPATRICK:  I -- I -- I'm asking you to
9  cooperate and follow the Rules.  That's all I'm asking.
10       MR. HELFAND:  Don't ask a question that you
11 know is false.  Mr. Shoaf was not fired, and you have no
12 evidence that Mr. Shoaf was fired.  Don't ask --
13       MR. KILPATRICK:  Actually --
14       MR. HELFAND:  -- a question --
15       MR. KILPATRICK:  That's incorrect.
16       MR. HELFAND:  Show it to me.  Show it to me.
17       MR. KILPATRICK:  It doesn't have to be a
18 document.
19       MR. HELFAND:  Show it to me.
20       MR. KILPATRICK:  I have very good reason to
21 believe that.  And --
22       MR. HELFAND:  Okay.
23       MR. KILPATRICK:  -- it's very inappropriate
24 for you to comment on that during the middle of a deposition
25 and you know that.

## 27

1        MR. HELFAND:  You have another question?
2        MR. KILPATRICK:  Of course, I do.
3        MR. HELFAND:  Then ask your question.
4        MR. KILPATRICK:  Then stop talking.  Thank
5  you.
6        MR. HELFAND:  Ask your question.
7        MR. KILPATRICK:  And follow the Rules, please.
8        MR. HELFAND:  Ask your question.
9        MR. KILPATRICK:  I will.  I'll -- I'll ask it
10 when I'm ready.
11       MR. HELFAND:  You haven't ask-- No, you never
12 ask when you're ready.  You're going to ask it now or we're
13 done.
14       MR. KILPATRICK:  I --
15       MR. HELFAND:  Go.
16       MR. KILPATRICK:  I will conduct this
17 deposition --
18       MR. HELFAND:  Stop talking to me --
19       MR. KILPATRICK:  -- the way I want to --
20       MR. HELFAND:  -- and ask a question.
21       MR. KILPATRICK:  -- 'cause I'm following the
22 Rules and you are not.
23       MR. HELFAND:  Stop talking to me and ask a
24 question.
25       Every time you've told me I'm not following

## 28

1  the Rules --
2        MR. KILPATRICK:  I'm not even talking to you
3  right now.
4        MR. HELFAND:  -- the Judge told me and told
5  you, I was following the Rules, so I'm going to go with --
6        MR. KILPATRICK:  Let me hear one --
7        MR. HELFAND:  -- the Judge's ruling.
8        MR. KILPATRICK:  -- one -- one example.
9        MR. HELFAND:  I'm going to go with the Judge's
10 ruling, Mr. Kilpatrick.
11       MR. KILPATRICK:  I -- I don't think he would
12 agree with this one, can assure --
13       MR. HELFAND:  Stop talking with me --
14       MR. KILPATRICK:  -- can assure you that.
15       MR. HELFAND:  -- and ask a question or we are
16 done.
17    Q  Back to my question.  So why was Brandon Shoaf's
18 employment terminated?
19       MR. HELFAND:  Mr. Shoaf's employment was
20 not --
21       MR. KILPATRICK:  I'm not asking you.
22       MR. HELFAND:  -- terminated.
23       MR. KILPATRICK:  I'm asking him.
24    A  It -- I agree, it was --
25       MR. HELFAND:  I know, but I want you to

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

---

29

1  know --
2  MR. KILPATRICK: Will you stop answering his
3  questions?
4  MR. HELFAND: Stop talking. I'm going to talk
5  to my witness. Mr. Shoaf's employment --
6  THE WITNESS: Resigned.
7  MR. HELFAND: -- was not terminated.
8  MR. KILPATRICK: Okay. Let's get the Judge on
9  the phone. This is ridiculous.
10  MR. KILPATRICK: Okay. Go right ahead.
11  MR. KILPATRICK: I'm not going to let you do
12  this.
13  MR. HELFAND: Sure. You don't have to let me
14  do anything. I don't need your permission to do anything.
15  I'm doing what the Rules permit.
16  MR. KILPATRICK: Answering questions for your
17  witness? Yeah, that -- that --
18  MR. HELFAND: I haven't answered a question,
19  yet.
20  MR. KILPATRICK: Yeah.
21  MR. HELFAND: Go ahead. Get the Judge on the
22  phone. You want his phone number? I'll get it for you.
23  MR. KILPATRICK: Just -- Just cooperate.
24  MR. HELFAND: Hold on. Hold on. Hold on.
25  That's the second time -- No. We're stopping. We're getting

---

30

1  the Judge on the phone.
2  MR. KILPATRICK: Okay.
3  MR. HELFAND: Hang on. I'll get it for you --
4  Every time you don't know what you're doing, you want to
5  threaten me with getting the Judge on the phone. Well, get
6  him on the phone.
7  MR. KILPATRICK: Look, I mean, you're
8  notorious for this, as Judge Hoyt called you, you know, an
9  obstructionist and, you know, perjuring yourself.
10  You're -- And I've talked to other lawyers, you're -- you're
11  notorious --
12  MR. HELFAND: Mr. Kilpatrick --
13  MR. KILPATRICK: -- for this, and I'm not --
14  I'm not going to let you do it at my deposition.
15  MR. HELFAND: Mr. Kilpatrick, your ad hominem
16  means nothing to me. You can't be insulted by someone you
17  don't respect.
18  MR. KILPATRICK: It's undeniable.
19  MR. HELFAND: I can't be -- You can't insult
20  me because I don't respect your opinion. You have --
21  MR. KILPATRICK: It wasn't my opinion.
22  MR. HELFAND: -- no basis.
23  MR. KILPATRICK: It was Judge Hoyt and -- and
24  other lawyers in your case, so...
25  MR. HELFAND: You -- Obviously, you don't know

---

31

1  how to read a Fifth Circuit opinion. But you keep bringing
2  that up like it means something.
3  You should talk to Judge Hoyt about that
4  before you tell me what Judge Hoyt thinks 'cause I know what
5  Judge Hoyt things about that.
6  MR. KILPATRICK: I would think that you'd stop
7  acting like that after a Judge has sanctioned --
8  MR. HELFAND: You should talk to Judge Hoyt
9  before you tell people you know what Judge Hoyt thinks
10  because --
11  MR. KILPATRICK: I read his Order.
12  MR. HELFAND: Did you read the Fifth Circuit
13  opinion?
14  MR. KILPATRICK: That -- The technicality. It
15  doesn't matter. Doesn't mean it didn't happen.
16  MR. HELFAND: Did you read the Fifth Circuit
17  opinion?
18  MR. KILPATRICK: Of course, I did. I read
19  all of it.
20  MR. HELFAND: And what -- Do you know what
21  "vacated" means?
22  MR. KILPATRICK: Doesn't matter.
23  MR. HELFAND: Do you know what "vacated"
24  means?
25  MR. KILPATRICK: Doesn't mean it didn't

---

32

1  happen.
2  MR. HELFAND: Have you talked to Judge Hoyt
3  about his opinion?
4  MR. KILPATRICK: Did that really happen?
5  MR. HELFAND: Have you talked to -- No.
6  That's why it --
7  MR. KILPATRICK: -- really happened.
8  MR. HELFAND: -- it was vacated. Have you
9  talked to Judge Hoyt about it?
10  MR. KILPATRICK: No. I read his Order --
11  MR. HELFAND: You're on the record saying --
12  MR. KILPATRICK: -- and his findings of fact.
13  MR. HELFAND: -- saying, "This is what
14  Judge Hoyt thinks."
15  MR. KILPATRICK: That's what his findings of
16  facts and --
17  MR. HELFAND: I know and respect Judge --
18  MR. KILPATRICK: -- conclusions of law say.
19  MR. HELFAND: No, it doesn't. Listen. Stop
20  talking for a second. I know what Judge Hoyt thinks 'cause
21  he and I have talked about this. You haven't.
22  If you want me to go show Judge Hoyt that
23  you're out in the community telling people what he thinks,
24  you get a record of saying that, I'll be happy to do that.
25  Otherwise, you might want to ask Judge Hoyt what he thinks

---

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

33

1   about --
2           MR. KILPATRICK: The only reason --
3           MR. HELFAND: -- before --
4           MR. KILPATRICK: The only reason that came up
5   in the first deposition, you asked what -- what basis I have
6   to say that, and I said I've read Judge Hoyt's Order --
7           MR. HELFAND: You have -- You --
8           MR. KILPATRICK: -- from the "Tollett" -- from
9   the "Tollett versus City of Kemah" case.
10          MR. KILPATRICK: Mr. Kilpatrick, you --
11  There's -- There's nothing about this proceeding that
12  involves you making personal attacks on opposing counsel.
13          MR. KILPATRICK: You asked and I answered.
14  Okay?
15          MR. HELFAND: No. I asked you to stop.
16          MR. KILPATRICK: I will stop.
17          MR. HELFAND: I did not --
18          MR. KILPATRICK: I'm asking you to stop.
19          MR. HELFAND: You keep -- No. You keep making
20  personal attacks. I get it. It's borne of an insecurity. I
21  understand it. I can see you shaking while we're talking.
22          MR. KILPATRICK: No. Your --
23          MR. HELFAND: So it's okay.
24          MR. KILPATRICK: Your hands are shaking right
25  now --

34

1           MR. HELFAND: Yeah, I -- Well, I'm old.
2           MR. KILPATRICK: -- and you keep picking up
3   other exhibits that I don't have before the witness, trying
4   to get -- answer questions for him. It's the most
5   inappropriate thing I've seen.
6           MR. HELFAND: All right. Stop talking to me.
7   Let me get you Judge Ellison's phone number and you can call
8   Judge Ellison, and we will read him this entire back-and-
9   forth about Mr. Shoaf being fired.
10          His chambers number is (409) 766-3729. You,
11  probably, should call Mr. Castro at (409) 766-3555.
12          MR. KILPATRICK: (409) 766?
13          MR. HELFAND: 3555. But you haven't fared
14  well so far in calling the Judge but...
15          MR. KILPATRICK: Well, he was out of town the
16  first time, that's true.
17          MR. HELFAND: I'm sure he'll remember you from
18  last time.
19          THE WITNESS: Take a little break, so I can
20  get a bottle of water.
21          MR. HELFAND: Sure. Absolutely.
22          (Whereupon, briefly off the record.)
23          (Whereupon, Mr. Kilpatrick is on the phone
24  with Court staff.)
25          (Whereupon, Mr. Kilpatrick requests reporter

35

1   to locate answer.)
2           MR. HELFAND: Do you have some questions for
3   him while you're waiting for the Judge?
4           MR. KILPATRICK: Well, she just found the
5   spot. Hang on. We'll give it a second, I guess.
6           (Whereupon, briefly off the record.)
7           MR. HELFAND: I need the court reporter to put
8   this on the record, please.
9           This is the third time --
10          MR. KILPATRICK: Let me say what I said. I
11  just need your cooperation, and I need you to follow the
12  Rules and I -- all I ask is that you don't answer the
13  question for your witness and to state facts that you want
14  your -- the witness to say because that's improper and
15  doesn't follow the Rules.
16          MR. HELFAND: I have not yet done that, so we
17  don't have to worry about that.
18          MR. KILPATRICK: Just --
19          MR. HELFAND: What I -- Mr. Kilpatrick, it's
20  my turn to talk. Stop talking.
21          I've told you, if you wish to suspend the
22  deposition under Rule 30D to present a motion to the Court,
23  you may do so. If you wish to continue asking the Mayor
24  questions, you may do so, but we are not going to sit here
25  right now, so either ask more questions or suspend the

36

1   deposition as the Rules permit.
2           MR. KILPATRICK: I would prefer that we work
3   this out together without having to waste the Court's time
4   because it's very simple. All I'm asking is, don't answer
5   the question for your witness, don't state facts like you did
6   here. I asked, "Who made the decision to fire Brandon
7   Shoaf?"
8           And you -- And you interrupted your witness
9   from answering and said, "He was -- He was -- He didn't -- He
10  wasn't fired. He -- He resigned." That is inappropriate.
11          MR. HELFAND: That's not --
12          MR. KILPATRICK: That's not a legal objection.
13          MR. HELFAND: That's not what happened. The
14  record is clear on what happened.
15          Do you have more questions for the witness or
16  do you wish to suspend the deposition?
17          MR. KILPATRICK: I, of course, have more
18  questions. All I ask is that you not answer questions for
19  your witness, don't coach your witness and follow the Rules.
20  It's very simple.
21          MR. HELFAND: I'm going to tell you for a
22  fourth time. I haven't coached the witness. I haven't
23  answered a question for the witness. And the fact that you
24  think I have doesn't change the fact that it hasn't happened.
25          But we're not going to agree on that,

READING COPY FOR SIGNATURE

37

1  Mr. Kilpatrick, no matter how many times you say it, so stop.
2       If you have a question for the witness, now's
3  the time to ask; otherwise, we're going to consider the
4  deposition suspended. Go ahead.
5     Q   Okay.
6         MR. HELFAND: You know the Talking Heads?
7         MR. KILPATRICK: Yeah, I like the Talking
8  Heads.
9         MR. HELFAND: "Singing it don't make it so,"
10 is one of their lines.
11        MR. KILPATRICK: Oh, you used that one at the
12 last deposition.
13        MR. HELFAND: It -- It's -- It's apt in your
14 case.
15        MR. KILPATRICK: The record speaks for itself.
16    Q   Okay. Mr. Joiner, are you ready to proceed?
17    A   Yes.
18    Q   Okay.
19        MR. HELFAND: He is Mayor Joiner.
20        MR. KILPATRICK: Okay. So Mayor Joiner.
21    Q   Okay. So back to Brandon Shoaf. When was his
22 employment with the City terminated as a building official?
23    A   I don't recall.
24    Q   Okay. But was it approximately in January, 2022?
25        MR. HELFAND: Objection, witness speculation.

38

1     A   I -- I don't -- I don't recall really.
2     Q   Okay. And -- Well, looking at that letter that's
3  sitting in front of you, Exhibit 5 --
4     A   This one?
5     Q   Yes. It's dated February 8th, 2022. At this point
6  in time, had -- Well -- And -- And actually look at also the
7  other exhibit, 6, right here.
8         MR. KILPATRICK: You can take your copy back,
9  Bill.
10        MR. HELFAND: Exhibit 6 is number --
11        MR. KILPATRICK: Is -- Is this one.
12        MR. HELFAND: -- 1032.
13    Q   So I put in front of you Exhibit 6, and it purports
14 to be a letter from Brandon Shoaf, building official, fire
15 marshal, to City of -- City of Kemah, Walter Gant, City
16 Administrator, dated January 25th, 2022.
17    A   Okay.
18    Q   And it states that, "Allow this to serve as my
19 official notice of resignation as the building official and
20 fire marshal for the City of Kemah." So was this the date --
21    A   I -- I don't know.
22    Q   -- he actually resigned?
23    A   This is the first time I've seen that --
24    Q   Okay.
25    A   -- seen this.

39

1     Q   Okay. So today is the first date you've seen this
2  document?
3     A   Yes.
4     Q   So... Now I'll ask you again in a dif-- about a
5  different part of this. What -- What brought about
6  Mr. Shoaf's resignation?
7         MR. HELFAND: Objection, speculation.
8     A   I don't know.
9     Q   If this -- If today's the first time you've seen
10 this document, that's a letter of resignation, how did you
11 even know that he resigned?
12    A   I didn't for awhile, to tell you the truth. I'm
13 not -- I'm not over him.
14    Q   Sir?
15    A   I'm not over him. Walter Gant is.
16    Q   Oh, okay.
17    A   And just so you know, there's an ordinance that I
18 don't have firing powers. Okay?
19    Q   Okay. So -- So your role as the Mayor, you -- you
20 don't have the power to -- to fire the building official?
21    A   No.
22    Q   Okay. So --
23    A   I don't even have the power to fire City
24 Administrator.
25    Q   Okay.

40

1     A   Only Council can.
2     Q   Okay. Thank you, for pointing that out.
3         So was Mr. Shoaf's resignation brought before
4  Council in any meetings that you attended?
5     A   Not specifically.
6     Q   Okay.
7     A   It's not required.
8     Q   Okay. Well, was the termination of his employment
9  discussed at any Council meetings?
10    A   I don't think so.
11    Q   Were there any Council meetings where -- that you
12 attended, where Council members expressed their, I guess,
13 complaints about his performance?
14    A   That would not be done in a open Council meeting.
15    Q   Okay. Do you recall in February -- February 16th,
16 2022, there's a City Council meeting where the -- Veronica
17 Crow and her husband came and addressed Council about issues
18 related to their property on Bay Street?
19    A   Yes.
20    Q   Okay.
21        MR. KILPATRICK: Oh, wait.
22        (Whereupon, Mr. Kilpatrick is on the phone
23 with Court staff.)
24    Q   Okay. So the -- Again, back to the February 16,
25 2022, City Council meeting, the Crows expressed their

READING COPY FOR SIGNATURE

41

1  concerns about what information they were getting from
2  Mr. Shoaf in regard to getting permits for their project
3  that -- on the Bay Street property?
4         MR. HELFAND:  Excuse me.  That assumes facts
5  not in evidence.
6      Q   Do you remember that?
7         MR. HELFAND:  Do you remember whether that was
8  what happened?
9         THE WITNESS:  No.
10     **A   I remember that they were at the meeting, yes.**
11     Q   Okay.  Well, tell me what you remember about what
12  they had to say at that City Council meeting.
13     **A   It was somewhat of a contentious Council meeting,**
14  **in that the neighbors were -- were very upset at them, that**
15  **it appeared they were doing things on their site without**
16  **permits, et cetera, and so they brought it to City Council.**
17     Q   Okay.  And do you recall Doug Meisinger stating
18  what he learned about the situation during the City Council
19  meeting?
20     **A   Somewhat, yeah.**
21     Q   Okay.  And -- Well -- And -- And you actually met
22  with the Crows before that City Council meeting to discuss
23  their project.  Correct?
24     **A   Yes.**
25     Q   And isn't it true you didn't want them putting

42

1  short-term rentals on that property?  Is that a fair
2  statement?
3      **A   No.**
4      Q   Okay.  What -- What -- What did you discuss with
5  the Crows with respect to the short-term rental part of that
6  project?
7      **A   Number one, I don't recall that it was short-term**
8  **rental.  What it was, was a barndominium, and the neighbors**
9  **were upset about that.**
10     Q   Okay.  Just -- At this City Council meeting, do you
11  recall stating that --
12        MR. KILPATRICK:  Oh, that's your phone.
13     Q   (CONTINUING) -- do you recall stating something
14  along the lines of you were glad that they took out the
15  short-term rental component of their project?
16        MR. HELFAND:  Objection, assumes facts not in
17  evidence.
18     **A   I don't recall that.**
19     Q   Okay.  And do you also recall Doug Meisinger
20  making -- making statements about how the City had targeted
21  certain businesses in the City that they've shut down even
22  though they had permits?
23     **A   No.**
24     Q   You don't remember that?
25        MR. HELFAND:  Excuse me.  That also assumes

43

1  facts not in evidence.
2      Q   Do you --
3      **A   No.**
4      Q   Okay.  So there was also a gentleman who spoke at
5  the hearing about his project for the food -- food truck
6  park.  Do you recall that?
7      **A   At that meeting?**
8      Q   Yes.
9      **A   No.**
10     Q   Or -- Or -- Was there an agenda item on that for
11  the approval of a food truck park?
12     **A   I don't recall.**
13     Q   You don't?  Are you familiar with the -- food
14  truck park at -- for the property called Bu-- Bubble
15  Jungle --
16     **A   Yes.**
17     Q   -- next door to -- And it -- That's next door to
18  Palapas.
19     **A   Yes.**
20     Q   Okay.  And did the City approve a food truck park
21  to be located at -- at that property adjacent to Palapas'
22  property?
23     **A   Yes.**
24     Q   Okay.  And -- So from the time that you have been
25  Mayor, approximately, how many food trucks in the City of

44

1  Kemah had City permits to operate food trucks within the
2  City?
3         MR. HELFAND:  Objection, calls for
4  speculation.
5      **A   I -- I don't recall.**
6      Q   Okay.  Do you recall Brandon Shoaf speaking at a
7  City Council meeting in August, 2021, stating that there was
8  only one food truck in the City that had a City permit?
9         MR. HELFAND:  Hang on.  That's a multifarious
10  question.  There's two questions there.  Does he consider --
11  remember him speaking; and do you -- does he know what he
12  said?  Which one do you want him to answer?
13        MR. KILPATRICK:  Either one.
14        MR. HELFAND:  Well, no.  He -- We have to know
15  which one he's answering 'cause if he says yes to one and no
16  to the other.  Look, just -- Do you want to know if he
17  recalls Mr. Shoaf speaking at all at that Council meeting or
18  do you want him to -- to tell you whether he remembers
19  Mr. Shoaf ever saying what you claim you think Mr. Shoaf
20  said?
21     Q   Did you understand my question?
22     **A   Could you repeat that, please.**
23        MR. HELFAND:  It doesn't matter whether he
24  understands it.  He's not answering it, so -- You either --
25  It's a multifarious question.  It's not a fair question

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

45

1  'cause it's a multifarious question.  Just break it up into
2  two questions.
3      Q   Okay.  Do you recall Brandon Shoaf speaking at any
4  City Council meeting about the number of food truck permits
5  that had been issued by the City?
6      A   **No.**
7      Q   Never?
8      A   **Correct.**
9          MR. HELFAND:  He does that a lot, where he'll
10 say something and you tell him the answer and then he says,
11 "That's your answer?", so you have to say it twice sometimes.
12 It's just a -- That's his thing.
13         MR. KILPATRICK:  Whose phone is that?  Oh,
14 that's yours.
15     Q   Okay.  Let's see.  Do you recall the food truck at
16 the Palapas property being towed on October 11th, 2021?
17     A   **No, I was not a part of it.**
18     Q   Okay.  But -- But you -- you know now, sitting here
19 today, that that -- it was towed around that time?
20     A   **I don't even know that it was towed.  Okay.  I**
21 **wasn't a part of it.**
22     Q   Okay.  Who was part of that?
23         MR. HELFAND:  Objection, calls for
24 speculation.
25     A   **You need to talk to Walter Gant about that.**

46

1      Q   Well, I did, and -- and he didn't know.
2          MR. HELFAND:  No, no, don't -- No, don't do
3  that.  Don't tell him what happened in another deposition.
4  Ask him a question.
5          MR. KILPATRICK:  I'm asking.  You -- You
6  interrupted --
7          MR. HELFAND:  'Cause that's not what --
8          MR. KILPATRICK:  -- me.  I wasn't done.
9          MR. HELFAND:  That's not what Walter said, so
10 don't --
11         MR. KILPATRICK:  I wasn't done talking.
12         MR. HELFAND:  You tell me when you're done
13 talking.  I'll tell you the same thing.  You ask him
14 questions.  You don't tell him what you think another witness
15 said in a deposition 'cause you're mischaracterizing
16 Mr. Gant's testimony.
17         MR. KILPATRICK:  There's nothing wrong with me
18 starting off my question like that.
19         MR. HELFAND:  Stop interrupting.  You're not
20 listening.
21         MR. KILPATRICK:  You're interrupting me and my
22 deposition.
23         MR. HELFAND:  No, no, it's our deposition.
24 Who made it your deposition.
25         MR. KILPATRICK:  This is my one chance to

47

1  depose --
2          MR. HELFAND:  Yes.
3          MR. KILPATRICK:  -- Mayor Joiner.
4          MR. HELFAND:  So ask him questions.  Don't
5  tell him things.  What you told him is incorrect.
6          MR. KILPATRICK:  You're --
7          MR. HELFAND:  Now ask him a question.
8          MR. KILPATRICK:  Stop coaching, again.  Mark
9  that.
10         MR. HELFAND:  Yeah, mark that.  That's
11 coaching, according to Mr. Kilpatrick.  Mark that as
12 coaching.  Put a big C next to it.
13         Do you have a question for the man?
14         MR. KILPATRICK:  Yes, of course, I do.
15         MR. HELFAND:  Ask a question.
16         MR. KILPATRICK:  Sorry for the interruption.
17     Q   So -- So the only person who would know who
18 authorized, that would be Walter Gant?
19         MR. HELFAND:  Objection, calls for speculation
20 as to who -- who the only person, the only people who would
21 know are.
22     Q   Well, who -- From your understanding, who -- who
23 would know, who would I need to ask about the food truck
24 being towed on October 11th, 2020?
25         MR. HELFAND:  Objection, calls for

48

1  speculation.
2      Q   You can answer.
3          MR. HELFAND:  Do you know?
4          THE WITNESS:  No.
5          MR. HELFAND:  Well, tell him that.
6      Q   Well, you said Walter Gant a second ago.
7          MR. HELFAND:  Well --
8      Q   Anyone else?
9          MR. HELFAND:  -- he did say Walter Gant.
10     Q   That's it?
11     A   **Right.**
12     Q   Okay.  And so if Walter Gant didn't know, then
13 what?
14     A   **I have no idea.**
15     Q   Okay.  Okay.  I'm going to hand you what's been
16 marked as Exhibit 12.
17         (Exhibit 12 marked.)
18         MR. HELFAND:  Okay.  Once again, we run into a
19 problem that is a document that's not been produced in this
20 case.  I'm not going to do anything about it 'cause it
21 reports to be City Council meeting minutes of
22 September 1st -- Or, sorry -- the agenda for September 1st,
23 2021.
24         But I'm going to tell you, Mr. Kilpatrick, the
25 Rules do not allow you to use documents in a deposition that

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

49

1   have not been produced.
2         MR. KILPATRICK: Well, do you have a problem
3   with me using this to ask him questions?
4         MR. HELFAND: I -- I feel like you're not
5   listening to me. I said I'm not going to make an issue of it
6   as to this document because it looks like it's a public
7   record. But if you have other documents that have not been
8   produced, you're not going to be able to use them.
9         MR. KILPATRICK: Okay.
10        MR. HELFAND: You can't question a witness
11  about a document you haven't disclosed or otherwise
12  exchanged.
13     Q   Okay. Anyway, let's go to the -- Page 3.
14     A   Okay.
15     Q   Or -- Or actually make that page -- Page 4, at the
16  top, where we see No. 3. It's -- So in this Exhibit 12, it
17  says, on Page 4 of 4 of the agenda, Item 3, at the top, says,
18  "Possible legal action on lack of enforcement of
19  Ordinance 1178, 1188, and 1189, and the City adopted 2009
20  International Building Code, which requires changing from
21  single family to hotel-motel building codes for STRs." And
22  then has a "Joiner" in parentheses to the right. Do you see
23  that?
24     A   Yes.
25     Q   Was this an item that you put on the agenda for the

50

1   executive session?
2      A   Yes, obviously.
3      Q   Okay. So do you believe that --
4         MR. HELFAND: Go ahead and ask your question.
5   I want him to wait.
6      Q   Okay. Do you believe that STRs, that's short-term
7   rentals, require changing from the single family to hotel-
8   motel building codes?
9         MR. HELFAND: Let me object that that invades
10  the legislative privilege, and he will not answer questions
11  involving the legislative privilege.
12     Q   Okay. And -- Yeah. Don't -- Don't answer that to
13  the extent it involves anything that's, you know, attorney-
14  client privilege or legislative privilege. But I'm just
15  asking you, as the Mayor of the City, irrespective of what
16  was discussed at the -- during executive session, do you
17  believe that short-term rentals are required to change from
18  single family to hotel-motel Building Code?
19        MR. HELFAND: Okay. I'm -- I'm afraid you
20  don't understand the legislative privilege; although, I
21  warned you of this when you asked for the Mayor's deposition.
22  You are not permitted to ask the Mayor his thought processes
23  regarding why he put something on the agenda, conversations
24  he has with Council members. You're not entitled to his
25  thought processes regarding the -- the business of the City.

51

1      Q   Okay.
2         MR. HELFAND: That's legislative privilege.
3      Q   And I -- I don't want to ask you about why you put
4   it on the agenda, why -- or what you discussed in executive
5   session --
6         MR. HELFAND: But that's not the limitation.
7   You can't even ask him what -- what he thinks about it, which
8   is what you just asked.
9      Q   I'm just ask-- I'm just asking what you,
10  personally, do you believe that short-term rentals are
11  required to change from single family to hotel-motel building
12  codes?
13        MR. HELFAND: You're -- He -- There's no him,
14  personally.
15        No offense.
16        You're -- He's the Mayor. You're asking him
17  questions as the Mayor of somebody he put on the agenda.
18  It's within the legislative privilege, and he's not going to
19  answer it. Move on. And if you think the law requires it,
20  tell the Judge or show it to me, and I'll look at it. But
21  that's directly within the legislative privilege.
22        I warned you this, when you told me you wanted
23  the Mayor's deposition, and you told me, "I'm not going to
24  get into the Mayor's thought processes regarding how he
25  conducts himself as the Mayor."

52

1         MR. KILPATRICK: Well, no. Initially, you --
2   you refused to produce him altogether --
3         MR. HELFAND: No, that's not --
4         MR. KILPATRICK: -- until, once again, I
5   proved that -- that -- that doesn't apply.
6         MR. HELFAND: Brian. Brian. If you have
7   another question for the man, ask him. He's not asking (SIC)
8   questions about his thought processes as a member of the
9   legislative body.
10     Q   And I'm not asking you that. That's not my
11  question. I just want to know, do you believe that STRs,
12  short-term rentals, have -- or have -- are required to change
13  from single family to hotel and motel building codes?
14        MR. HELFAND: What -- what he believes as the
15  Mayor is privileged. He's not answering the question.
16  You've now asked it three times. I've told you it's
17  privileged. He's not asking (SIC) it.
18        And then what you say is, "I don't want to
19  know what you believe. Now, do you believe?"
20        You have another question 'cause this one's
21  done?
22     Q   Well, you recall stating in open sessions during
23  City Council meetings that you believe that STR, short-term
24  rentals, are required to comply with hotel-motel building
25  codes. Correct?

READING COPY FOR SIGNATURE

---

53

1    MR. HELFAND:  That assumes facts not in
2  evidence.
3            Have you said that?
4            THE WITNESS:  I don't recall.
5            MR. HELFAND:  Okay.
6    Q    Never -- So sitting here today, you don't recall
7  ever saying --
8    A    I don't recall.
9    Q    -- those words.
10   A    I don't recall.
11   Q    And you don't be-- So -- And you won't answer my
12 question whether you believe -- I'm not talking about what
13 you discussed with the City Council.  Talking about outside
14 of your role as the Mayor on City Council in your legislative
15 capacity, your role as the Mayor and implementing what City
16 Council has enacted, what your position is, if -- do -- does
17 a short-term-rental property have to comply with hotel-motel
18 building codes?
19           MR. HELFAND:  Mayor, don't answer that
20 question.  It's privileged.  But it's now been asked four
21 times, and if you ask it again, we're going to leave.
22           MR. KILPATRICK:  I'm asking a different way.
23           MR. HELFAND:  I know, but it's the same
24 question.
25           MR. KILPATRICK:  And it's a baseless

---

54

1  objection.
2            MR. HELFAND:  It's the same question.
3            MR. HELFAND:  Okay.  Well, we'll take that one
4  up with the Judge, too.
5            MR. HELFAND:  Okay.  Now, move on to a
6  different one, though.
7    Q    So since you testified earlier that you don't play
8  a role in Building Code enforcement, why -- why were you
9  meeting with the Crows at their property?
10   A    Because the neighbors had asked me to meet with
11 them.
12   Q    Okay.  So sometimes you get involved in certain
13 permit code enforcement, things of that nature, those issues.
14   A    Yes.
15   Q    Okay.  And --
16   A    I miss -- met with Mr. Placek because some of his
17 neighbors asked me to do it.
18   Q    Okay.  Which neighbors asked you to meet with
19 Mr. Placek?
20   A    One of the bars there.
21   Q    Okay.  Which -- Which bar?
22   A    I think it was Voodoo.
23   Q    The Voodoo Lounge?
24   A    (NODS HEAD AFFIRMATIVELY.)
25   Q    Who -- Who's the person at Voodoo Lounge that asked

---

55

1  you to do that?
2    A    I think it was him.  That was Harry -- Harry.
3    Q    Okay.  So you remember the meeting you had with
4  Mr. Placek?
5    A    Yes, we met one evening at a restaurant.
6    Q    Okay.  Where was the restaurant?
7    A    In Clear Lake Shores.
8    Q    Okay.  And do you -- What did you discuss at that
9  meeting?
10   A    He had concerns and asked me to set up a meeting at
11 City Hall, I think it was that following Monday, that he'd
12 been in town and wanted to get everyone together, so I did
13 set that up.
14   Q    Okay.  And tell me what happened at the meeting.
15   A    It didn't happen.
16   Q    Oh, there was no meeting?
17   A    Yeah, Mr. Placek -- I don't remember exactly what
18 happened, but he couldn't make the meeting, so it didn't
19 happen.
20   Q    Okay.  And do you recall telling Mr. Placek that if
21 he got rid of the short-term rentals, that you would get him
22 a certificate of occupancy for the bar?
23   A    No.
24   Q    No?
25           MR. HELFAND:  Objection, leading.  Object that

---

56

1  that assumes facts in evidence.
2            What don't you ask him if he said something,
3  not that he said something, 'cause I'm going to have to
4  object every time you say, "Do recall saying," something,
5  unless you lay a predicate that he actually said it.
6            But the Mayor's already rejected that one, so
7  move on to the next question.
8    Q    Okay.  So what exactly did you discuss with Matt
9  Placek when you did -- when -- when you met with him at the
10 restaurant?
11   A    I've answered that.
12   Q    What particular issues?
13   A    I don't recall.  It's been a long time ago.
14   Q    Okay.  Well, let me just throw out some things that
15 may refresh your recollection.  Did you discuss the
16 short-term rental units on the third --
17   A    I don't recall.
18   Q    -- and fourth floors?
19   A    I don't recall.
20   Q    Did you discuss the food truck?
21   A    I don't recall.
22   Q    Did you discuss the first and second floors inside
23 the building?
24   A    I don't recall.
25   Q    Do you -- Do you recall even generally what the --

---

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

57

1 what the issue was at that time?
2    **A  Getting his permit. That's what I recall.**
3    Q  Okay. And what was your understanding of the
4 problem with getting the permit?
5    **A  That's why I set the meeting up.**
6    Q  But --
7    **A  Because I'm not -- I'm not involved in that**
8 **process. I was asked to set the meeting up and I did.**
9    Q  Okay. Was it -- Anyone -- Did anybody else attend
10 that meeting?
11    **A  It didn't happen.**
12    Q  No. I meant the meeting at the restaurant.
13    **A  No.**
14    Q  Okay. How often do you meet with business owners
15 that are ex-- experiencing issues getting permits?
16    **A  Not very often.**
17    Q  Okay. So since you've been Mayor, approximately,
18 how many times have you done that?
19    **A  Less than five, probably.**
20    Q  Okay. Which -- Which other business owners have
21 you had to meet with?
22    **A  Bubble Jungle; this one we talked about; the Crows.**
23 **I think that's it.**
24    Q  Okay. Those three?
25    **A  (NODS HEAD AFFIRMATIVELY.)**

58

1    Q  Okay. What about Doug Meisinger?
2    **A  What about him?**
3    Q  Did -- Did you meet with him about issues with
4 permits or certificates of occupancy with his property --
5    **A  No.**
6    Q  -- or -- or his business?
7    **A  No.**
8    Q  No? What about Matt Wiggins?
9    **A  No. They don't speak to me.**
10    Q  Okay. Well, within -- within your experience as an
11 architect, do -- do you have an understanding of the -- the
12 Building Code -- the applicable Building Codes?
13    **A  Yes.**
14    Q  Okay. So in the City of Kemah, the 2009
15 International Building Code that we've marked as
16 Exhibit 11 --
17    **A  Uh-huh.**
18    Q  -- is this the Code that applies --
19    MR. HELFAND: Is the Code?
20    Q  -- the Building Code that applies in the City of
21 Kemah?
22    MR. HELFAND: Object that it calls for a legal
23 conclusion; speculation.
24    Q  Well -- And -- Let me rephrase that, actually. For
25 anything that is built after 2009, would the 2009

59

1 International Building Code be the applicable Code that an
2 owner would have to comply with?
3    MR. HELFAND: Objection, calls for a legal
4 conclusion; and speculation.
5    Q  You can still answer.
6    **A  Yes.**
7    Q  Okay. What about if something was built in 2008 --
8    MR. HELFAND: Objection, calls for a legal --
9    Q  -- which Code would apply?
10    MR. HELFAND: Pardon me. Calls for a legal
11 conclusion; speculation.
12    THE REPORTER: What?
13    MR. KILPATRICK: Sorry. He keeps
14 interrupting.
15    THE REPORTER: "What about if something was
16 built in 2008, which" --
17    Q  What about if something was built in 2008, which
18 Code would apply?
19    MR. HELFAND: Objection, calls for a legal
20 conclusion; and speculation.
21    Q  You can answer.
22    MR. HELFAND: You can answer if you know.
23    **A  Well, where is it being built at?**
24    Q  Well, I guess the point I'm getting at is,
25 generally speaking, the -- the 2009 Code is going to apply to

60

1 anything that was built after 2-- on -- in 2009 and after.
2 Right?
3    **A  Correct.**
4    MR. HELFAND: Objection, legal conclusion;
5 speculation.
6    Q  So if something was built in the '80s or '90s, the
7 2000 Code -- 2009 Code, generally speaking, would not apply
8 to something that's -- that was built before that.
9    MR. HELFAND: Objection, legal --
10    Q  Correct?
11    MR. HELFAND: -- conclusion; speculation.
12    Q  Is that a fair statement?
13    **A  No.**
14    Q  Okay. Well, tell me what would apply in -- under
15 those circumstances.
16    MR. HELFAND: Objection, legal conclusion;
17 speculation.
18    Q  You can answer.
19    **A  As an architect or as a Mayor?**
20    Q  Well, I'm -- I'm just saying, you know, with your
21 experience as an architect, you know -- you -- you said you
22 know these things, so which -- which Code would someone have
23 to comply with...
24    **A  Depending on the amount of work --**
25    Q  Okay.

READING COPY FOR SIGNATURE

61

1    A   -- it would be this Code.
2    Q   Right.  So -- There -- And there are provisions
3  that say, if you build more than fifty percent of the value,
4  and things of that nature, that -- that it could -- that you
5  have to bring it up to current Code.  Correct?
6        MR. HELFAND:  Excuse me.  Mischaracterizes the
7  document; calls for speculation and a legal conclusion.
8    Q   That's fine.  You can answer.
9    A   No, I -- I'd have to research that.  Okay?
10   Q   Yeah, I understand there's specific situations but
11  just broadly speaking, the --
12   A   I can't broadly speak.
13       MR. HELFAND:  Yeah.  He can't broadly speak of
14  what a statute says.
15   Q   Okay.  So in the 2009 Building Code that's sitting
16  in front of you as Exhibit 11 --
17   A   Uh-huh.
18   Q   -- is there anywhere in there that authorizes a
19  building official to issue a zero occupancy red tag?
20       MR. HELFAND:  Objection, calls for speculation
21  and a legal conclusion.
22       Do you know?
23       THE WITNESS:  No.
24   Q   Okay.  Are you aware of any red tags being placed
25  on any buildings in the City of Kemah since you've been

62

1  Mayor, that provide for or that state a zero occupancy for a
2  building?
3    A   No.
4    Q   No?  Did you know that Brandon Shoaf put a zero
5  occupancy red tag on Palapas?
6        MR. HELFAND:  Objection, assumes facts not in
7  evidence.
8    A   No.
9    Q   Okay.  In your ex-- With your experience as an --
10  as an architect, how do you determine the -- the occupancy
11  number for a building?
12   A   "Occupancy number," what do you mean?
13   Q   Like the -- the actual occupancy, the number of
14  people that can be inside of a building.
15   A   Well, first, you start with what the occupancy is,
16  then you go to that section.
17   Q   The occupancy type?
18   A   Uh-huh.
19   Q   Okay.  So you -- Occupancy type.  And then from
20  there, how do you arrive at a number for any given --
21   A   Follow that section in the Code.
22   Q   Okay.  So would it be the occupancy type, times the
23  square foot -- or -- and then look at the square footage --
24   A   Depends what it -- Depends what this Code says.
25   Q   Okay.  But it's all in -- in -- It's all in the

63

1  Code?
2    A   Uh-huh.
3    Q   Okay.  So when a building official goes out and
4  makes determinations on the number of occupants that can be
5  in a property pursuant to a certificate of occupancy, that
6  would be determined based on the calculation in the Code.
7        MR. HELFAND:  I'm sorry.  Now you want him to
8  testify what a building per-- official's supposed to do?
9  That's speculation.
10       MR. KILPATRICK:  Well, that's also what
11  architects do.
12       MR. HELFAND:  Let me just stop for just a
13  moment here.  You asked to take the deposition of the Mayor
14  of the City of Kemah about issues relating to -- standing in
15  this case.
16       You've now found out that he's an architect,
17  which I'm impressed, too, but we're -- he's not an expert
18  witness on building Codes or architecture.  I'm letting him
19  answer 'cause you -- it's just -- it -- it -- you're using up
20  time that has nothing to do -- goes nowhere and does nothing,
21  as they say on the U-- USS Enterprise.
22       But he can't testify -- It's speculating as to
23  what a building official is supposed to do.  He can testify
24  what architects do.
25       MR. KILPATRICK:  If he knows, he can answer.

64

1        MR. HELFAND:  Sure.  That's why I said, it's
2  speculation.
3        MR. KILPATRICK:  Okay.
4        MR. HELFAND:  But I will say this.  I'm not
5  going to sit here for several hours and have you ask
6  questions about architects and -- and neither is he.
7  That's -- He's --
8        MR. KILPATRICK:  Oh, don't worry.  I'm not.
9        MR. HELFAND:  -- to do.  Okay.
10       THE WITNESS:  How about if we take a little
11  break?
12       MR. HELFAND:  Yeah, that'd be great.
13       MR. KILPATRICK:  Okay.
14       THE VIDEOGRAPHER:  Off the record at
15  2:37 p.m., ending Card 1.
16       (Whereupon, briefly off the record.)
17       MR. HELFAND:  Five-minute break,
18  Mr. Kilpatrick.  If you're leaving the room, we're leaving.
19       MR. KILPATRICK:  Look, we -- we skipped lunch
20  to get started at 1:00 'cause you had to take a phone call
21  earlier, so I -- I expect you to --
22       MR. HELFAND:  I took a phone call for four
23  minutes.  It's on my phone.  Listen to me again --
24       MR. KILPATRICK:  We're going to go eat lunch
25  in the other room.  I'm not going -- I'm not going to let you

READING COPY FOR SIGNATURE

---

65

tell me what to do.

MR. HELFAND: Okay. We're -- Then, we're leaving. I want you to know the Mayor's leaving.

MR. KILPATRICK: You're not -- No, you're not.

MR. HELFAND: Yes, we are.

MR. KILPATRICK: No.

MR. HELFAND: The Mayor is leaving.

MR. KILPATRICK: We're going to -- We're going to take --

MR. HELFAND: We told you --

MR. KILPATRICK: -- ten minutes to eat lunch.

MR. HELFAND: -- the Mayor would start at 1:00 o'clock --

MR. KILPATRICK: That's a five-minute difference. Same --

MR. HELFAND: -- and you would -- Mr. Kilpatrick, tell me when done.

MR. PLACEK: We're not eating lunch, then.

MR. HELFAND: Okay. We're leaving.

MR. KILPATRICK: No, you're not.

MR. HELFAND: We're leaving 'cause you're walking out while I'm talking to you and you don't do that. You don't drop something and then walk out of a room. This is not a discussion with a family member. You act like a professional. Listen to me.

---

66

You told me you would start at 1:00 o'clock and keep going, and the Mayor said he would stay, so you could finish. Now you're telling me you want to go eat lunch. No.

If you're not back here when the Mayor's back here, we're leaving. Do you understand?

MR. KILPATRICK: We were supposed to be done by noon --

MR. HELFAND: We were.

MR. KILPATRICK: -- but because of you, we were not, not only because you've delayed it and you had to take a phone call, but, also, I let you -- you cut into all my time by making speaking objections and doing other inappropriate things that you've done in all the depositions now.

MR. HELFAND: My phone call took three minutes. If you're not here when the Mayor's ready to go, we're leaving. Do you understand that? That --

MR. KILPATRICK: Are you --

MR. HELFAND: -- simple.

MR. KILPATRICK: Are you serious?

MR. HELFAND: Yeah, I'm dead serious. We're not wasting that gentleman's time.

MR. KILPATRICK: You said you wanted --

MR. HELFAND: You've already wasted asking

---

67

questions --

MR. KILPATRICK: -- a five-minute break. We're asking for another five more minutes.

MR. HELFAND: Listen. You asked me a question. I'm telling you the answer. You've already wasted his time asking questions about architects. You already wasted his time by pretending to -- make facts and ask him to answer to them.

If you're not here, and he's ready to go, he said five minutes, we're ready to go. Are you ready to go? If not, we're leaving.

MR. KILPATRICK: Well, five minutes hasn't started yet --

MR. HELFAND: That's all --

MR. KILPATRICK: -- 'cause I've been wasting my time talking to you.

MR. HELFAND: Mr. Kilpatrick, sit down and ask more questions or we're done.

MR. KILPATRICK: No.

MR. HELFAND: Okay? All right. Well, then, we're done. We'll put on the record that we're done. Our agreement --

MR. KILPATRICK: No, no.

MR. HELFAND: -- was the Mayor would -- would appear at 1:00 o'clock --

---

68

MR. KILPATRICK: No.

MR. HELFAND: -- to do his deposition --

MR. KILPATRICK: Mr. Helfand --

MR. HELFAND: You don't have any more questions for him, it's fine.

MR. KILPATRICK: -- had to take a phone call in the last deposition, so -- it lasted longer than we had agreed --

MR. HELFAND: Mr. Kilpatrick.

MR. KILPATRICK: -- and now he's --

MR. HELFAND: I don't care --

MR. KILPATRICK: -- being argumentative.

MR. HELFAND: -- what your rationale is --

MR. KILPATRICK: He's still interrupting me.

MR. HELFAND: You have a choice.

MR. KILPATRICK: -- as we speak right now, he's interrupting me. He's being rude, unprofessional, and not been following the Rules all day. We're -- We're asking for a five-minute break to -- to eat the lunch --

MR. HELFAND: A five-minute break is fine. Five minutes. It is 2:42. You should have taken a five-minute break when the Mayor took a five-minute break. Be back here ready to ask questions at 2:50 or we won't be here.

(Break.)

MR. KILPATRICK: I, Brian Kilpatrick, am back

---

READING COPY FOR SIGNATURE

69

1  now pursuant to our agreement to take a break for five
2  minutes. It's now 2:49 and Bill is not in the room, and we
3  are waiting on him, so -- I just want to make the record
4  clear that we're waiting on -- on Bill Helfand, and my client
5  and I have been ready to proceed.
6            (Whereupon, briefly off the record.)
7            THE VIDEOGRAPHER: On the record at 2:50 p.m.,
8  beginning Card 2.
9      Q   Okay. Mayor Joiner, I'm handing you what will be
10  marked Exhibit 13.
11           (Exhibit 13 marked.)
12           MR. HELFAND: This is marked Kemah 2.
13     Q   Okay. And so Exhibit 13 is a document with
14  Resolution Number 2017-11 at the top. Do you recognize this
15  document, Mayor Joiner?
16     A   Yes.
17     Q   Okay. And in the body of this document it says,
18  that, "A variance is hereby granted for a special commercial
19  area that is hereby created in or -- in a corridor along the
20  south side of 6th Street, from Bradford Street to Kipp
21  Street, wherein the owners of the lots abutting 6th Street
22  will be allowed to install, use and utilize structures up to
23  the street right-of-way." Did I read that correctly?
24     A   Yes.
25     Q   Okay. And at the bottom, it -- I guess this was

70

1  enacted when you were Mayor?
2      A   Yes.
3      Q   Okay. And what was the purpose of enacting this
4  resolution?
5            MR. HELFAND: Sorry. That's a legislative
6  permit. The doc-- The ordinance speaks for itself -- The
7  resolutions speaks for itself. You're not entitled to know
8  the purpose, the thought process, the ideas, the goals behind
9  adopting it. That's the legislative privilege.
10           MR. KILPATRICK: Okay. Fair enough. I'll --
11  I'll agree with you there.
12     Q   So this resolution creates a commercial zone on the
13  side of 6th Street that Palapas is on. Correct?
14     A   Yes.
15     Q   Okay. And the other businesses along that same
16  stretch of 6th Street have built decks out to the point
17  pursuant to this document. Is that a fair statement?
18           MR. HELFAND: Sorry. That assumes facts not
19  in evidence and it's also multi-- also multifarious.
20     Q   Well, let me ask you this way. Are you
21  familiar with the business Scallywag's?
22     A   Yes.
23     Q   Okay. And are you familiar with the deck that they
24  built out towards the street that covers the parking spaces
25  that used to be along the south side of 6th Street?

71

1      A   Yes.
2      Q   Okay. So Scallywag's, the area -- the point to
3  which Scallywag's built out that deck, is that the area
4  that's covered by this document?
5            MR. HELFAND: Objection, calls for a legal
6  conclusion.
7      A   I can't say, specifically, that it does, but it's
8  got to be close.
9      Q   Okay. And then, there's a -- there's another
10  business on the street called Shot Bar.
11     A   Uh-huh.
12     Q   Are you familiar with that business?
13     A   (NODS HEAD AFFIRMATIVELY.)
14     Q   And they built a deck out towards the street, as
15  well?
16     A   That is correct.
17     Q   And the point at which the deck ends, is that the
18  area that's within the commercial zone approved by this
19  document?
20           MR. HELFAND: Objection, mischaracterizes the
21  document; and also calls for speculation.
22     Q   You can answer.
23     A   It -- It's got to be close like Scallywag's.
24     Q   Okay. And then are you familiar with the deck that
25  was built at the Palapas property?

72

1      A   That one, I'm not as familiar with.
2      Q   Okay. So if that deck is built out to the same
3  point that the other -- that those two other properties are
4  built, that would be within the area of the special
5  commercial zone. Is that a fair statement?
6            MR. HELFAND: Objection, assumes facts not in
7  evidence; and again, calls for speculation. Moreover, it
8  mischaracterizes the resolution.
9      Q   You can answer.
10     A   To the best of my knowledge, yes.
11     Q   Okay. So while -- Since you've been Mayor in the
12  latest election, you know, after the 2021 election, have you
13  ever asked Brandon Shoaf to do anything with respect to, you
14  know, Code enforcement or issuing permits related to any
15  business in Kemah?
16     A   No.
17     Q   Do you ever email with Brandon Shoaf about Code
18  enforcement issues?
19     A   I could have.
20     Q   Okay. But you -- you never asked him to actually
21  go inspect a property or go issue a permit or deny a permit,
22  anything like that?
23     A   There's several questions in that.
24     Q   Okay. Well -- Well -- Yeah. Let's -- Let's go one
25  by one. Have you ever asked Brandon Shoaf to perform any

READING COPY FOR SIGNATURE

73

1 type of inspection on a property in the City of Kemah?
2    A  I don't recall.
3    Q  Okay. Have you ever asked him to request that any
4 third party perform an ADA compliance inspection?
5    A  Possibly.
6    Q  Okay. What -- So -- Is there something you recall
7 with respect to ADA compliance?
8    A  Sir, I just know, as an architect, that all
9 facilities need to comply. Okay?
10    Q  Okay. Yeah. And I'm just trying to get an idea of
11 the situations in which you become involved in the Code
12 enforcement process.
13        MR. HELFAND: Well, ask him a question --
14    Q  So --
15        MR. HELFAND: -- 'cause that's a statement.
16        MR. KILPATRICK: I know.
17        MR. HELFAND: That statement that
18 mischaracterizes --
19        MR. KILPATRICK: Now I'm going to ask a
20 question.
21        MR. HELFAND: Okay.
22    Q  So, you know, we talked about before, for example,
23 like you got involved in some capacity with the -- with
24 Veronica Crow and her husband.
25    A  Uh-huh.

74

1    Q  Right? And what other properties have you asked --
2 What other properties have you asked Brandon to do something
3 in connection with -- with permits?
4    A  I don't recall.
5    Q  Are you aware that Brandon Shoaf put a red tag on
6 the building located at 707 Bradford?
7        MR. HELFAND: Excuse me. That assumes facts
8 not in evidence.
9    A  No.
10    Q  No?
11    A  No.
12    Q  Are you aware of any issues with certificates of
13 occupancy or permits at 707 Bradford?
14    A  Ask the question again.
15    Q  Are you aware of any issues with Code compliance,
16 permitting, certificates of occupancy at the property located
17 at 707 Bradford?
18    A  All's I know, it was issued a certificate --
19 certificate of occupancy.
20    Q  And when was that issued?
21    A  I have no idea. I don't recall.
22    Q  Recently?
23    A  Last three months or so, maybe.
24    Q  Okay. So before that, were there issues that you
25 became involved in, with Brandon Shoaf and that -- and that

75

1 property?
2    A  I did not become involved. They might have asked
3 me some questions but that was it.
4    Q  Okay.
5    A  I don't call the shots.
6    Q  Okay. So Brandon -- When you say "they," Brandon
7 Shoaf is one of the people who may have asked you some
8 questions about it?
9    A  Or Walter.
10    Q  Did you ever ask Brandon Shoaf to send an
11 email to the -- to any fire marshal's office to -- to do an
12 ADA inspection on the 707 Bradford property?
13        MR. HELFAND: Objection, assumes facts not in
14 evidence.
15    A  No, because the fire marshal doesn't do ADA.
16    Q  Okay. Well, did you --
17        MR. HELFAND: He's right, you know.
18    Q  -- ask him to contact the -- any fire marshal to do
19 any type of inspection on the 707 Bradford property?
20    A  No.
21    Q  Okay. Now, with respect to food trucks, do you
22 recall, in August of 2021, for -- the -- there being a
23 discussion in the open session about proposed revisions to
24 the food truck ordinance?
25        MR. HELFAND: Objection, assumes facts not in

76

1 evidence.
2        THE WITNESS: Do I answer?
3        MR. HELFAND: If you -- If -- If you have a
4 recollection of that happening. But just because counsel
5 says something happened, it doesn't mean it happened. That's
6 my objection. If you remember that happening, though, you
7 can --
8    A  I recall it being revised numerous times.
9    Q  Okay. And in October, 2021, at the first City
10 Council meeting, the City Council approved a revised food
11 truck ordinance. Do you recall that?
12    A  I don't recall the date.
13    Q  Okay. And within a few days after that, Mr. Shoaf
14 went out and towed the food truck from Palapas. Do you --
15    A  I was not aware of that.
16    Q  Okay. Do you ever drive down Kipp --
17    A  Yeah, I --
18    Q  -- Street?
19    A  -- live on Kipp.
20    Q  Right. So do you ever drive by the corner of Kipp
21 and 6th Street?
22    A  Yes.
23    Q  Okay. So you don't recall -- You recall seeing a
24 food truck there for a period of time. Right?
25    A  I didn't see a food truck. I saw a trailer.

READING COPY FOR SIGNATURE

77

1    Q   Oh, yeah.  Food -- Actually, yeah.  Correct.  It
2    was a food trailer.  You -- At the Palapas property.  Right?
3    A   Yes.
4    Q   Okay.  And is it -- Was it there the last time you
5    drove by?
6    A   Just recently?
7    Q   Yeah.
8    A   I don't think so.
9    Q   Okay.  So you understand now that Brandon Shoaf had
10   it towed from the property.  Right?
11   A   I -- I don't know that for a fact.
12   Q   Okay.  So you never talked to Brandon about that or
13   Mr. Brandon Shoaf about it?
14   A   I -- I was totally unaware of it.
15   Q   Okay.  So you have no role in the towing of that
16   food truck.  Is that your testimony?
17   A   I -- I've had no role in that project since the
18   meeting was cancelled.
19   Q   Okay.  Has the City issued any citations to any
20   food truck operators that you're aware of?
21          MR. HELFAND:  Objection, calls for
22   speculation.
23   A   I'm not involved in that.
24   Q   Okay.  So if a citation is issued, who authorizes
25   that?

78

1    A   Walter Gant.
2    Q   Okay.  So Brandon Shoaf does not have the power to
3    issue citations without his approval?
4          MR. HELFAND:  Sorry.  That calls for a legal
5    conclusion.  It mischaracterizes the witness' prior
6    testimony.
7    A   What --
8    Q   You can answer.
9    A   What's the question again?
10   Q   So Walter Gant -- or, sorry -- Brandon Shoaf does
11   not have the power to issue a citation without getting
12   Mr. Gant's approval?
13          MR. HELFAND:  Restate my objections, please.
14   A   I don't know for sure what their arrangement is.
15   Q   Okay.  Who -- Who determines the -- what powers the
16   building official has?  How is that determined?
17   A   I would assume it's in his job description.
18   Q   Okay.  And who prepares the job description?
19   A   Walter Gant.
20   Q   Okay.  So -- So Walter Gant has -- in essence, has
21   those powers, and he -- he's allowed to authorize the
22   building official to do certain things, such as towing a food
23   truck.
24          MR. HELFAND:  Objection, legal conclusion.
25   A   Again, I wasn't involved in that.

79

1    Q   Okay.  Do you know of any other food trucks in the
2    City of Kemah that have been towed since the -- the new
3    ordin-- food truck ordinance was passed in October, 2021?
4    A   No.
5    Q   No?  Do you know if the reason that food truck was
6    towed from Palapas was due -- a violation of the new food
7    truck ordinance that was enacted in --
8    A   No, no.
9    Q   Hold on one second.  -- that was enacted in
10   October, 2021?
11   A   No.
12   Q   No?  Do you -- Have you read the food truck
13   ordinance that was enacted in October, 2021?
14   A   I'm sure I did at that time.
15   Q   Okay.  Do you have a general understanding of what
16   would constitute a violation of that ordinance?
17   A   Like I said, it's been changed a number of times,
18   but I believe the latest one says that if you're within
19   200 feet of a residence, you can't have it.
20          THE REPORTER:  "Can" or "can't"?
21          THE WITNESS:  Cannot.
22   Q   Okay.  And that would apply to anyone who applies
23   for a permit after that revised ordinance was enacted.
24          MR. HELFAND:  Objection, calls for a legal
25   conclusion.

80

1    A   There's a "depends" on that because the -- when the
2    set of plans that are submitted to be reviewed on a project,
3    at that time, it falls within the ordinance that the plans
4    were reviewed.  Okay?
5    Q   Okay.  So at the time the plan -- At the time the
6    permit is filed, whatever ordinance was in effect at that
7    time, that's the applicable ordinance?
8          MR. HELFAND:  Objection, legal conclusion.
9    A   Yeah, that would be a legal thing to review.
10   Q   Okay.  Okay.  Let me ask you this.  So if someone
11   applies for a permit for a food truck and it's put on -- put
12   on hold, what -- what's the process for dealing with permits
13   that are placed on hold?
14          MR. HELFAND:  Objection, calls for speculation
15   and a legal conclusion.
16   A   I'm not sure.
17   Q   Okay.  Is there anything that you're aware of in --
18   in the City ordinances that allows the building official to
19   place applications on hold?
20          MR. HELFAND:  Objection, legal conclusion and
21   speculation.
22   A   I don't -- I'm not aware of it.
23   Q   I'm handing you what's been marked Exhibit 14.
24          (Exhibit 14 marked.)
25          MR. HELFAND:  This is Kemah 85 through 87.

READING COPY FOR SIGNATURE

81

1  Q   Okay.  I've handed you a document.  It's been
2  labeled Exhibit 14.
3  A   Okay.
4  Q   It's an email chain between you, and it looks like,
5  Kyle Burks and Nick Haby, Wendy Ellis; and the subject is
6  6th Street.  And -- Well, let me ask you this.  Who is Nick
7  Haby?
8  A   He was, at the time, our community development
9  person.
10  Q   Okay.  Has he had any other positions in the City,
11  in the City of Kemah?
12  A   No.
13  Q   Okay.  So -- Well, did he ever serve as the -- He
14  never served as a -- the building official?
15  A   No.
16  Q   Okay.  So what was his -- What were his -- the
17  scope of his job duties?
18  A   He would have been over the building official.
19  Q   So this was before the City Administrator
20  position was created?
21  A   No.  Wendy Ellis is the City Administrator.
22  Q   Okay.  And, let's see.  You make a comment in
23  here -- Who's -- Who's James Gartrell?
24  A   Must be -- Well, looks like he's an engineer.
25  Q   Okay.  Do -- Do you re-- What were y'all discussing

82

1  in this email, if you recall?
2  A   Looks like we were interested in utilities in the
3  right-of-way that we were allowing people to build over.
4  Q   Okay.  And on February 15th, 2018, you -- you sent
5  an email pointing out the -- Or, you say "all."  "It will be
6  important that -- that all these line up," period.
7  A   Uh-huh, and we have discussed that.
8  Q   So is that -- When -- When you're talking
9  about lining up, are you talking about the decks --
10  A   All of it.
11  Q   -- that are going to be built out --
12  A   Right.
13  Q   -- under that 2017 --
14  A   Right.
15  Q   -- resolution?  Okay.
16  A   But I've never looked at them, if --
17  Q   Sure.
18  A   -- that's what you're saying -- Yeah.
19  Q   Okay.  Okay.
20      (Exhibit 15 marked.)
21      MR. KILPATRICK:  Okay.  Here you go.
22      MR. HELFAND:  Thanks.
23  Q   Okay.  I've handed you what's been marked as
24  Exhibit 15.
25      MR. HELFAND:  This is 102 -- Kemah 102 through

83

1  105.
2  Q   And it's a -- At the top it says, "City of Kemah,
3  Application for Short-Term Rental STR Permit."
4      And if you go to the second page, you'll see that
5  the -- Matt -- Matt Placek shows as the owner.
6      And on the third page, it shows 606 6th Street,
7  Units C and D and --
8      Okay.  So this is the application that someone's
9  required to file in order to get a permit to operate
10  short-term rental units?
11  A   Appears so.
12  Q   Okay.  And if you look on the -- on -- on the first
13  page, the top right, it says, "On hold."
14  A   Okay.
15  Q   Do you know why this short-term rental application
16  was placed on hold?
17      MR. HELFAND:  No.  Hang on.  Assumes facts not
18  in evidence.  Does he know why it -- the words "on hold" are
19  on there --
20  Q   Okay.
21      MR. HELFAND:  -- is all he could answer.
22  A   This is the first time I've seen this.
23  Q   Okay.  Well, let me ask you this.  Did you know
24  that Matt Placek had -- and Paige Pitonyak had submitted an
25  application for a short-term rental permit?

84

1  A   No.
2  Q   Okay.  So you never discussed this with Mr. Shoaf?
3  A   (NO VERBAL RESPONSE.)
4  Q   "No"?  You got to --
5      THE REPORTER:  Your answer?
6  A   No.  Sorry.  I'm sitting here...
7  Q   Okay.  And this was submitted -- Well, at least
8  it -- it's dated May 27th, 2021, right after you were elected
9  Mayor.
10  A   Right.
11  Q   And then if you look on the third page, it --
12  There's another -- There's some more handwriting.  It says,
13  "A change of occupancy permit must be filed, first."  Do you
14  see that?
15  A   Uh-huh.
16      MR. HELFAND:  Actually, what it says is, "A
17  change of OCC permit must be filed, first."
18  Q   Okay.
19      MR. HELFAND:  If you're going to quote the
20  document, let's quote it correctly.
21  Q   What do you -- What is -- Do you know what's being
22  referred to as "OCC permit"?
23      MR. HELFAND:  Calls for speculation as to what
24  somebody else meant as to "OCC permit."
25  Q   You can answer.

READING COPY FOR SIGNATURE

85

1    A   **You know, I don't.**
2    Q   Okay.  Is it possible that that was a "change of
3    occupancy permit"?
4          MR. HELFAND:  Everything is possible.
5    Q   Okay.
6          MR. HELFAND:  But that's not a good question.
7    Let me object for spec--
8          MR. KILPATRICK:  It's a good question to me.
9          MR. HELFAND:  -- speculation.
10         MR. KILPATRICK:  It's your opinion.
11         MR. HELFAND:  Let me know when you're done
12   talking.
13         Anything is possible, but that's not a good
14   question.  That's speculation.
15         MR. KILPATRICK:  I like it.
16   Q   So if -- if you read that right now --
17         MR. HELFAND:  I imagine you would.
18   Q   -- in the context of a short-term rental
19   application, what -- what does that handwriting mean to you?
20         MR. HELFAND:  Objection, speculation.  It's
21   been asked and answered.  He told you he doesn't know.
22         Do you have another question?
23   Q   You can answer.
24   A   **Yeah, I don't know.**
25   Q   Okay.

86

1    A   **Like I said, I've never seen this before.**
2    Q   So do all -- If -- If a -- a property that -- If a
3    person that owns a home in Kemah wants to start -- wants to
4    get a short-term rental permit, do they also have to file a
5    change of occupancy permit, first?
6          MR. HELFAND:  Objection, calls for a legal
7    conclusion and speculation.
8    A   **I don't know the answer to that.**
9    Q   Okay.  So you don't know?
10   A   **No.**
11   Q   Okay.
12         (Exhibit 16 marked.)
13   Q   Okay.  I've handed to you what's been marked as
14   Exhibit 16.
15         MR. HELFAND:  This is Kemah 106.
16   Q   And it's a certificate of occupancy application,
17   and it's the business name T&W Holding, LLC; business
18   address, 606 6th Street; owner, Matt Placek.  And is this
19   what someone -- Is this the application that a owner's
20   required to file to get a certificate of occupancy?
21   A   **It appears so.**
22   Q   Okay.  And, looks like, down here, it shows the
23   permit fee, $200.  If that -- If -- If -- If those three
24   lines at the bottom right are filled in, does that indicate
25   that the permit fee was paid?

87

1          MR. HELFAND:  Object.  It calls for
2    speculation.
3    A   **It appears so.**
4    Q   Okay.  Did you know that T&W -- T&W Holding filed
5    this application for a certificate of occupancy?
6    A   **This is the first I've seen it.**
7    Q   Okay.  Are you -- Are you familiar with Bureau
8    Veritas?
9    A   **Yes.**
10   Q   Okay.  What does -- What does Bureau Veritas do?
11   A   **They review plans.**
12   Q   Okay.  What else do they do?
13   A   **Depending on what they were hired for, maybe,**
14   **inspections.**
15   Q   Okay.  And who orders inspections from Bureau
16   Veritas within the City of Kemah?
17   A   **It depends, when it was.**
18   Q   Okay.
19   A   **What's the date on it?**
20   Q   This would have been July 8th, 2021.
21   A   **That, probably, would have been Walter Gant.  July.**
22   **Yeah.**
23   Q   Okay.  So Walter Gant, the -- Just walk me through
24   how that process works.  The -- Walter Gant contacts Bureau
25   Veritas to perform --

88

1    A   **Services.**
2    Q   -- inspections.  And then what -- what is -- what
3    happens after that?
4    A   **You'd have to ask Walter.**
5    Q   Okay.  So you're not involved in that process --
6    A   **No.**
7    Q   -- in any way?
8    A   **No.**
9    Q   Okay.  But sort of like the Crows and Palapas, for
10   example, sometimes you've -- you've gotten involved in
11   dealing with permits and inspections and certificates?
12   A   **Rarely.**
13         MR. HELFAND:  That mischaracterizes the
14   witness' former testimony.
15         And then, did you record his answer?
16         THE REPORTER:  Yes.
17         MR. HELFAND:  Thank you.
18   A   **(CONTINUING)  I said rarely.**
19   Q   Rarely?  Okay.  Do you know Daniel Conrad?
20   A   **Yes.**
21   Q   Okay.  How do you know him?
22   A   **He's a resident in Kemah.**
23   Q   Okay.  Does -- Does he ever get involved in the
24   City's, like, issuance or denial of permits to business
25   owners?

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

89

1   **A   Not that I know of.**
2   Q   Had -- Do you recall the City receiving any
3   complaints from Mr. Conrad about certain businesses in -- in
4   the City of Kemah?
5   **A   No, I don't recall.**
6   Q   Okay.  Are y'all friends?
7   **A   No.**
8   Q   Does he -- Well, at some point a dispute arose
9   between the two of you.  Correct?
10  **A   Correct.**
11  Q   Was that related to a business that he owns?
12  **A   I don't know that he owns a business.**
13  Q   Okay.  Well, what's the -- What -- What was the
14  nature of that dispute?
15  **A   It's going on right now, and I'm in a lawsuit with**
16  **him, and I prefer not to spend any more time on --**
17          MR. HELFAND:  We're not going to talk about
18  that.
19  Q   Okay.  All right.
20          THE REPORTER:  Say -- What?
21          MR. HELFAND:  I said, we're not going to talk
22  about that.
23  Q   Okay.  Fair enough.
24          MR. HELFAND:  I need to use the bathroom, when
25  you have time.  Just need -- I just need a minute or two, but

90

1   I need to use the bathroom.  Don't -- You don't have to stop
2   right now, but when you get to a natural stopping point, let
3   me know.
4           MR. KILPATRICK:  Okay.  Well, yeah.  Why don't
5   you go ahead right now.
6           MR. HELFAND:  Thank you.
7           MR. KILPATRICK:  Some of these are before his
8   tenure, so...
9           THE VIDEOGRAPHER:  Off the record at 3:26 p.m.
10          (Break.)
11          THE VIDEOGRAPHER:  On the record at 3:36 p.m.
12  Q   Okay.  Mayor Joiner, I'm going to -- handing you
13  what we marked as Exhibit 17.
14          (Exhibit 17 marked.)
15          MR. HELFAND:  Do you have a copy for me?
16          MR. KILPATRICK:  Oh, yeah, I do.
17          MR. HELFAND:  Thank you.
18          MR. KILPATRICK:  Sorry.
19          MR. HELFAND:  That's Kemah 77 and 78.
20  Q   And this is an email chain between you, Brandon
21  Shoaf, Dick Gregg, and Walter Gant; and it says, "Regarding
22  Palapas meeting, 8-23-21."
23          MR. KILPATRICK:  Hang on.  This -- We -- I need
24  to claw this back.  This is attorney-client privileged
25  communication.  I'm sorry.  We -- We can't use this; and

91

1   consistent with the Rules, I'll write you a letter clawing it
2   back.  I should not have produced a document with the City
3   Attorney.
4           MR. KILPATRICK:  Well, I'm not going to get
5   into what y'all -- what they talked about.
6           MR. HELFAND:  Well, you're not even allowed to
7   have this email.  That was my mistake.  And the Rules provide
8   that I'll notify you that I -- I -- I need it back.  It's an
9   attorney-privileged communication.
10          MR. KILPATRICK:  This is one of the first
11  documents you produced.
12          MR. HELFAND:  The timing of the production
13  doesn't have anything to do with what I've just told you.  Do
14  you have other questions about something else?
15          You can either agree -- I'll give you the
16  Rule.  You can either agree to give it to me today and
17  destroy any other copies or I'll write you a letter about it.
18  But we're not going to answer questions about it because I
19  shouldn't have given it to you.  That was my mistake, but the
20  Rules provide a remedy for that.  But it is an
21  attorney-client privileged document.
22          MR. KILPATRICK:  Well, I won't ask him about
23  it now, but I reserve the right to take this up with the
24  Judge, if we need to.
25          MR. HELFAND:  I -- I will send you what people

92

1   call a "clawback letter," and if you do not wish to return it
2   because you don't think you're required to under the Rules,
3   then we'll -- we can take that up with the Judge.
4           And if the Judge believes that it's not
5   privileged and that you're entitled to ask questions about
6   it, then we can deal with that at that time.
7           MR. KILPATRICK:  Yeah, that's what I'm saying.
8           MR. HELFAND:  But why don't we -- We can pre--
9   We can, probably, preclude the necessity of a round trip.
10  What do you want to ask him about that, that wouldn't be
11  privileged, about a meeting he had with the City Attorney?
12          MR. KILPATRICK:  Well, look, I'll ask the
13  question and see if you --
14          MR. HELFAND:  Sure.
15          MR. KILPATRICK:  -- if you have a problem with
16  it and then --
17          MR. HELFAND:  Yeah.
18          MR. KILPATRICK:  -- we'll deal with it, as --
19  question by question.
20          MR. HELFAND:  But we're not -- I'm not going
21  to allow --
22          MR. KILPATRICK:  I'm not going to ask a lot
23  about it.
24          MR. HELFAND:  Hang on.  I'm not going to allow
25  this to be part of the deposition transcript, in light of the

READING COPY FOR SIGNATURE

93

1  fact that I pointed out that it was inadvertently produced.
2          We'll ask the court reporter, put this in a
3  separate, sealed envelope.  Okay?  She'll keep it but put it
4  in a separate sealed envelope.  Is that okay with you?
5          MR. KILPATRICK:  That's fine.
6          MR. HELFAND:  Pending a ruling by the Court.
7          MR. KILPATRICK:  Okay.  That's fine.
8          MR. HELFAND:  Great.
9      Q   Okay.
10         MR. HELFAND:  Anyway, she'll know that.
11     Q   Mr. Joiner, do you recall -- Or, sorry --
12  Mayor Joiner, do you recall attending a meeting in August,
13  2021 --
14         MR. HELFAND:  Don't do it --
15     Q   -- regarding --
16         MR. HELFAND:  -- with reference to this
17  letter.  Sorry.
18         THE WITNESS:  Okay.
19         MR. HELFAND:  He's asking if you -- Because
20  we're not supposed to be using that letter.
21     Q   And I'm -- I'm not ask-- going to ask what y'all
22  talked about at the -- the meeting I'm asking about.  I'm
23  just asking you some basic questions.
24         Did you meet with Brandon Shoaf and Walter Gant to
25  discuss the -- the issues related to the Palapas in August of

94

1  2021?
2      A   If I hadn't seen that, I would not recall that.
3      Q   And, you know, I'm just asking about whether you
4  ever -- you had a meeting with them to discuss issues related
5  to Palapas.  So is the answer, yes?
6          MR. HELFAND:  He's answered the question.
7      A   Yeah.  I -- I don't recall, and I won't go any
8  further.
9      Q   But -- Well -- But sitting here today, you -- you
10  recall having a meeting at some point with Brandon Shoaf and
11  Walter Gant to discuss issues related to --
12     A   No, I don't.
13     Q   -- Palapas.
14     A   That's why I'm...
15     Q   Well, you did see the email, and I know we're
16  clawing it back, but it doesn't mean it erased your memory.
17  I'm just asking if you had the meeting.
18         MR. HELFAND:  Do you remember having a
19  meeting?
20     A   Like I say, I saw that, and I said, "Let's meet at
21  City Hall."  I don't remember the meeting.
22     Q   Okay.  But you -- But you -- And I'm not saying
23  what happened at the meeting.  I'm saying do you recall --
24     A   No.
25     Q   -- whether y'all met or not?

95

1      A   No.
2      Q   Okay.  Since you've been Mayor, how many times have
3  you met with Walter Gant to discuss issues related to
4  Palapas?
5      A   Just with Walter Gant?  I only recall one meeting.
6      Q   Okay.  Approximately, when was that?
7      A   It was when we were going to have a meeting here,
8  and it got cancelled.
9      Q   Okay.  And was that the meeting that I was going --
10  going to attend, along with Mr. Gregg, to discuss Palapas?
11     A   I don't know if you were attending or, what.
12     Q   Okay.  And there was a -- if -- you may recall,
13  there was a weather event that Mr. Gregg had to cancel the
14  meeting because there was a -- some emergency issues the City
15  was dealing with at that point?
16         MR. HELFAND:  I'm sorry.  That assumes facts
17  not in evidence.
18         Do you want to ask him if he knows why it was
19  cancelled?  You can't tell him the answer to -- what you want
20  the answer to be.  That assumes facts not in evidence.  Do
21  you want to ask him why it was cancelled?
22     A   I don't recall that meeting.
23     Q   You don't -- You don't know why it was cancelled?
24     A   No.
25     Q   Okay.

96

1          MR. HELFAND:  By the way, the Rule is
2  26(b)(5)(B), and I am telling you now that -- I'm notifying
3  you that you received information that is subject to
4  attorney-client privilege.
5          You are required to promptly return, sequester
6  or destroy the information and any copies.  You may not use
7  it or disclose the information until the claim is resolved.
8  If you disagree with the claim, you should tell me, and we'll
9  take it up with the Judge.  But you can't do anything with it
10  until that claim's been resolved.
11         But if you, honestly, think an email like --
12  like that is not -- a privileged, you let me know.
13         MR. KILPATRICK:  All -- All I said is that
14  I -- I reserve the right to -- I'm going to look -- I'm going
15  to look into this after the deposition --
16         MR. HELFAND:  The Rule requires --
17         MR. KILPATRICK:  -- and if --
18         MR. HELFAND:  -- that you sequester it and not
19  use it for any purpose or show it to anyone else.  As long as
20  you do that, that's fine.  And you --
21         MR. KILPATRICK:  That's what I'm doing.
22         MR. HELFAND:  -- let me know if you believe
23  that it's not privileged.  But right now, we can't use it for
24  any purpose.
25         MR. KILPATRICK:  That's fine.

READING COPY FOR SIGNATURE

97

1 MR. HELFAND: But since it's been a -- made
2 a -- since we've been -- identified on the record of the
3 deposition, we'll have the court reporter seal it up and,
4 she'll keep it sealed. And then you and I will give her
5 joint instructions on what to do with it, either we've agreed
6 or the Court ordered.
7 MR. KILPATRICK: That's fine.
8 MR. HELFAND: Great.
9 THE REPORTER: Okay.
10 MR. HELFAND: Thirty-five years without a
11 mistake and then, there you go. And I went through these
12 things really carefully on my own.
13 UNIDENTIFIED SPEAKER: No, that's not what
14 happened.
15 Q Okay. Mayor Joiner, have you ever asked Brandon
16 Shoaf, when -- when he was the building official, to enforce
17 deed restrictions for any subdivisions in the -- the City of
18 Kemah?
19 A I have not asked him to enforce deed restrictions.
20 Q Okay. Did you ask him to do anything in connection
21 with the Bay Breeze subdivision?
22 A I -- Yes, I asked him -- Because we have an
23 ordinance, I said, "Please, do not permit any facility in
24 Bay Breeze that is not single family," as the deed
25 restrictions say.

98

1 Q Okay. And what -- Which ordinance are you
2 referring to?
3 A I -- It's a number. Okay?
4 Q Okay. But, I mean, it -- Just in general, what
5 does it say?
6 A Just what I said. It, basically, says, if it's not
7 single family, it is not to be permitted.
8 Q Okay. If there are deed restrictions?
9 A In this particular case, there are.
10 Q Okay. Well -- And just to clarify. You know --
11 A We're talking about Bay Breeze.
12 Q -- does that ordinance only apply to a subdivision
13 that has deed restrictions?
14 A Yes.
15 Q Okay. Have you -- And so -- Well, what -- what
16 exactly did you tell Brandon Shoaf to do in connection with
17 that?
18 A I just, in passing, said, "Moving forward, you
19 weren't aware of this ordinance. Please, follow it."
20 Q Okay. So no building permits for anything other
21 than single-family in the Bay Breeze subdivision. Is that --
22 A Correct.
23 Q Okay. Have you done that, something similar for
24 other subdivisions in the City of Kemah?
25 A I don't recall doing it in any other subdivision,

99

1 except Bay Breeze.
2 Q Did you ever instruct Brandon Shoaf to not issue
3 any short-term rental permits in any subdivisions on the same
4 basis?
5 A There was discussions, but our City Attorney
6 stated that --
7 MR. HELFAND: Oh. Wait.
8 THE WITNESS: Wait. I can't say anything, can
9 I?
10 MR. HELFAND: Yeah. You can't talk about what
11 the City Attorney you told you.
12 THE WITNESS: Okay.
13 Q Well, was this discussed in an -- in an open
14 session City Council meeting?
15 A I don't know -- recall if it was closed or open.
16 Q Okay. What other types of directives or
17 instructions have you given Brandon Shoaf that would -- that
18 are somewhat similar, you know? And just to clarify my
19 question, in -- With Bay Breeze, you're referring to an
20 ordinance that only allows single family in a deed-restricted
21 subdivision. Correct?
22 A Let me clarify.
23 Q Okay.
24 A I never really gave Brandon specific instructions.
25 I went through Walter Gant --

100

1 MR. HELFAND: I was just about to --
2 A -- who gave those instructions.
3 Q Okay.
4 MR. HELFAND: I was just about to object that
5 you mischaracterized his testimony. What he said was, he
6 pointed out the existence of an ordinance that he thought
7 Mr. Shoaf was not aware of.
8 Q Okay. So you mentioned -- So I think you said
9 something about, in passing, you mentioned something to
10 Brandon Shoaf about -- about that. What did you mean by
11 that?
12 A Well, it was probably in our meeting. I never met
13 with Brandon by himself. It was always with Mr. Gant.
14 Q Okay. So you and Brandon have never, just the two
15 of you, met?
16 A No, I don't recall ever doing that.
17 Q Okay.
18 A I haven't met with any City staff by myself.
19 Q Okay.
20 A That's not my role.
21 Q Have you give -- Have you given Walter Gant any
22 directives for anything related to -- at the Palapas
23 property?
24 A No.
25 Q Okay. Have you approved any directives,

READING COPY FOR SIGNATURE

101

1  suggestions or other recommendations that Walter Gant made --
2  may have made to you about anything related to Palapas?
3      MR. HELFAND: Object to vague. But you can
4  answer.
5      A  I don't recall any.
6      Q  Okay. So back when you were Mayor the first time
7  around, who was the building official back then?
8      A  You know, we went through so many. I don't recall
9  their names.
10     Q  Okay. Do you recall a building official, Jack
11 Friday?
12     A  Oh, wow, he goes way back.
13     MR. HELFAND: Is that what he did after he
14 left the LAPD?
15     A  He -- He -- He was not building inspector or
16 whatever, when I've been Mayor.
17     Q  Okay.
18     A  It goes back further than that.
19     Q  Okay. Well -- And how -- how long have you lived
20 in the City of Kemah, again?
21     A  2001.
22     Q  2001. Okay. So was he the building official --
23 He -- He was the building official for a period of time while
24 you lived -- since you've lived in the City of Kemah. Right?
25     A  Correct.

102

1      Q  Okay. Do you remember, there -- there were some
2  news articles that came out back then, about how he had not
3  hit -- he had not documented or kept good records of all the
4  certificates of occupancy with respect to most of the
5  businesses in the City, you know...
6      A  I wouldn't have been a part of any of that.
7      Q  But I -- I just -- Do you -- Do you remember that
8  happening?
9      A  No.
10     Q  No? So when -- when a ordinance or -- or -- or
11 when any agenda item, I guess, is -- is approved at a City
12 Council meeting, what -- how is there -- what records are
13 kept to show that City Council approved any given item on the
14 agenda?
15     A  As Mayor, I'm not the keeper of the records.
16     Q  Okay. Well, the -- Is it the City Secretary?
17     A  Correct.
18     Q  Okay. And would those -- any agenda items that are
19 approved at City Council meetings, would those be reflected
20 in the minutes that the City Secretary prepares?
21     A  Should be.
22     Q  Okay. So if someone wanted proof that a certain
23 item on the agenda was voted on and approved by Council, that
24 would be -- you -- you would look at the meeting minutes
25 to -- to show proof that it was approved. Is that a fair

103

1  statement?
2      A  You should be able to do that.
3      Q  Okay. And when permits, certificates of occupancy,
4  and, you know, registrations, things of that nature, what's
5  the chain of custody for -- for those documents?
6      MR. HELFAND: Let me just object that it
7  assumes facts not in evidence, that is, is there any -- any
8  chain of custody, which is a criminal law issue but -- not a
9  civil law issue. But -- If what you mean is, where do they
10 go, is that what you're asking?
11     Q  Or -- Yeah. Just to put it in more simple words,
12 what -- what -- how are those records maintained?
13     A  You'd have to ask Walter, who's over our City -- or
14 who works with our City Secretary.
15     Q  Okay. Is -- Are -- Are there -- Are they kept in
16 paper files, digital files or both?
17     A  I would say we're both.
18     Q  Okay. And how do you control who has access to the
19 paper files?
20     A  It's not under my duties.
21     Q  Okay. And that file room that we walked by, on the
22 way in here that has the door laying on the ground, is that
23 where the records are -- are kept?
24     A  Some of them, I believe.
25     Q  Okay. So right now, there's no door on -- on that

104

1  room --
2      A  That's correct.
3      Q  -- as we sit here today?
4      A  That is correct.
5      Q  Well, why --
6      MR. HELFAND: But you also don't know what's
7  in that room, so what difference does that make to this case?
8      MR. KILPATRICK: Well, it does matter to this
9  case.
10     MR. HELFAND: No, it does not. It has no
11 bearing on any issue in this lawsuit, whether there is or is
12 not a door on a room in City Hall, the contents of which you
13 don't know.
14     Q  Okay.
15     MR. HELFAND: But I'll --
16     Q  If there's a --
17     MR. HELFAND: If you think that the --
18     Q  If there's a permit or certificate of occupancy for
19 Palapas property, would it be kept in that room?
20     MR. HELFAND: Objection, calls for
21 speculation.
22     A  I -- I don't know. I'm -- I'm not the filer.
23 It could be in a file cabinet. I don't know.
24     Q  Okay. Well, why -- why was the door taken off of
25 that room, just out of curiosity?

READING COPY FOR SIGNATURE

26

READING COPY FOR SIGNATURE

105

1   A   That used to be two rooms, and it was combined into
2   one room, and it took a lot of time to order the door.  And
3   the door will be installed by Public Works, but they're down
4   two people right now, so, hadn't been a high priority --
5   Q   Okay.
6   A   -- for them.
7   Q   It -- Well, isn't it true, City Council approved
8   something to put that -- a door on that room to control
9   access to the files?
10  A   Uh-huh.
11  Q   And so you, as Mayor, unilaterally decided to take
12  it off?
13  A   I don't have that con— control.  Sorry.
14  Q   Okay.  Okay.  When was that door removed?
15  A   Last couple of months.
16  Q   Okay.
17  A   About the time that the Council said, "Let's get a
18  door."
19  Q   So what was the concern -- What -- What was
20  discussed at the City Council meeting in the open session
21  about putting a door on there?  What -- What was the
22  concern?
23       MR. HELFAND:  There's two questions there.
24  "What was discussed in open session?", he can answer.  "What
25  was somebody's concern?", is within the legislative

106

1   privilege.  So which --
2   Q   Okay.  What was discussed in open session about --
3       MR. HELFAND:  About --
4   Q   -- the door?
5       MR. HELFAND:  -- putting a door on the room.
6   A   Said that it would be under lock and key.
7   Q   Okay.  Have there been problems with missing files
8   or anything in the past?
9   A   There's another case that I can't really talk about
10  at City Hall, which is concerned about records.
11      MR. HELFAND:  But it's not about -- But -- You
12  can answer his question as to whether anybody's identified
13  missing records --
14  A   (CONTINUING)  Yeah.  I'm not aware.
15      MR. HELFAND:  -- records that the City had but
16  now are missing.
17      That's what you're asking.  Right?
18      MR. KILPATRICK:  Yeah.
19      MR. HELFAND:  Okay.
20  A   (CONTINUING)  I don't know of any.
21      MR. HELFAND:  The Mayor's talking about
22  something else.
23      MR. KILPATRICK:  Okay.
24  Q   And with respect to -- Have there been any issues
25  with files being altered or documents being added that

107

1   weren't supposed to be there?
2   A   Not that I'm aware of.
3   Q   Okay.  Do you recall when the -- Veronica Crow and
4   her husband, when they attended the February 16th, 2022, City
5   Council meeting, pointed out that there were maps that had
6   been swapped out in their permit application?  Do you
7   remember her talking about that?
8   A   No.
9       MR. HELFAND:  Let me object that that assumes
10  facts not in evidence.  It mischaracterizes the witness'
11  prior testimony.
12  Q   Well, to refresh your recollection, do you remember
13  there being discussion in open session about the flood
14  rate -- or, the flood map that was in her file?
15  A   I recall discussion on the -- really, the civil
16  drawings.  That's all recall.
17  Q   Okay.  So part of the reason that, in open session,
18  the Council discussed putting a door on there is not just for
19  missing files but for files that were altered?
20  A   Oh, no.
21      MR. HELFAND:  No.  You just mis— completely
22  mischaracterized.  He just said they just want them locked
23  up.  There's been no evidence of alteration, no evidence of
24  missing files.
25      MR. KILPATRICK:  Okay.  That's fine.

108

1   Q   Okay.  So the answer's, no?
2       MR. HELFAND:  But it also has nothing to do
3   with this case, so -- You're not going to -- You're -- You're
4   not just going to use your deposition time to ask interesting
5   questions about what you walked by when you came in to do the
6   deposition.
7       MR. KILPATRICK:  Well, sorry, but Brandon
8   Shoaf, on several occasions, said that there are no permits
9   on file.  And I do have proof --
10      MR. HELFAND:  Well, then, let's show that --
11      MR. KILPATRICK:  -- that -- that there --
12      MR. HELFAND:  -- to the Court.  But why the
13  door --
14      MR. KILPATRICK:  Yeah, I know.
15      MR. HELFAND:  -- isn't on the room --
16      MR. KILPATRICK:  Well, that's why I'm asking.
17  That's why it's relevant.
18      MR. HELFAND:  No.  Why the door isn't on the
19  room has nothing to do with this case.
20      MR. KILPATRICK:  That's why I'm asking about
21  it.
22      MR. HELFAND:  You --
23      MR. KILPATRICK:  And I can ask --
24      MR. HELFAND:  You didn't know there wasn't a
25  door on the room 'til you came here to take a deposition.

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

---

**109**

1  MR. KILPATRICK:  That's right.
2  MR. HELFAND:  Okay.  So it has nothing to do
3  with this case.
4  Do you have other questions for the Mayor?
5  MR. KILPATRICK:  Of course, I do.
6  MR. HELFAND:  And, of course --
7  Q  What --
8  MR. HELFAND:  -- it bears pointing out --
9  Q  What's the --
10  MR. HELFAND:  -- there was a door on the room
11  at all times that Mr. Shoaf worked here --
12  Q  Is --
13  MR. HELFAND:  -- according to the Mayor's
14  testimony.
15  Q  Is the door on the -- on the file room what
16  Mr. Gant has referred to as a lock-down procedure?
17  MR. HELFAND:  Well, hang on.  He can't testify
18  what Mr. Gant referred to.  That calls for speculation.
19  MR. KILPATRICK:  Well, if he knows.
20  MR. HELFAND:  Well, then -- then, you have to
21  ask a different question.
22  MR. KILPATRICK:  I said --
23  MR. HELFAND:  "Has Mr. Gant ever told you what
24  he meant by a lock-down procedure?"
25  MR. KILPATRICK:  That's a trial objection,

---

**110**

1  like --
2  MR. HELFAND:  No, no.  You can't -- Man.  He's
3  not going to testify --
4  MR. KILPATRICK:  Okay.
5  MR. HELFAND:  -- to what Mr. Gant means by
6  something 'cause that's speculation, unless he says he knows.
7  MR. KILPATRICK:  That's what -- Exactly my
8  point and I --
9  MR. HELFAND:  Okay.
10  MR. KILPATRICK:  -- I think by --
11  MR. HELFAND:  Well, that's my objection.
12  MR. KILPATRICK:  -- inserting your comments,
13  it's, you know -- Anyway...
14  MR. HELFAND:  (MAKES SOUND.)  You have this
15  bad habit of saying a lot of stuff under your breath that's
16  just totally inappropriate in a deposition.
17  If you have a question, ask the question and
18  wait for the answer.  If there's an objection, you have to
19  wait for that and then see if the witness has an answer.
20  Would you like the answer to the question
21  whether he knows what Mr. Gant means by that term, whether it
22  has --
23  MR. KILPATRICK:  Yeah.
24  MR. HELFAND:  -- anything to do with the door?
25  Okay.  Do you know?

---

**111**

1  A  What was the question?
2  Q  Lock-down procedure.
3  MR. HELFAND:  Yeah.  What was the procedure?
4  A  I've never heard that.
5  Q  Okay.  Well, Mr. Gant's never used that term?
6  A  No.
7  Q  Okay.
8  A  Not around me.
9  MR. HELFAND:  Okay.  It got resolved.
10  MR. KILPATRICK:  Okay.  See how easy that was.
11  Q  What is Collin Jones' position with the City?
12  A  He's a police chief.
13  Q  Police chief?
14  A  Yes.
15  Q  Okay.  And when did -- when did he start in that
16  role?
17  A  Seems like it was late September, October of last
18  year.
19  Q  Did -- Did he implement lock-down procedure for the
20  file room?
21  A  I've never heard that from him, either.
22  Q  Or -- Or -- Well, what -- what -- Is there another
23  term that he used for the locking up the file room?
24  A  He's been going through and securing City Hall.
25  Q  Okay.

---

**112**

1  A  Uh-huh.
2  Q  So who -- who instructed him to do that?
3  A  I believe he took that on himself --
4  Q  Okay.
5  A  -- as our police chief.
6  Q  So what -- what kind of things has -- has he done
7  thus far to secure City Hall?
8  A  They've added some Coded doors.
9  Q  Okay.
10  A  And, pretty much, that's it.
11  Q  Okay.  So that wasn't part of -- that's not why the
12  door was added to the file room?
13  A  The door was added because we did renovations in
14  there to make that room larger.  What had happened is, we had
15  a plan room down here, and they chose to use it as an office,
16  so they moved the plan room in with the files.
17  Q  So is that door supposed to be locked when -- when
18  it's on?
19  A  Yes.
20  Q  Okay.  And so who maintains who -- who goes in and
21  out of that room or who controls that?
22  A  At that point, it would be only those people that
23  should go in and have access to the files.
24  Q  Okay.  And who within the City has access to those
25  files?

---

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

113

1    A    To me, it would be the Court side and possibly City
2    Secretary.
3        Q    Okay.  No -- No one else?
4        A    But, again, I don't make that call.  Okay.  That'd
5    be a Walter Gant call.
6        Q    Okay.  Have any files from that room been taken out
7    of this building?
8        A    I would not know that.
9        Q    Okay.  So as far as you're aware, none --
10       A    No.
11       Q    -- have been taken.
12           Have you ever asked Brandon Shoaf to prepare a
13   report or spreadsheet showing all the properties that are not
14   in compliance with any Code or ordinance?
15       A    No.
16       Q    Has Brandon Shoaf ever provided you a spreadsheet
17   or other report showing a list of all properties that were
18   not in compliance with Code or any ordinance?
19       A    I don't recall ever seeing one.
20       Q    Okay.  What -- In the event of a declaration of
21   disaster or, I guess, hurricane, freeze or something of that
22   nature, you, as the Mayor, have the power to declare a -- a
23   disaster.
24       A    Yes.
25       Q    Is that right?

114

1        Okay.  And if a disaster is declared, how -- how
2    does that change the process for making repairs or getting
3    building permits?
4            MR. HELFAND:  Objection, legal conclusion.
5        A    Best of my knowledge, that's never happened since
6    I've been Mayor.
7        Q    Okay.  You recall the -- the freeze in February,
8    2021, when the City...
9        A    Yes; I was not Mayor.
10       Q    Right.  But -- But you lived in Kemah?
11       A    Yeah, uh-huh.
12       Q    Okay.  And Mayor -- So Mayor Gail -- or, excuse --
13   Terri Gail was the Mayor at that time.  Correct?
14       A    Right.
15       Q    And do you recall if she declared a -- a disaster
16   and invoked the emergency management plan?
17           MR. HELFAND:  Let me object that those --
18   That's a multifarious question 'cause those are two different
19   things.
20           MR. KILPATRICK:  Okay.  I'll rephrase.
21           MR. HELFAND:  All right.
22       Q    Do you recall that Terri Gail declared a disaster
23   in the City of Kemah in February, 2021?
24       A    I do not recall that.
25           MR. HELFAND:  Let me object.  That assumes

115

1    facts not in evidence.
2        Q    Okay.  Have you ever declared a disaster in the
3    City of Kemah in --
4        A    No.
5        Q    -- while you were Mayor?
6        A    No.
7        Q    No?  Does the City of Kemah have an emergency
8    management plan?
9        A    Yes.
10       Q    Okay.  Is it -- And it's a written document.
11   Correct?
12       A    Yes, yes.
13       Q    Where -- Where can that be found?
14       A    Our Chief, police chief, is our emergency
15   management coordinator.
16       Q    Okay.  And have you read the emergency management
17   plan?
18       A    Yes, 'cause I'm the emergency management director.
19       Q    Okay.  So as the emergency management director, do
20   you -- you have the power to take certain actions without
21   Council approval?
22       A    That is correct.
23       Q    Okay.  Do any of those powers relate to building
24   permits, Code compliance --
25       A    No.

116

1        Q    -- or any things of that nature?
2        A    No.
3        Q    What -- What types of things, for example?
4        A    This is like calling for voluntarily evacuation --
5        Q    Okay.
6        A    -- keeping our citizens informed.  I -- I've called
7    a voluntary evacuation one time and -- and so we were on
8    Facebook and Blackboard Connect to keep our citizens updated
9    and things like that.
10       Q    Okay.  Understand.  Is there a place online to find
11   that document, to your rec--
12       A    I -- I -- You know, I'm not a tech person, so I
13   don't know.
14       Q    Okay.
15       A    I would -- I would assume so.
16       Q    Okay.  Just sitting here today and based on what
17   you know about the Palapas property, what does Mr. Placek
18   need to do to get a certificate of occupancy for his
19   building?
20           MR. HELFAND:  Don't answer that question
21   because it invades the attorney-client privilege.
22       Q    Well -- And don't -- don't answer it to the extent
23   that it involves communications with your lawyer.  But, you
24   know, if -- if my client wanted to go do everything required
25   to get a certificate of occu-- occupancy for the building,

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

---

117

1   what does he need to do?
2           MR. HELFAND:  That is privileged information
3   because it comes from communications with the City Attorney
4   and the City's attorney.  Don't answer that question.
5           But let me see if we can fix privilege
6   problem.  Do you know of the compliance or noncompliance of
7   any of the plaintiff properties with City ordinances and
8   Codes.
9           THE WITNESS:  No.
10          MR. HELFAND:  Okay.  Then we don't need to
11  worry what specifics there are.
12      Q   Who -- Who would know?
13          MR. HELFAND:  Speculation.
14      A   I would think you'd need to ask Walter Gant.
15      Q   Okay.  Well, if Walter Gant testified that he
16  doesn't know, then who would -- who would know?
17          MR. HELFAND:  Excuse me.  I don't think Walter
18  Gant was asked that question.  But, again, you shouldn't ask
19  questions based upon your interpretation of somebody else's
20  testimony.
21          What you're asking him is, "Anybody other than
22  Mr. Gant at the City that you're aware of who would know the
23  compliance status?"  That's what you're asking.
24          MR. KILPATRICK:  I can ask the question
25  however I want to --

---

118

1           MR. HELFAND:  No, you can't.
2           MR. KILPATRICK:  -- and you can object.
3           MR. HELFAND:  You can't ask an objectionable
4   question.
5           MR. KILPATRICK:  You can object --
6           MR. HELFAND:  Yes, that's --
7           MR. KILPATRICK:  -- and I can rephrase the
8   question.
9           MR. HELFAND:  -- what I did.  Yeah, that's
10  what I just did.
11          MR. KILPATRICK:  But that's just so
12  unnecessary how you're doing this over and --
13          MR. HELFAND:  Well, what's unnecessary --
14          MR. KILPATRICK:  -- over and over again.
15          MR. HELFAND:  -- is for you to make speeches,
16  then ask a question.  You just ask questions.
17          The deposition is to proceed as if it were in
18  Court.  In Court you're not allowed to tell a -- a witness
19  what you think some other witness testified to.  You're just
20  supposed to ask questions.
21          MR. KILPATRICK:  That's a trial objection.
22          MR. HELFAND:  There's no such thing as a trial
23  versus deposition --
24          MR. KILPATRICK:  Yes, there is.
25          MR. HELFAND:  Do you understand -- No.

---

119

1   Listen.  The Rule, I'll read it to you, says, "The deposition
2   shall proceed under the same Rules at -- as if in Court,"
3   with the exception of Rules 6, 15, and one other of the Rules
4   of Evidence.  That's --
5           MR. KILPATRICK:  Really?
6           MR. HELFAND:  -- what the Rule says.  Yeah.
7           MR. KILPATRICK:  So you can make a hearsay
8   objection that -- during -- an objection --
9           MR. HELFAND:  You don't have to make a hearsay
10  objection, but, yes, you can make a hearsay objection.
11          MR. KILPATRICK:  It's not appropriate in a
12  deposition.
13          MR. HELFAND:  But this is not -- I'm not
14  making a hearsay objection.  I'm making a speculation
15  objection, so leave hearsay somewhere else because it's got
16  nothing to do with what we're talking about.
17          The deposition proceeds as if in Court.
18  There's no such thing as "that's a trial objection."
19          MR. KILPATRICK:  Yeah, it is.  Hearsay.
20          MR. HELFAND:  In your mind.  I get it.  He's
21  not -- If you want him to answer the question whether he
22  knows of anybody else, that's fine; but you don't predicate
23  it by saying, "If Mr. Gant told me this," 'cause that's not a
24  question --
25          MR. HELFAND:  I can say whatever I want to.

---

120

1   Here --
2           MR. HELFAND:  Right.  But he's not going to
3   answer that.
4           MR. KILPATRICK:  Let's proceed.
5       Q   So if Mr. Gant doesn't know the answer to that
6   question, then who would my client go to, to find out the
7   answer to that question?
8           MR. HELFAND:  Objection, speculation.
9       A   I still say that Mr. Gant is the place to go.
10      Q   Okay.  To your knowledge, has Mr. Gant ever told my
11  client what needs to be done to get a certificate of
12  occupancy issued?
13      A   I have no idea.
14      Q   Just wrap up that issue.  You know, sitting here
15  today, you don't know of any issues at the Palapa property
16  that are not in compliance with any Code, City Code or -- or
17  Building Code or City ordnance?
18          MR. HELFAND:  Objection.
19      A   No.
20          MR. HELFAND:  Witness has tes-- That
21  mischaracterizes his testimony.  He's testified he doesn't
22  know one way or the other.
23      Q   You can answer.
24      A   No.
25          MR. KILPATRICK:  Want to take a short break?

---

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

121

1    MR. HELFAND: Sure.
2        THE VIDEOGRAPHER: Off the record at
3  4:17 p.m., ending Card 2.
4        (Break.)
5        THE VIDEOGRAPHER: On the record 4:28 p.m.,
6  beginning Card 3.
7    Q   Okay. Mayor Joiner, who -- who is the current
8  building official for the City of Kemah?
9    A   His name's Alfonso. He just started working with
10  us.
11    Q   Okay. You don't -- Do you know his last name?
12    A   No. Sorry, I don't.
13    Q   Oh, that's okay. Was a -- Was there a committee
14  formed to vet candidates and interview them and things of
15  that nature?
16    A   Yes.
17    Q   Okay. Was there a similar process that you're
18  aware of for Brandon Shoaf?
19    A   I don't know. He was before my time.
20    Q   Okay. And so how many -- how -- how long did it
21  take to find a new building official after Brandon Shoaf's
22  employment was terminated?
23    A   I couldn't tell you the number of days, but it
24  wasn't too long.
25    Q   Okay. And so, in the interim, who -- who -- during

122

1  that period of time where there was no building official,
2  who -- who handled the duties of the building -- building
3  official?
4    A   Probably, Veritas.
5    Q   Bureau of Veritas?
6    A   Uh-huh.
7    Q   Okay. Were -- Were you on the committee --
8    A   No.
9    Q   -- to select -- Okay.
10    A   No.
11    Q   Who -- who was on that committee?
12    A   You know, I'm not sure who all was on it. I
13  believe Isaac Saldana and, maybe, Teresa Vazquez-Evans from
14  the Council and then I'm not sure here.
15    Q   Okay. And to hire the -- the new -- to hire
16  Alfonso, the new building official, was that put up for a
17  vote before City Council?
18    A   You know, I -- I -- I'm really not sure. I believe
19  it was because he was a community development director for
20  us, so I think it would have taken Council approval.
21    Q   Okay. So do you -- Comparing Alfonso to -- to
22  Brandon Shoaf, do you think Alfonso's more qualified for the
23  job?
24    A   I didn't do the interview.
25    MR. HELFAND: Yeah.

123

1    Q   Okay. Well -- But he's been -- How long has he
2  been in that role?
3    A   I don't know. Six weeks, maybe.
4    Q   Okay. Any complaints so far?
5    A   Not that I'm aware of.
6    Q   Okay. I notice there have been some videos made of
7  City Council meetings made by Wayne Dolcefino?
8    A   Yes.
9    Q   Did you hire him to --
10    A   No.
11    Q   -- to make those -- or -- Directly or indirectly?
12    A   No.
13    Q   So you -- you haven't paid any compensation to
14  Wayne Dolcefino --
15    A   No.
16    Q   -- directly or indirectly?
17    A   No.
18    Q   Do you know who hired him?
19    A   No.
20    Q   Okay. Well, we've talked about the short-term
21  rental ordinances, but, in general, are -- are you in favor
22  or opposed to short-term rentals?
23        MR. HELFAND: That's in the executive
24  privilege -- sorry -- legislative privilege. He's not going
25  to answer questions about what he -- positions related to the

124

1  City that he favors, disfavors, or his opinion on those.
2        MR. KILPATRICK: Well, he doesn't vote -- vote
3  on them.
4        MR. HELFAND: That's an interesting point that
5  has nothing to do with what I just told you. He's privileged
6  not to answer questions about his position on issues that
7  come before the City.
8    Q   Before you were the Mayor, before you were elected
9  as Mayor in 2021, were you in favor or against short-term
10  rentals?
11        MR. HELFAND: You -- You -- I don't think you
12  understand the privilege. When he had the opinion doesn't
13  matter now that he's a public official. You're not entitled
14  to inquire as to his thought processes regarding matters that
15  come before the City. No. Any other questions?
16        MR. KILPATRICK: I don't think you're right
17  about that but --
18        MR. HELFAND: Well, I --
19        MR. KILPATRICK: -- it's not a big deal.
20        MR. HELFAND: You're entitled to your opinion,
21  but I'm not going to change anything today.
22        It also has no bearing on this case
23  whatsoever, since, as you pointed out, the Mayor takes no
24  action as it relates to any plaintiff in this lawsuit.
25        MR. KILPATRICK: Well, that's not necessarily

READING COPY FOR SIGNATURE

125

1 true, unless it's been demonstrated --
2      MR. HELFAND: It is necessarily true because
3 he does not act as the -- as -- on the -- He does not vote,
4 and he does not direct the actions of staff, as he's
5 testified. So it is not -- not necessarily true. It is
6 actually necessarily true. It has nothing to do with this
7 lawsuit.
8      MR. KILPATRICK: I disagree, but doesn't
9 matter. We'll go ahead.
10     MR. HELFAND: It's okay.
11     MR. KILPATRICK: Okay.
12     MR. HELFAND: You know what deGrasse Tyson
13 would say, "You can have your own opinions, but you can't
14 have your own facts."
15     MR. KILPATRICK: Got to come up with some
16 better ones than that.
17     MR. HELFAND: I'm sorry. I didn't hear what
18 you said.
19     MR. KILPATRICK: Don't -- Don't worry about
20 it.
21     MR. HELFAND: I don't worry about it, but I
22 don't appreciate it.
23     (Whereupon, reporter asks for clarification;
24 briefly off the record.)
25   Q   I'm handing you what's been marked as Exhibit 18.

126

1      (Exhibit 18 marked.)
2      MR. HELFAND: This is Kemah 165 to 167.
3   Q   Okay. Mayor, Mayor Joiner, I've handed to you
4 what's been marked as Exhibit 18.
5   A   Okay.
6   Q   And it is a document entitled "City of Kemah,
7 Texas, Position Titles, City -- City Building Official."
8   A   Okay.
9   Q   Are you familiar with this document?
10  A   No.
11  Q   Well -- Well, this is a document that was produced
12 by the City as Kemah 105 through 107 --
13     MR. HELFAND: Okay.
14  Q   -- and sets forth the scope of responsibilities,
15 essential functions, necessary knowledge, skills, and
16 abilities of the building official. Is that a fair
17 statement?
18  A   It appears so.
19  Q   Okay. So is this something that the City
20 Administrator would have created or is this something City
21 Council would create?
22  A   No. This would be the City Administrator.
23  Q   The City administrator would prepare this?
24  A   (NODS HEAD AFFIRMATIVELY.)
25  Q   Okay. Do you recall the February 16th, 2022, City

127

1 Council meeting where Mr. Meisinger, one of the City Council
2 members, pointed out that the City had targeted certain
3 businesses that were permitted and shut them down? Do you
4 recall that?
5      MR. HELFAND: Excuse me. I -- I object. That
6 assumes facts not in evidence.
7      Do you recall something like that happening
8 with Mr. Meisinger saying that at a meeting?
9      THE WITNESS: No.
10  Q   Okay. You don't remember any -- any of that
11 discussion?
12  A   No.
13  Q   Okay.
14     MR. HELFAND: Let me object that the last
15 question assumes facts not in evidence, as well.
16  Q   So certificates of occupancies in the City of Kemah
17 are -- are issued to businesses. Correct?
18     MR. HELFAND: Object to form of the question,
19 calls -- calls for a legal conclusion. Sorry. Object to the
20 form of the question because it calls for a legal conclusion.
21     THE WITNESS: Do I answer or --
22     MR. HELFAND: If you know the answer.
23  Q   You can answer.
24  A   Okay. Ask your question again.
25  Q   Certificates of occupancy in the City of Kemah

128

1 are -- are issued to businesses. Correct?
2      MR. HELFAND: Let me object. That now calls
3 for a legal conclusion.
4   A   It's more than just businesses. Anyone that
5 applies for a permit, complies with all the documents, then a
6 certificate of occupancy is issued to say that they are --
7 they have complied with the Codes and ordinances to the best
8 of their knowledge.
9   Q   Okay. But -- But a -- for a single-family
10 residence, for example, you don't need to get a certificate
11 of occupancy in order to occupy your own house.
12  A   I believe you do.
13  Q   Is that a fair -- Do you have a certificate of
14 occupancy for your house?
15  A   You know, I don't recall. It's been a long time.
16  Q   Okay.
17  A   And it would have been taken care of by the
18 contractor.
19  Q   But you don't -- you don't -- you don't have
20 possession of a certificate of occupancy in your house, do
21 you?
22  A   I could.
23  Q   You just -- You don't know?
24  A   No. It's been twenty years ago.
25  Q   So if the building official came over to your house

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

129

1  and said to you, "I want to see your certificate of
2  occupancy," and -- and you say you don't have it, is he going
3  to kick you out of the house?
4     A  No.
5     Q  Probably not.  Right?
6     A  No.
7     Q  Okay.  And...
8        MR. KILPATRICK:  Let me just talk to -- Go off
9  the record real quick.  Just talk to my client and see if...
10       MR. HELFAND:  Sure.
11       THE VIDEOGRAPHER:  Off the record at 4:44 p.m.
12       (Break.)
13       THE VIDEOGRAPHER:  On the record at 4:50 p.m.
14    Q  Okay.  Let's see.  So if you know, what's the
15 process for getting permits to -- to make repairs after, you
16 know, a freeze, for example?
17    A  I can't say for sure about the City, but I would
18 assume that you would get professionals involved and go
19 through all the areas that need to be covered, documented on
20 a set of documents, get a seal from a professional and submit
21 it for a permit.
22       Then make sure the inspections are made and
23 assuming all the work is done per the documents, then the
24 certificate of occupancy should be submitted.
25       Then one of the advantages of that is, is when a

130

1  professional puts a seal on a set of documents, he's, pretty
2  much, saying that it complies with Codes and ordinances.
3     Q  Okay.  So in the -- Back in the February, 2021,
4  freeze that affected, pretty much, all of Texas,
5  especially --
6        MR. HELFAND:  Object.
7     Q  -- these areas.
8        MR. HELFAND:  I'm sorry.  I thought you were
9  done.  Go ahead.
10    Q  The -- Here, let me -- Let me start over.  In 2021,
11 February, 2021, do you re-- you recall the freeze that froze
12 most of Texas over.
13    A  Yes.
14    Q  You weren't the Mayor at that time, but at your
15 home, did you have any frozen pipes burst or anything like
16 that?
17    A  No froze pipes.
18    Q  Okay.
19    A  Just frozen landscaping.
20    Q  Okay.  And so did you repair the frozen landscaping
21 pipes?
22    A  Wait.  There wasn't any pipes.
23       MR. HELFAND:  He didn't say pipes.
24    Q  Oh, just frozen plants.
25    A  Plants.

131

1     Q  Plants.  Okay.  Yeah.  I understand.
2        So did you know other people who had broken pipes,
3  things of that nature?
4     A  Really, no.  We drove around, when we could finally
5  get out, and Kemah came through Harvey really pretty well.
6     Q  Okay.  So -- Or, yeah.  Sorry.  Not Harvey, not --
7  not Hurricane Harvey but the -- the freeze --
8     A  Oh, the freeze.
9     Q  -- of February --
10    A  Yeah, yeah.
11    Q  -- 2021.
12    A  Yeah.  You know, again, I just was worried about
13 myself.
14    Q  Okay.  Well, do -- do you know what the City's
15 procedures, policies or ordinance -- ordinances say about
16 making repairs when there's an emergency freeze?
17       MR. HELFAND:  Objection.
18    A  No.
19       MR. HELFAND:  Assumes facts not in evidence;
20 and calls for a legal conclusion.  But he's answered the
21 question.
22    Q  Is that something that is in the 2009 Code?
23       MR. HELFAND:  Well, let me object.  "The 2009
24 Code" is too vague for anyone to answer.
25       MR. KILPATRICK:  Okay.  No.  I'll -- I'll --

132

1  I'll -- I'll clarify.  I was also pointing to it.
2     Q  Is that also found in the 2009 International
3  Building Code?
4        MR. HELFAND:  Objection.  That calls for
5  speculation.
6     A  I don't know.
7     Q  You don't know?
8     A  No.
9     Q  Okay.
10    A  Never had to search it.
11    Q  Okay.  That's a good thing.  So -- Okay.  Okay.  So
12 if -- if pipes burst in -- in a property and then -- and they
13 need to be repaired, can the owner make the repair first and
14 then apply for a permit?
15       MR. HELFAND:  Objection, a legal conclusion.
16    A  I have no idea.
17    Q  Okay.  When -- Regardless of -- Well, let's say
18 that they do make -- and that they apply for a permit, first.
19 Do they have to do a plan review to make repairs to plumbing?
20    A  I have no idea.
21       MR. HELFAND:  Objection, legal conclusion.
22    Q  You don't know?  Okay.  Do you know if --
23       MR. HELFAND:  Did you get my objection?
24       THE REPORTER:  Yes.
25       MR. HELFAND:  Thanks.

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

133

1       Q    -- the 2009 International Building Code speaks to
2 that issue?
3           MR. HELFAND: Objection, speculation.
4       A   I have no idea.
5       Q   Okay. Is that not -- That's not in your
6 wheelhouse, as far as, you know, being an architect?
7       A   I've never had to search it.
8       Q   Okay. No. That's fine. That's my question.
9 Okay.
10       A   That's a thick book.
11       Q   Yeah. No. I understand.
12        Okay. Do you know if the City has failed -- or has
13 refused to issue any permits or have plumbing permits for
14 property that was damaged in that freeze?
15           MR. HELFAND: Objection, call for speculation.
16       A   No.
17       Q   Okay. And so getting -- getting those permits to
18 make repairs, that would be something that the building
19 official would be in charge of?
20           MR. HELFAND: Objection, speculation.
21       A   I would assume it would be Walter Gant.
22       Q   Oh, Walter Gant?
23       A   Yeah.
24       Q   Okay.
25       A   Through the -- And the building inspector.

134

1           MR. KILPATRICK: Okay. I'll pass the witness.
2          E X A M I N A T I O N
3 BY MR. HELFAND:
4       Q   Mayor, do you know, one way or another, whether any
5 of Mr. Placek's properties situated within the City of Kemah,
6 are or not -- or are or not in compliance with City Code?
7       A   Do I know of any?
8       Q   Do you know, one way or another, whether they are
9 or are not --
10       A   No, I don't.
11       Q   -- in compliance?
12        Okay. If Mr. Placek has previously been advised by
13 some representative of the City of Kemah that he cannot have
14 a certificate of occupancy because his building does not meet
15 Code, whether it's Mr. Placek or any other person in Kemah,
16 what would you tell that person to do to get a certificate of
17 occupancy?
18       A   I think I just said that awhile ago, but I'll
19 repeat it, is, is get professionals, architect, mechanical,
20 electrical, plumbing, engineers, to come out, document what
21 you have. Okay? And then they need to put a set of
22 documents together to -- to fix whatever problems might be
23 out there.
24        And then they should seal that set of documents
25 stating that to the best of their ability, they've complied

135

1 with the Codes and ordinances of Kemah.
2        Then you take that to the City. They review the
3 set. There may be a couple of things that the engineers
4 maybe -- not a -- maybe, didn't miss but that the City
5 requires. So they send the documents back. They fix them.
6        Then it comes back, and if they've been fixed, then
7 they should issue you a permit. And then make sure that it's
8 inspected and that it -- it complies with those documents.
9 And when that's done, the certificate of occupancy will be
10 issued.
11           MR. HELFAND: Okay. Thank you. I have no
12 other questions.
13           MR. KILPATRICK: Okay. One, maybe, two more
14 questions.
15           MR. HELFAND: Sure.
16         F U R T H E R   E X A M I N A T I O N
17 BY MR. KILPATRICK:
18       Q   Mayor Joiner, did you know that the plaintiffs have
19 done all those things you just mentioned --
20           MR. HELFAND: Okay.
21       Q   -- and still don't have a permit after over a
22 year-and-a-half?
23           MR. HELFAND: Okay. Object. That's not true
24 and that assumes facts not in evidence. So --
25           MR. KILPATRICK: That's not a -- That's not a

136

1 legal objection. What's your legal objection?
2           MR. HELFAND: It assumes facts we both know
3 are not only not in evidence but are not true.
4           MR. KILPATRICK: That's coaching.
5           MR. HELFAND: You can't ask --
6           MR. KILPATRICK: You're telling him that's not
7 true is coaching your witness.
8           MR. HELFAND: No. I'm telling you. I'm
9 looking at you, and I'm telling you --
10           MR. KILPATRICK: Oh, you think he can't hear
11 you?
12           MR. HELFAND: You let me know when it's my
13 turn to talk and that you're not going to interrupt me.
14           MR. KILPATRICK: Well, I'm doing my best to
15 try to stop the coaching before you -- well --
16           MR. HELFAND: This gentleman is -- This
17 gentleman doesn't need any coaching to know what he does and
18 doesn't know, but he also is not -- You're not permitted to
19 say something that's untrue and then ask a question.
20        I'm coaching you. Stop telling him things you
21 know are untrue. It's not the first time.
22        Now, do you have a question for him, as
23 opposed to a statement?
24           MR. KILPATRICK: My -- I, actually, asked a
25 question.

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

137

1    MR. HELFAND: No. You said, "Did you know
2  that this happened?" That's a statement because it
3  isn't proven --
4    MR. KILPATRICK: That's a question.
5    MR. HELFAND: -- in the records.
6    Show us where that happened and then you can
7  ask him questions about that. You can't pretend a fact and
8  say, "Did you know this?"
9    MR. KILPATRICK: We've already shown the
10  application to him.
11    MR. HELFAND: You want to ask the -- the --
12  the witness whether he knows if your client is or isn't in
13  compliance, a question that was already asked, or whether
14  your client has done those things, then go ahead and ask him
15  that but don't tell him something.
16    You're allowed to communicate --
17  Q  Did you know --
18    MR. KILPATRICK: Go ahead.
19  Q  Did you know that T&W Holdings applied for a
20  plumbing permit after making repairs after the freeze and
21  still doesn't have that permit? Did you know that?
22  **A  They applied for a permit?**
23  Q  Yes.
24  **A  I did not know that.**
25  Q  Okay. Did you know that T&W Holdings applied for

138

1  an electrical permit?
2  **A  Did not know that.**
3  Q  And did -- Okay. Well, then, I guess, it's also
4  true to follow that you don't know that they -- T&W Holdings
5  was actually issued the -- the electrical permit.
6  **A  Did not know that.**
7  Q  Okay. Do you know why the City will not issue a
8  plumbing permit to T&W Holdings?
9    MR. HELFAND: I object, assumes facts not in
10  evidence that the City will not issue a permit. But --
11  Q  You can answer.
12    MR. HELFAND: Do you know whether the City
13  will or will not issue a permit?
14    THE WITNESS: No. I -- I mean, I don't know
15  the situation.
16  Q  Okay. Well -- And we already looked at this
17  earlier, but you saw that the short-term rental application
18  was placed on hold.
19    MR. HELFAND: No. Again, that's not what he
20  said and that's not what the document says. The document has
21  the words "On Hold" written on it. There's no evidence in
22  this case that the short-term rental application was placed
23  on hold.
24    MR. KILPATRICK: Anyone with --
25    MR. HELFAND: Ask questions.

139

1    MR. KILPATRICK: -- common sense would know --
2    MR. HELFAND: Ask --
3    MR. KILPATRICK: -- that that means it's on
4  hold.
5    MR. HELFAND: No.
6    MR. KILPATRICK: Okay.
7    MR. HELFAND: We're in Court. We're in Court.
8    MR. KILPATRICK: Well, he --
9    MR. HELFAND: Your common sense --
10    MR. KILPATRICK: Then -- Then -- Then you can
11  cross me.
12    MR. HELFAND: -- may not be -- your common
13  sense may not be his common sense. Ask questions. Don't
14  talk to him. Ask questions.
15    MR. KILPATRICK: No. The way it actually
16  works is I ask questions and then you object and --
17    MR. HELFAND: Ask questions.
18    MR. KILPATRICK: -- then you re-direct.
19    MR. HELFAND: Ask questions. Don't make --
20    MR. KILPATRICK: That's what I --
21    MR. HELFAND: -- statements.
22    MR. KILPATRICK: You -- You don't -- I'm not
23  going to listen to what you tell me to do.
24    MR. HELFAND: I know.
25    MR. KILPATRICK: I follow the Rules.

140

1    MR. HELFAND: I know. That's unfortunate, but
2  you've made that clear.
3    MR. KILPATRICK: Well, no. I'm glad. I'm
4  really glad that I don't have to.
5    MR. HELFAND: Ask questions.
6    MR. KILPATRICK: Your reputation --
7    MR. HELFAND: Do you have more questions?
8    MR. KILPATRICK: Yes, I do.
9    MR. HELFAND: Go ahead.
10    MR. KILPATRICK: If you -- We'd get through
11  much --
12    MR. HELFAND: Just ask a question.
13    MR. KILPATRICK: Get through it much faster
14  if --
15    MR. HELFAND: Don't make comments to me.
16    MR. KILPATRICK: -- you wouldn't interrupt me.
17    MR. HELFAND: Just ask a question.
18    MR. KILPATRICK: You done?
19    MR. HELFAND: If I'm done, I'm leaving. Do
20  you have another question?
21    MR. KILPATRICK: I'm -- I just don't want to
22  interrupt you again.
23    MR. HELFAND: Do you have another question?
24    MR. KILPATRICK: Just -- Just going on --
25    MR. HELFAND: Don't --

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

141

1    MR. KILPATRICK: -- and on and on.
2    MR. HELFAND: You know, what? Act like a
3    professional adult. Do you have another question?
4    MR. KILPATRICK: Yes, I do.
5    MR. HELFAND: Now's the time to ask.
6    Q   Okay. Mayor Joiner, you saw the document we looked
7    at earlier, the short-term rental application. Correct?
8    A   I did.
9    Q   You saw the words "On Hold," on the front of it.
10   Correct?
11   A   I did.
12   Q   And you saw the words say, "Needs change of
13   occupancy."
14   MR. HELFAND: No. It says, "Needs change
15   OCC."
16   Q   Well, anyone with common sense knows that means
17   change of occupancy, if anyone --
18   MR. HELFAND: Or, maybe, it stands -- Maybe
19   "OCC" stands for something. Again, you're not testifying.
20   Ask questions.
21   MR. KILPATRICK: I'm not asking you a
22   question, and I don't want your side-bar comments, either,
23   but...
24   MR. HELFAND: Well, you -- Here's the thing.
25   You can't make a comment like, "Anyone with common sense

142

1    knows," and then say your opinion of something; and then say,
2    "But I don't want you to tell me what you think about that."
3    Just ask questions like you were in Court.
4    MR. KILPATRICK: And just make objections --
5    MR. HELFAND: Yeah.
6    MR. KILPATRICK: -- in accordance with --
7    MR. HELFAND: I'm telling you right now.
8    MR. KILPATRICK: -- the Rules.
9    MR. HELFAND: Stop speechifying.
10   MR. KILPATRICK: You're -- You're the only one
11   that's still --
12   MR. HELFAND: Do you have another question?
13   MR. KILPATRICK: You done?
14   MR. HELFAND: One more time, and we're walking
15   out the door. Do you have another question?
16   MR. KILPATRICK: Oh, no. Yeah, I do.
17   MR. HELFAND: All right. You do that again,
18   and we're done. You're not going to talk to me like that.
19   That's unprofessional and rude.
20   MR. KILPATRICK: I didn't say anything.
21   MR. HELFAND: Yes, you did. Do you have
22   another question?
23   MR. KILPATRICK: Yes, I do.
24   MR. HELFAND: It's on the record. When you
25   say, "I don't say anything," you're on video, and you're on

143

1    the record of what you said.
2    Okay. Ask your question.
3    MR. KILPATRICK: Oh, I know. Yeah, I know
4    that.
5    MR. HELFAND: Ask your question.
6    MR. KILPATRICK: I paid for it.
7    Q   So, anyway. Sorry for the distraction.
8    MR. HELFAND: Ask your question.
9    Q   Let's see. Get back to where I was.
10   Okay. Did you know that T&W Holdings applied for a
11   permit for the deck with engineered drawings attached to it,
12   and the City still has not issued a permit for that?
13   MR. HELFAND: Excuse me. Object to that.
14   Assumes facts not in evidence.
15   Do you know whether that happened?
16   THE WITNESS: No.
17   Q   Okay. And when you had the -- that meeting at the
18   restaurant with Matt Placek, you didn't tell him that he
19   needed to get a permit for the deck, did you?
20   A   I don't think we got into that level or anything
21   else. Basically, I -- I said before, he wanted to get a
22   meeting together, everybody, and I did that and the meeting
23   didn't happen.
24   MR. HELFAND: And my objection was, assumes
25   facts not in evidence that there was a discussion about the

144

1    need for a permit or the deck at all.
2    Q   And one last question. When making repairs to
3    plumbing that's already been installed in the building,
4    there's no need to have -- have a plan review to make repairs
5    to plumbing. Correct?
6    A   I don't know what the requirements are.
7    Q   You don't know.
8    MR. KILPATRICK: Okay. I'll pass the witness.
9    MR. HELFAND: Thank you. We'll reserve all
10   the rest of our questions for another time. Thank you,
11   Mr. Mayor.
12   THE VIDEOGRAPHER: Ending deposition at
13   5:06 p.m., with Card 3.
14
15
16
17
18
19
20
21
22
23
24
25

READING COPY FOR SIGNATURE